**ZENITH RADIO CORPORATION,**
**Plaintiff,**

v.

**MATSUSHITA ELECTRIC INDUSTRI-AL CO., LTD. et al., Defendants.**

**NATIONAL UNION ELECTRIC CORPORATION, Plaintiff,**

v.

**MATSUSHITA ELECTRIC INDUSTRI-AL CO., LTD. et al., Defendants.**

**In re JAPANESE ELECTRONIC PRODUCTS ANTITRUST LITIGATION.**

Civ. A. Nos. 74–2451, 74–3247.
MDL 189.

United States District Court,
E. D. Pennsylvania.

Dec. 10, 1980.

As Amended Feb. 19, 1981.

---

See also D.C., 505 F.Supp. 1125 and 505 F.Supp. 1190.

Blank, Rome, Comisky & McCauley by Edwin P. Rome, William H. Roberts, John Hardin Young, Arnold I. Kalman, Kathleen H. Larkin, Norman E. Greenspan, Lawrence S. Bauman, Philadelphia, Pa., for Zenith Radio Corporation and National Union Electric Corporation, plaintiffs.

Philip J. Curtis, John Borst, Jr., Glenview Ill., for Zenith Radio Corporation, plaintiff.

Mudge, Rose, Guthrie & Alexander by Donald J. Zoeller, John P. Hederman, Thomas P. Lynch, Howard C. Crystal, Robert A. Jaffe, Shelly B. O'Neill, Mark K. Neville, Jr., New York City, Drinker, Biddle & Reath by Patrick T. Ryan, Philadelphia, Pa., for Tokyo Shibaura Elec. Co., Ltd. and Toshiba America, Inc., defendants; defense coordinating counsel.

Duane, Morris & Heckscher by Henry T. Reath, Terry R. Broderick, Philadelphia, Pa., Crummy, Del Deo, Dolan & Purcell by John T. Dolan, Arnold B. Calmann, Newark, N.J., Baker & McKenzie by Hoken S. Seki, Thomas E. Johnson, Chicago, Ill., for Mitsubishi Electric Corporation and Melco Sales, Inc.

Reid & Priest by Charles F. Schirmeister, Robert J. Lynch, New York City, L. Peter Farkas, Washington, D.C., for Mitsubishi Corporation and Mitsubishi International Corporation, defendants.

Weil, Gotshal & Manges by Ira M. Millstein, A. Paul Victor, Joel B. Harris, Kevin P. Hughes, Robert K. Hood, H. Adam Prussin, Harry M. Davidow, Jeffrey L. Kessler, Stuart Peim, Lenore Liberman, Gavle E. Hanlon, Makoto Matsuo, New York City, Morgan, Lewis & Bockius by Raymond T. Cullen, Philadelphia, Pa., for Matsushita Elec. Indus. Co., Inc., Matsushita Elec. Corp. of America, Matsushita Electronics Corp., Matsushita Elec. Trading Co., and Quasar Electronics Corp., defendants.

Metzger, Shadyac & Schwarz by Carl W. Schwarz, Michael E. Friedlander, William H. Barrett, Stephen P. Murphy, William B. T. Mock, Jr.; Tanaka, Walders & Ritger by Lawrence R. Walders, B. Jenkins Middle-

ton, Washington, D.C., Hunt, Kerr, Bloom & Hitchner by Charles J. Bloom, Philadelphia Pa., for Hitachi, Ltd., Hitachi Sales Corporation of America, and Hitachi Kaden Hanbai Kabushiki Kaisha, defendants.

Wender, Murase & White by Peter J. Gartland, Gene Yukio Matsuo, Peter A. Dankin, Lance Gotthoffer, New York City, Dechert, Price & Rhoads, Philadelphia, Pa., for Sharp Corporation and Sharp Electronics Corporation, defendants.

Whitman & Ransom by Patrick H. Sullivan, Dugald C. Brown, James S. Morris, Kevin R. Keating, Michael S. Press, New York City, Hunt, Kerr, Bloom & Hitchner by Charles J. Bloom, Philadelphia Pa., for Sanyo Elec., Inc., Sanyo Elec. Co., Ltd., Sanyo Elec. Trading Co., Ltd., and Sanyo Manufacturing Corporation, defendants.

Arnstein, Gluck, Weitzenfeld & Minow by Louis A. Lehr, Jr., Stanley M. Lipnick, John L. Ropiequet, Chicago, Ill., for Sears, Roebuck & Co., defendant.

Rosenman, Colin, Freund, Lewis & Cohen by Asa D. Sokolow, Renee J. Roberts, Marc Rowin, Kaye, Scholer, Fierman, Hays & Handler by Joshua F. Greenberg, New York City, Wolf, Block, Schorr & Solis-Cohen by Franklin Poul, Philadelphia, Pa., for Sony Corp. and Sony Corp. of America, defendants.

Kirkland & Ellis by Thomas P. Coffey, E. Houston Harsha, Karl F. Nygren, Chicago, Ill., for Motorola, Inc., defendant.

## OPINION AND ORDER

(Admissibility of Expert Testimony)

*Pretrial Order No. 301*

EDWARD R. BECKER, District Judge.

### TABLE OF CONTENTS

| | Page |
|---|---|
| I. Preliminary Statement | 1319 |
| II. The Applicable Legal Principles | 1321 |
| A. Rule 703 | 1321 |
| 1. The Rule and its Roots | 1321 |
| 2. The Parties' Rule 703 Contentions | 1324 |
| 3. Identity of Decisionmaker Regarding Reasonable Reliance on Underlying Bases for Opinion Testimony | 1325 |
| 4. Standards for Assessing Reasonable Reliance | 1326 |
| B. Rules 702 and 704 | 1330 |

TABLE OF CONTENTS | Page

III. The DePodwin Report 1334
 A. Introduction 1334
 B. Outline of the Economic Analysis 1336
 C. Industry Background Materials 1337
 D. The Japanese Television "Cartel" and Its Operation 1338
 1. Introduction 1338
 2. Conspiratorial Groups 1339
 3. The Manufacturers' Agreements and the Japan Machinery Exporters Association (JMEA) Rules 1343
 4. Information Exchange and Voting 345
 5. Price-Fixing Activities in Japan 1347
 6. Export Reference Prices 1347
 7. Rebates and Kickbacks 1348
 8. Five-Company Rule 1349
 9. Summary 1349
 E. The Price of Japanese Television Receivers in the United States and Japan 1352
 1. Price Comparisons 1352
 2. Appendix B Cost Construction 1356
 a. Cost Equivalency Assumption 1359
 b. The Unit Value Equivalency Assumption 1360
 c. The Operating Profit Equivalency Assumption 1361
 d. The Assumption That No Products were Manufactured for Export to Third Countries 1362
 e. Admissibility With Respect to MEI, Sanyo, Hitachi, and Melco 1363
 F. The Japanese Market Background 1363
 G. Summary of Conclusions 1364
IV. The Yamamura Report 1364
 A. Introduction 1364
 B. The Japanese Market Background 1364
 C. Collusive Activities 1366

TABLE OF CONTENTS | Page

V. The Nehmer Report 1369
VI. The Saxonhouse Report 1376
VII. The Haley Report 1378
VIII. Conclusion 1379

## I. *Preliminary Statement*

This is the third and last in a series of opinions addressing evidentiary issues which were the subject of extensive pretrial evidentiary hearings in this complex antitrust litigation, the scope of which has been amply set forth elsewhere.[1] We address herein the admissibility under Article VII of the Federal Rules of Evidence (F.R.E.) of the critical opinions expressed in five compendious reports, totalling some 2700 pages, submitted by plaintiffs' expert witnesses.[2] The admissibility of all of these opinions is vigorously attacked by defendants. The reports, which set forth the opinions to which the experts are prepared to testify at trial and the bases therefor, were required by pretrial order no. 154, the comprehensive case management order that governs this litigation.[3]

The reports at issue are: (1) "Economic Study of the Japanese Television Industry," by Dr. Horace J. DePodwin, Dr. David Schwartzman, and Marcio Teixeira of Horace J. DePodwin Associates, Inc., an economic consulting firm (the DePodwin Report); (2) "The Pervasive Use of Collusive and Company Group (*Keiretsu*) Activities in Achieving the Rapid Increase of Japanese Exports of Television Receivers to the United States," by Professor Kozo Yamamura, Chairman, Japan Studies Program and Professor of Economics and East Asian

1. The factual background of the litigation is described in the first of our parallel series of opinions addressing various motions for summary judgment. That first opinion served as an introduction to the summary judgment motions and dealt with the question of subject matter jurisdiction. *See Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 494 F.Supp. 1161, 1164–67 (E.D.Pa.1980). The anatomy of the pretrial evidentiary hearings was described in the first opinion in the evidentiary, as opposed to substantive law, series, which also addresses the summary judgment motions. *See* Opinion (Admissibility of Public Records and Reports), Pretrial Order No. 283, 505 F.Supp. 1125, at 1136–1139 (1980). Further background is provided by the second opinion in our evidentiary trilogy. *See* Opinion (Admissibility of Materials Relating to Activities in Japan), Pretrial Order No. 295 (Sept. 29, 1980). These opinions will hereinafter be referred to

as the Public Records Opinion and the Japanese Materials Evidentiary Opinion, respectively.

2. At our request, in order to facilitate consideration of the expert reports, each expert has provided a summary of the primary opinions to which he would testify. Although plaintiffs maintain that a summary cannot effectively portray the scope of the expert's proposed testimony, we find the summaries helpful, and we shall utilize them as a vehicle for our analysis when appropriate.

3. Pretrial Order 154 is published as an appendix to our opinion addressed to the necessity for a jury trial. *See Zenith Radio Corp. v. Matsushita Elec. Ind. Co.*, 478 F.Supp. 889, 948 (E.D.Pa.1979). While the jury trial opinion was subsequently vacated and remanded, 631 F.2d 1069 (3rd Cir. 1980), PTO 154 has not yet been the subject of appellate review.

Studies at the University of Washington (the Yamamura Report); (3) "Economic Analysis of Evidence Relating to Japanese Electronic Products Antitrust Litigation," by Stanley Nehmer of Economic Consulting Services, Inc. (the Nehmer Report); (4) "The Impact of Japanese Financial and Employment Practices on Japanese Production, Marketing, and Price Behavior," by Prof. Gary R. Saxonhouse, Professor of Economics, University of Michigan (the Saxonhouse Report); and (5) "Vertical Restraint by Japanese Television Manufacturers: Anticompetitive Effects," by Professor John Owen Haley, Associate Professor of Law at the University of Washington (the Haley Report).[4]

While defendants' objections to the opinions expressed in these reports implicate a number of evidentiary issues, there are two critical overriding questions. The first relates to F.R.E. 703: we are asked to engage in a line drawing exercise to define what materials, although inadmissible in evidence, are encompassed within those "of a type reasonably relied upon by experts in the particular field." While F.R.E. 703 permits an expert to base his opinion upon materials which would otherwise be inadmissible, it is not clear that the rule cognizes an expert's reliance upon materials which have been independently excluded from evidence by the court by reason of irrelevance or inability to meet one of the hearsay exceptions, because of untrustworthiness or otherwise. Many of the materials which underlie the opinions here under consideration have in fact been ruled inadmissible in our two previous evidentiary opinions. In addition, some of the experts have based portions of their testimony upon advocatory documents such as plaintiffs' Preliminary Pretrial Memorandum, a document of plainly questionable evidentiary reliability. Defendants maintain that such materials may not form the basis for an expert opinion.

Plaintiffs respond that F.R.E. 703 plainly permits an expert's reliance upon inadmissible evidence in forming his opinion, citing

caselaw which explains that one facet of an expert witness's expertise is his ability to sift reliable from unreliable information and to analyze the information before him with full understanding of the extent of its validity. In addition, plaintiffs' experts have submitted affidavits certifying that the information upon which they relied in preparing their reports was of a type generally relied upon by experts in their respective fields.

The second critical issue, which relates to F.R.E. 702, is whether, notwithstanding the provision of F.R.E. 704 permitting an expert witness to testify to an opinion embracing an ultimate issue, the "helpfulness" and "specialized knowledge" requirements of F.R.E. 702 preclude an economist from drawing an inference of the existence of a conspiracy based upon his analysis of evidence in the case coupled with his knowledge of treatises describing the practices and patterns of cartels. Defendants contend that plaintiffs' expert reports are not the business of economists, but of "conspiracyologists": that the experts have strayed beyond their respective spheres of expertise and have invaded the province of the jury by drawing factual conclusions based upon the same evidence which the jury has under consideration. This, suggest defendants, is "lay testimony in experts' clothes," and is impermissible "oath-helping." A related issue is the extent to which the court may consider whether inferences drawn by experts are logical ones, thus excluding expert opinion which the court determines to be illogical (or unreliable), or whether such questions go to the issue not of admissibility but of the weight to be accorded the opinion by the trier of fact. Plaintiffs respond that their experts, with their vast stores of knowledge of economic behavior, are uniquely suited to assist the jury in understanding the evidence before it, and that the conclusion of the existence of a conspiracy is rooted in sound economic theory, plainly within the areas of expertise of these witnesses.

Defendants raise a number of additional objections. They claim that great chunks

---

4. Five additional expert reports referenced in plaintiffs' final pretrial statement, filed with preclusionary effect pursuant to the provisions of pretrial order no. 154, see 478 F.Supp. at 949–50, were not the subject of dispute during the pretrial evidentiary hearings and will not be addressed herein. These reports are an opinion of Milton L. Davies, Certified Public Account-

ant; an opinion with attachments by Morris J. Cohen & Co., Certified Public Accountant; a report of Walter Lukas, Consulting Engineer; a report of Karl Horn and Vito Brugliera, of Zenith Radio Corporation; and an opinion by the Japanese law firm of Braun, Moriya, Hoashi & Kubota concerning the Japanese commodity tax law.

of the experts' reports are entirely irrelevant; they further suggest that even if the reports were deemed to have some minimal probative force, the fact that permissible materials are inextricably interwoven with highly inflammatory, conclusory rhetoric renders them too prejudicial to be admissible by reason of F.R.E. 403. Finally, they argue that Rule 404(a), regarding the inadmissibility of character evidence, prohibits plaintiffs' experts, principally Professor Yamamura, from implying that the Japanese have a "propensity to conspire." We confine ourselves in this opinion to consideration only of the Article VII objections; the relevancy-based objections will be considered in conjunction with our forthcoming opinion disposing of the overall conspiracy summary judgment motions.

Plaintiffs urge that many of these problems would be mooted in the actual trial context, with the give and take of question and answer, and that our consideration of the admissibility of the expert opinions as memorialized in written reports, which were intended not as exhibits to be independently admissible, but as descriptions of the opinions to which they would testify, is premature. We disagree. It is true that some phrasings of an expert opinion might be admissible while others might not be,[5] but the two overriding issues outlined above are properly before us and must be addressed at this time if we are to consider the expert opinions in conjunction with (1) our decision on the pending motions for summary judgment on plaintiffs' conspiracy claims; and (2) our preliminary determination pursuant to F.R.E. 104(a) of the existence *vel non* of sufficient independent evidence of conspiracy to permit plaintiffs' evidence to be admissible against alleged coconspirators under F.R.E. 801(d)(2)(E).

The propriety of our consideration of the expert opinions is clear. First, the provisions of Pretrial Order No. 154 requiring the filing of expert reports are plainly within the case management powers of the court conferred by F.R.Civ.P. 16. Indeed, in a complex case such provisions are salutary and to be encouraged. *See Manual for Complex Litigation* § 2.60. They are espe-cially in order in a case such as this in which there have been monumental discovery problems and in which the court has perceived a pressing need for clarification of plaintiffs' case. Second, plaintiffs themselves wish us to consider the expert opinions, believing them to add substance to their case. Alternatively, consideration of the opinions is necessitated by the fact that plaintiffs' case, or at least a significant portion thereof, is at risk by virtue of the evidentiary rulings made in the first two opinions in this series, and plaintiffs have in effect attempted an "end run" around these rulings by offering expert opinions explicitly based upon the excluded material on the grounds that, although inadmissible, it is nonetheless of a type "reasonably relied upon" by experts in the field.

We note that, in a surprising show of unanimity, both plaintiffs and defendants approach the expert reports as single, complete units. Defendants argue that, because many of the opinions contained in the reports are, in their submission, inadmissible, the entire reports must be excluded. Plaintiffs, similarly, appear to imply that the entire reports may be considered if parts are acceptable. We disagree with this approach. Instead, we shall analyze the reports and extract from them (aided by the summaries provided by the experts) those expressions of opinion which are of significance to plaintiffs' case, making individualized rulings as to admissibility.

Before turning to a detailed analysis of each expert report, we will outline the basic legal principles to be applied.

## II. *The Applicable Legal Principles*

### A. *Rule 703*

#### 1. *The Rule and its Roots*

Federal Rule of Evidence 703 provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the

---

5. Obviously, inflammatory rhetoric and highly conclusory statements, which appear throughout these reports, are never appropriate expert testimony. We understand plaintiffs to agree, for they have steadfastly adhered to the position that questions put to the expert witnesses at trial, as well as the answers by the witnesses, would be carefully framed, and rephrased when necessary, to avoid objection. *See, e. g.,* Pretrial Order No. 281 at 117. We do not find it difficult to ignore the rhetoric and focus instead on the gist of the actual opinions offered.

subject, the facts or data need not be admissible in evidence.

The Rule represents a departure from the common law tradition of restricting the bases for expert testimony to (1) information obtained by the expert's personal knowledge; (2) the hypothetical question, which assumes facts reasonably supported by the evidence; and (3) in some jurisdictions, testimony previously elicited during the trial, with the expert instructed to assume the truth of that evidence and to base his conclusions thereon. *See generally* 3 *Weinstein's Evidence* ¶ 703[01], at 703–4. All of these common law bases remain permissible under Rule 703, but a significant factor has been added: an expert may now testify to an opinion he has formed based on information which is not necessarily admissible into evidence, if that information is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."

That provision grew out of an exception to the hearsay rule which had been employed in a number of jurisdictions. The basis for that hearsay exception was explained by the Fifth Circuit in a case decided while the proposed new federal rules were pending:

> Expert witness testimony is a widely-recognized exception to the rule against hearsay testimony. It has long been the rule of evidence in the federal courts that an expert witness can express an opinion as to value even though his opinion is based in part or solely upon hearsay sources. . . . The rationale for this exception to the rule against hearsay is that the expert, because of his professional knowledge and ability, is competent to judge for himself the reliability of the records and statements on which he bases his expert opinion. Moreover, the opinion of expert witnesses must invariably rest, at least in part, upon sources that can never be proven in court. An expert's opinion is derived not only from records and data, but from education and from a lifetime of experience. Thus, when the expert witness has consulted numerous sources, and uses that information, together with his own professional knowledge and experience, to arrive at his opinion, that opinion is regarded as evidence in its own right and not as hearsay in disguise.

*United States v. Williams*, 447 F.2d 1285, 1290 (5th Cir. 1971), *cert. denied*, 405 U.S. 954, 92 S.Ct. 1168, 31 L.Ed.2d 231 (1972) (citations and footnote omitted). The court noted that the proposed F.R.E. 703 was in accord.

The hearsay exception which evolved into Rule 703 was originally restricted to a limited group of cases. Perhaps the most frequent application was to permit a physician to testify based in part upon information received from nurses, patients, radiologists, pathologists, and so forth. This is the only example, in fact, offered by the Advisory Committee.[6] *See, e. g., Birdsell v. United*

---

**6.** The Advisory Committee Note reads:

Facts or data upon which expert opinions are based may, under the rule, be derived from three possible sources. The first is the firsthand observation of the witness, with opinions based thereon traditionally allowed. A treating physician affords an example. Rheingold, The Basis of Medical Testimony, 15 Vand.L.Rev. 473, 489 (1962). Whether he must first relate his observations is treated in Rule 705. The second source, presentation at the trial, also reflects existing practice. The technique may be the familiar hypothetical question or having the expert attend the trial and hear the testimony establishing the facts. Problems of determining what testimony the expert relied upon, when the latter technique is employed and the testimony is in conflict, may be resolved by resort to Rule 705. The third source contemplated by the rule consists of presentation of data to the expert outside of court and other than by his own perception. In this respect the rule is designed to broaden the basis for expert opinions beyond that current in many jurisdictions and to bring the judicial practice into line with the practice of the experts themselves when not in court. Thus a physician in his own practice bases his diagnosis on information from numerous sources and of considerable variety, including statements by patients and relatives, reports and opinions from nurses, technicians and other doctors, hospital records, and X rays. Most of them are admissible in evidence, but only with the expenditure of substantial time in producing and examining various authenticating witnesses. The physician makes life-and-death decisions in reliance upon them. His validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes. Rheingold, *supra*, at 531; McCormick

*States,* 346 F.2d 775 (5th Cir.), *cert. denied,* 382 U.S. 963, 86 S.Ct. 449, 15 L.Ed.2d 366 (1965); *Jenkins v. United States,* 307 F.2d 637 (D.C.Cir.1962); *cf.* F.R.E. 803(4) (the hearsay exception for statements made for purposes of medical diagnosis or treatment).

A second class of cases in which federal courts have permitted expert testimony based upon hearsay information is that involving land valuation based upon comparable sales. *See, e. g., United States v. 1,516.-90 Acres of Land,* 405 F.2d 913 (6th Cir. 1968), *cert. denied,* 395 U.S. 909, 89 S.Ct. 1752, 23 L.Ed.2d 222 (1969); *United States v. 60.14 Acres of Land,* 362 F.2d 660 (3d Cir. 1966). Judge Weinstein suggests that this exception was created out of necessity. 3 *Weinstein's Evidence* ¶ 703[02], at 703–12. A third category, related to the second, consists of a few cases in which courts permitted experts to testify as to valuation of businesses based upon diverse background sources, including accounting data. *See, e. g., Standard Oil Co. v. Moore,* 251 F.2d 188 (9th Cir. 1957), *cert. denied,* 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958). To the extent that cases permitting expert testimony based upon hearsay information fall into one of these traditional mainstream categories, Rule 703 does not represent the radical departure that some critics had warned against. *See 3 Weinstein's Evidence* § 703[02], at 703–9. Nonetheless, given the potential for open-ended receipt into evidence of testimony based upon information of questionable reliability, it is plain that some limitation on the types of information upon which an expert may rely is essential. This possible problem was recognized by the Advisory Committee, which noted:

> If it be feared that enlargement of permissible data may tend to break down

the rules of exclusion unduly, notice should be taken that the rule requires that the facts or data "be of a type reasonably relied upon by experts in the particular field." The language would not warrant admitting in evidence the opinion of an "accidentologist" as to the point of impact in an automobile collision based on statements of bystanders, since this requirement is not satisfied.

*See* the entire Advisory Committee note, quoted at note 6, *supra.*

Because of the context out of which the Rule arose, (*i. e.,* as an exception to the hearsay rule, *see* pp. 1322–1323, *supra*), the cases which anticipated it can be helpful in determining the practical application of the requirement that an expert testify only to opinions based upon information on which he has placed "reasonable reliance." In *United States v. Aluminum Co. of America,* 35 F.Supp. 820, 823 (S.D.N.Y.1940), Judge Caffey, in allowing expert testimony concerning the results of test drills for bauxite deposits despite a lack of personal involvement in the drilling, explained:

> Opinion testimony by an acceptable expert resting wholly or partly on information, oral or documentary, recited by him as gathered from others, which is trustworthy and which is practically unobtainable by other means, is competent even though the firsthand sources from which the information came be not produced in court. With respect to the matter, in what impresses me as unambiguous authoritative judicial language, it has been said that "the requisites of an exception of the hearsay rule" are "necessity and circumstantial guaranty of trustworthiness." *G. & C. Merriam Co. v. Syndicate Pub. Co.,* 2 Cir. 207 F. 515, 518. [L. Hand, J.] In other words, when hearsay evi-

---

§ 15. A similar provision is California Evidence Code § 801(b).

The rule also offers a more satisfactory basis for ruling upon the admissibility of public opinion poll evidence. Attention is directed to the validity of the techniques employed rather than to relatively fruitless inquiries whether hearsay is involved. *See* Judge Feinberg's careful analysis in *Zippo Mfg. Co. v. Rogers Imports, Inc.,* 216 F.Supp. 670 (S.D. N.Y.1963). See also Blum et al., The Art of Opinion Research: A Lawyer's Appraisal of an Emerging Service, 24 U.Chi.L.Rev. 1 (1956); Bonynge, Trademark Surveys and Techniques and Their Use in Litigation, 48 A.B.A.J. 329 (1962); Zeisel, The Uniqueness

of Survey Evidence, 45 Cornell L.Q. 322 (1960); Annot., 76 A.L.R.2d 919.

If it be feared that enlargement of permissible data may tend to break down the rules of exclusion unduly, notice should be taken that the rule requires that the facts or data "be of a type reasonably relied upon by experts in the particular field." The language would not warrant admitting in evidence the opinion of an "accidentologist" as to the point of impact in an automobile collision based on statements of bystanders, since this requirement is not satisfied. See Comment, Cal.Law Rev.Comm'n, Recommendation Proposing an Evidence Code 148–150 (1965).

dence is offered it is admissible if resort to it be essential in order to discover the truth and if the surroundings persuade the court that the information adduced by the expert as a basis of his opinion is reliable.

The "necessity" element required by Judges Caffey and Hand, drawn originally from 3 *Wigmore on Evidence* §§ 1421–22 and 1690 (1st ed. 1913), *see Alcoa, supra*, at 823, was abandoned by the Ninth Circuit in *Standard Oil Co. of California v. Moore*, 251 F.2d 188 (9th Cir. 1957), *cert. denied*, 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958). In that case, which permitted the testimony of an expert regarding the valuation of a business based upon a variety of background sources, the court focused on the reliability of the underlying information:

> It is common practice for a prospective witness, in preparing himself to express an expert opinion, to pursue pretrial studies and investigations of one kind or another. Frequently, the information so gained is hearsay or double hearsay, in so far as the trier of the facts is concerned. This, however, does not necessarily stand in the way of receiving such expert opinion in evidence. *It is for the trial court to determine*, in the exercise of its discretion, *whether the expert's sources of information are sufficiently reliable* to warrant reception of the opinion. If the court so finds, the opinion may be expressed. If the opinion is received, the court may, in its discretion, allow the expert to reveal to the jury the information gained during such investigations and studies. Wide latitude in cross-examination should be allowed.

*Id.* at 222 (emphasis supplied) (footnote omitted).

Thus it is plain that the "reasonable reliance" requirement of F.R.E. 703 grew from and is cognate with the requirement that information admitted as an exception to the hearsay rule have some circumstantial degree of reliability or trustworthiness. We see the "reasonable reliance" language built into Rule 703 as essentially a shorthand translation of the hearsay rules' trustworthiness element. However, because the evidence before us is far outside the traditional mainstream categories of cases described *supra*, it requires a rigorous application of the general principles enunciated in the cases and by the Advisory Committee.

### 2. The Parties' Rule 703 Contentions

Given the text of Rule 703, the parties to this litigation agree, as they must, that the information which undergirds an expert's opinion need not be admissible into evidence, and that hearsay can be a permissible basis for opinion testimony. Their dispute centers instead upon the extent to which such information may be used and the degree of trustworthiness it must attain. As to trustworthiness, plaintiffs argue, in essence, that an expert may testify to anything related to his field of expertise, and that it is the expert who is best qualified to assess whether the materials which he has utilized are the subject of reasonable professional reliance and hence are sufficiently trustworthy to support an opinion. Defendants counter that the question of "reasonable reliance" is one for judicial determination, and that the court must recognize limits to the amount and type of inadmissible data upon which an expert may rely, making trustworthiness determinations when necessary or appropriate.

Putting their Rule 703 position in the best possible light, plaintiffs point to numerous economic treatises, studies, and articles cited by their experts—presumably admissible under the 803(18) exception to the hearsay rule—which in their submission suffice to render their experts' opinions based in part thereon admissible. Defendants do not quibble over those sources; they point out, however, that in addition to such legitimate bases of information, plaintiffs' experts have canvassed enormous quantities of material proffered in this litigation, much of which has been ruled inadmissible on various grounds in our two previous

evidentiary opinions.[7] Furthermore, the experts had access to, and often cited in their reports, various advocatory documents, such as plaintiffs' preliminary pretrial memorandum (PPTM) and briefs in both this litigation and in other lawsuits.[8] The use of inadmissible or questionable documents was so pervasive, and so many of the experts' assumptions were based wholly on such documents, defendants argue, that their entire opinions are necessarily suspect. Thus in defendants' submission plaintiffs are attempting to import into evidence via the "back door" of their experts' testimony the very evidence already ruled inadmissible, for the underlying basis for the opinion would inevitably be revealed, if not on direct examination, at least upon cross-examination by defendants.[9]

In sum, the primary questions which confront us under Rule 703 are: (1) the identity—the expert or the court—of the ultimate decisionmaker with regard to reasonable reliance on underlying information; and (2) if it is the court, the standards to be used in assessing "reasonable reliance" in a given case.

### 3. Identity of Decisionmaker Regarding Reasonable Reliance on Underlying Bases for Opinion Testimony

As to the first question, our study of the rule and the cases leads us to accept defendants' position. While it is true that some courts have used relatively broad language in describing an expert's ability to choose materials upon which to base his opinion, see, e. g., United States v. Sims, 514 F.2d 147 (9th Cir.), cert. denied, 423 U.S. 845, 96 S.Ct. 83, 46 L.Ed.2d 66 (1975),[10] it is nonetheless plain that courts routinely make the decision whether a particular expert has reasonably based his opinions upon trustworthy underpinnings. See, e. g., Punnett v. Carter, 621 F.2d 578 (3d Cir. 1980); United States v. Genser, 582 F.2d 292 (3d Cir. 1978), cert. denied, 444 U.S. 928, 100 S.Ct. 269, 62 L.Ed.2d 185 (1979); Pittsburgh Press Club v. United States, 579 F.2d 751 (3d Cir. 1978). Accord, S. Saltzburg & K. Redden, Federal Rules of Evidence Manual 426 (2d ed. 1977). The fact that a court may permit certain testimony, finding that a particular expert's opinion was reasonably based, does not imply that the court does not inquire into the trustworthiness of the underlying data. The Advisory Committee, see note 6, supra, plainly contemplated that the trial court, as part of its admissibility judgment, would inquire into an expert's reasonable reliance. Furthermore, because the court under F.R.E. 702 must assess a witness's qualifications in order to permit his testimony, it follows that when an expert deviates from his area of expertise by basing his opinion upon untrustworthy matters, that assessment must similarly be within the province of the court.[11]

We view the question of reasonable reliance to be a preliminary determination of admissibility under F.R.E. 104(a), analogous to the question of qualification of the witness. We do not consider the affidavits

---

**7.** This canvass forms the basis of defendants' major objection under Rule 702 to the effect that the experts, by sifting through the evidence in the case and forming conclusions based thereon, are not assisting the jury but rather usurping its function. This argument will be discussed infra.

**8.** See, e. g., the Nehmer Report at IV–14; Yamamura Report at 128; DePodwin Report at II–20, II–31, et seq.

**9.** Cf. F.R.E. 705, which provides:

The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be re-quired to disclose the underlying facts or data on cross-examination.

**10.** In Sims, the court permitted a psychiatrist to testify regarding defendant's sanity based in part upon conversations with government attorneys and I.R.S. agents, saying: "[y]ears of experience teach the expert to separate the wheat from the chaff and to use only those relied upon by similar experts in arriving at sound opinions on the subject." 514 F.2d at 149.

**11.** Indeed, the court's assessment of the qualifications of an expert witness, which results in a determination of the witness's ability to give certain types of testimony, can be seen to include a determination under Rule 703.

submitted by plaintiffs' experts to the effect that the material upon which they relied in forming their opinions is of a type generally relied upon by experts in their respective fields as in any way determinative of the issue. We deal in this opinion not with a Rule 56 motion, on which the affidavits could potentially be viewed as attempts to create a material factual issue; rather, we have before us a pretrial evidentiary objection under F.R.E. 104(a), pursuant to which we must sift the relevant factors in arriving at a conclusion. We will thus undertake an independent analysis of the trustworthiness of the data underlying the expert opinions in this litigation.

Our conclusion that the judge must be the ultimate arbiter of the reliability of materials upon which an expert witness bases his opinion is congruent with the principles developed previously in this litigation for the admission of public records and reports under F.R.E. 803(8)(C). *See* Public Records Opinion, 505 F.Supp. 1125, at 1143–1150. Moreover, any other result would open the door to the wholesale admission of otherwise inadmissible evidence before the jury, not, to be sure, as probative of the truth, but to explain the basis of the expert's opinion. Such a result could not have been contemplated by the rule.[12] We turn then to the standards to be employed in making the Rule 703 judgment.

### 4. *Standards for Assessing Reasonable Reliance*

The case law under F.R.E. 703 is not particularly enlightening on the subject of standards to be employed in assessing an expert's reliance. Defendants do not dispute that the cases cited by plaintiffs were correctly decided. *United States v. Genser,*

582 F.2d 292 (3d Cir. 1978), *cert. denied,* 444 U.S. 928, 100 S.Ct. 269, 62 L.Ed.2d 185 (1979), for example, permitted an I.R.S. agent to testify in a criminal tax evasion conspiracy case based in part upon his own examination of defendants' records and in part upon an audit conducted by other agents. Similarly, the court in *Bauman v. Centex Corp.,* 611 F.2d 1115 (5th Cir. 1980), a securities fraud action, admitted the testimony of an accountant who based his opinion on information gleaned from defendants' files and financial statements, his own background and experience as a CPA and management consultant, and "all available information in [the University of Houston] library." These cases are within the mainstream of the Rule as it was conceived by the Advisory Committee, described *supra.* Similarly, *United States v. Williams,* 447 F.2d 1285 (5th Cir. 1971), *cert. denied,* 405 U.S. 954, 92 S.Ct. 1168, 31 L.Ed.2d 231 (1972) (*en banc*), discussed *supra* at 1322, dealt with the valuation of oil and gas properties based upon various records of, *inter alia,* the companies' prices, operating costs, well records, and past production performance. This extension is a logical outgrowth of the traditional exception to the hearsay rule for expert opinion concerning land valuation. *See United States v. 60.14 Acres of Land,* 362 F.2d 660 (3d Cir. 1966); *Standard Oil Co. v. Moore,* 251 F.2d 188 (9th Cir. 1957), *cert. denied,* 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958).[13]

All of these cases present a picture of an expert testifying to an opinion formed on the basis of a number of sources, some of them hearsay, but all of them either intimately connected with his immediate sphere of expertise, such as in the co-worker audit of the *Genser* case, or upon unques-

---

12. We note that virtually the same result could be reached under F.R.E. 403 by excluding the expert testimony on the grounds that admission of the underlying basis, when otherwise inadmissible, would amount to unfair prejudice. Rule 403 might be an alternate basis for exclusion of a number of expert opinions addressed (and excluded) herein, but we shall not reach it.

13. Plaintiffs also cite the equally uncontroversial mainstream cases of *United States v. Gold-*

en,* 532 F.2d 1244 (9th Cir.), *cert. denied,* 429 U.S. 842, 97 S.Ct. 118, 50 L.Ed.2d 111 (1976), in which a special agent was permitted to testify to the market price of heroin based upon information received from other narcotics agents; *Frazier v. Continental Oil Co.,* 568 F.2d 378 (5th Cir. 1978), which found it appropriate for a civil engineer to testify as to an industry's standard of care based in part upon publications such as safety codes; and *United States v. Sims, supra* note 10.

tionably permissible documentary research materials.[14] In none of these cases were the courts faced with the question facing us, whether matters offered into evidence but excluded by the court may properly serve as fodder for an expert's opinion.

The Advisory Committee note to Rule 703 offers little more guidance, pointing out merely that the requirement of reasonable reliance by experts in the field would prevent undue expansion of the rule. *See* note 7 *supra.* By way of example, the Committee points out that an "accidentologist" who attempted to testify as to the point of impact of a collision would not meet the "reasonable reliance" requirement if he based his testimony on the statements of bystanders. Defendants, as we have noted, suggest that the experts in this case are "conspiracyologists" attempting to testify in a similarly impermissible manner.[14a]

Turning then to cases cited by defendants, *Pittsburgh Press Club v. United States*, 579 F.2d 751 (3d Cir. 1978), could conceivably be read as holding that if the foundation for expert testimony is held to be unreliable, the expert testimony itself is *a fortiori* excludable. *Pittsburgh Press* involved a survey, which was excluded because its methodology was unsound—"neither objective, scientific, nor impartial." 579 F.2d at 759. With regard to the testimony of an economist/statistician and an accountant, the court continued:

> The survey—which we have just held to be inadmissible—was the foundation for certain of the plaintiff's exhibits, and for much of Dr. Kenkel's testimony. Since this second survey should have been excluded, it follows that the evidence based on the survey should have been excluded as well. In particular, Dr. Kenkel's determinations as to amount of outside income and the percentage of gross receipts attributable to outside affairs could not have been admitted into evidence once the foundation for that testimony was excluded. For the same reason, the exhibits prepared by PPC's accountants and the testimony of accountant Di Mario, respecting the Club's net profits attributable to outside business, should not have been admitted into evidence.

*Id.* at 760.

This language—and it is from a Third Circuit opinion—is extremely supportive of defendants' position, and corroborates our thesis that 703's roots are in the hearsay notions of trustworthiness and reliability. However, we decline to read the *Pittsburgh Press* language so broadly as to automatically exclude from an expert's consideration all matters which have been excluded from evidence at trial. In *Pittsburgh Press*, the expert economist/statistician had participated in the preparation and execution of the survey found to be unreliable. His calculations and exhibits, as well as those of the accounting expert, were extrapolated virtually entirely from that unreliable survey. But while the special factual context and the lack of any specific language make us skeptical that the Third Circuit intended to create any *per se* rule of exclusion in *Pittsburgh Press*, the case does plainly demonstrate that certain materials, excludable at trial because of unreliability, are impermissible bases for an expert's opinion, despite the fact that the expert himself may have deemed them reliable.[15]

---

14. Defendants have suggested that the underlying information in these traditional cases is at least potentially admissible. The exception to permit an expert's reliance on such hearsay can then be seen as a matter of convenience to avoid the presentation of authenticating witnesses. *See* transcript, PTO 281, at 112–13. There may be merit in this suggestion.

14a. We deem the Advisory Committee to have used the term "accidentologist" to mean a qualified accident reconstructionist. To the extent, however, that the term may be interpreted to convey opprobrium, it may have the unfortunate result of creating confusion between Rules 702 and 703.

15. Plaintiffs have suggested that this inquiry amounts to an unfair retroactive application of our evidentiary rulings, but that suggestion is plainly without merit. First, plaintiffs' counsel, who supplied the experts with the bulk of the materials upon which they relied, knew that those materials would be subject to evidentiary review, for the materials had already been challenged in submissions by defendants. More-

*Pittsburgh Press* is the only case we have found which deals directly with an opinion based upon information actually tendered as evidence at trial. The cases cited by plaintiff and discussed *supra* involved identifiable bases of information, concededly hearsay for the most part, which were never independently proffered in evidence. A number of cases urged upon us by defendants deal with a different class of expert opinion altogether—cases in which the expert opinion was excluded because it was based upon faulty assumptions or unfounded conclusions. *See Punnett v. Carter,* 621 F.2d 578 (3d Cir. 1980); *Drayton v. Jiffee Chemical Corp.,* 591 F.2d 352 (6th Cir. 1978); *Bryan v. John Bean Division,* 566 F.2d 541 (5th Cir. 1978); *Merit Motors, Inc. v. Chrysler Corp.,* 569 F.2d 666 (D.C.Cir.1977); *Scheel v. Conboy,* 551 F.2d 41 (4th Cir. 1977); *Berguido v. Eastern Air Lines, Inc.,* 317 F.2d 628 (3d Cir.), *cert. denied,* 375 U.S. 895, 84 S.Ct. 170, 11 L.Ed.2d 124 (1963); *Tabatchnick v. G. D. Searle & Co.,* 67 F.R.D. 49 (D.N.J.1975). The theory of these cases appears to be that a reasonable expert would not rely on unsupported assumptions in forming his opinion, and that an opinion so based must be excluded.

These cases arose in a variety of procedural contexts—some on review of trial proceedings, some on review of summary judgment proceedings, and one (*Punnett v. Carter*) on review of denial of a preliminary injunction. It is frequently unclear whether the court is making a judgment as to admissibility, or whether it is deciding whether the expert testimony raises a material factual issue under F.R.Civ.P. 56 (although that would have to result from admissible evidence, *see* Rule 56), or whether it is making a judgment on an abuse of discretion standard. Even when the issue is plainly admissibility, it is not always clear

what rule is used as the basis for the court's decision. For example, as alternative theories, some courts deem an opinion based on unsupported assumptions to be unhelpful to the jury under F.R.E. 702, discussed *infra,* or to be so misleading as to be excludable under F.R.E. 403, instead of being unreliably based under F.R.E. 703. In any event, all of the above-cited cases refuse to countenance expert testimony based upon what the courts determine to be unreasonable assumptions. Despite the variety of procedural contexts and variety of F.R.E. pigeonholes, they indicate that the assumptions which form the basis for the expert's opinion, as well as the conclusions drawn therefrom, are subject to rigorous examination. We turn to a brief discussion of these cases.

In *Merit Motors, supra,* one of the more thoroughly reasoned of the cases cited, plaintiffs had attempted to prove antitrust injury by way of an expert report detailing the "inherent" economic effects of defendants' system. Defendants attacked the expert's theories on their motion for summary judgment, arguing that the theories were "abstract speculation" and that the expert was, by his own admission, unfamiliar with the record of the case. The district court agreed, dismissing the expert's theory "since his opinion [was] unsubstantiated by any evidence in the record." 569 F.2d at 672, *quoting* 417 F.Supp. at 272. On appeal, the D.C. Circuit, in an opinion by J. Skelly Wright, J., affirmed, observing:

> Even Rule 703 requires that the grounds relied on by an expert must be "a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." While appellants claim that Staelin has merely applied "standard economic theory" to "a factual basis which is uncontroverted," it is obvious that [the expert] makes unsup-

---

over, since plaintiffs eschewed the taking of depositions to establish evidentiary foundation, they knew, or should have known, that the risk of exclusion was high. But the major reason that this argument lacks merit is because we are not applying our evidentiary rulings retroactively at all. As discussed *supra* in our analysis of F.R.E. 703, our exclusion of certain materials from evidence on trustworthiness

grounds is one of a number of factors to be taken into consideration in determining whether the foundation for an expert's opinion is reliable. To suggest that use of this factor constitutes retroactive application of our rulings is to imply that an expert may be given *carte blanche* to decide what materials he may reasonably rely upon, a proposition which we rejected *supra.*

ported assumptions about the elasticities of demand in various markets and that he virtually ignores the impact of the dominant forces in the automobile market: General Motors and Ford.

569 F.2d at 673 (footnotes omitted).[16]

*Punnett v. Carter, supra,* the most recent Third Circuit discussion of the topic, arose on a motion for a preliminary injunction, and so is not strictly applicable to the present litigation. In that case, which requested relief for alleged mutagenic dangers stemming from nuclear testing in Nevada in the 1950's and 1960's, radiation dosage levels were pivotal to a showing of likelihood of success on the merits. After analyzing the expert's testimony, the district court had concluded that the assumptions upon which the expert relied were not supported by the evidence or by the methodology. The Third Circuit upheld the district court's refusal to grant the injunction because of the unconvincing nature of plaintiffs' scientific evidence. There was no reference to the rules of evidence, for admissibility was not at issue. Nonetheless, the case demonstrates a willingness in this circuit to question expert assumptions and to disregard them when appropriate.

In *Berguido v. Eastern Air Lines, Inc., supra,* a pre-F.R.E. wrongful death action in this circuit, experts testified to their opinions as to the behavioral character of the plane's pilot (in particular, degree of risk and intent to violate regulations), based upon assumptions presented in a hypothetical question. The assumptions had been drawn from the report of the CAB investigating team, which was in turn based upon calculations by an engineer not before the court. Because it was revealed that the engineer must have made "certain assumptions and choices relative to the physical facts found at the crash scene before he could reach the final computation state," 317 F.2d at 632, and because he was not available for cross-examination to test the basis of his computations, it was held to have been prejudicial error to have permitted the second expert to base his conclusions upon those calculations.

*Bryan v. John Bean Div., supra,* similarly addressed a situation in which the testifying expert relied upon reports of non-testifying experts. The expert in that products liability case had utilized the data reported by another, but had reached a contrary conclusion. The court held that cross-examining counsel's extensive impeachment use of the written conclusions of the previous expert, who did not testify, was impermissible despite F.R.E. 705, although the expert's use of the underlying data was apparently proper. While basing its decision primarily on lack of trustworthiness, the court noted in passing that the jury's attention could have been drawn to the reports by bringing those experts before the court.

*Tabatchnick v. G D Searle & Co., supra,* refused to permit an expert to testify when he expressed bare conclusions based in part upon "facts" contradicted by the record. *Drayton v. Jiffee Chemical Corp., supra,* and *Scheel v. Conboy, supra,* both rejected economists' damage calculations as based on unreasonable or speculative assumptions.

■ We believe these cases to have been soundly decided, but all were decided on

16. *Merit Motors* is also important to this case for its comments regarding the relationship between expert opinion testimony and summary judgment. Bracketing the portion quoted in text, the court stated:

On appeal appellants attempted to salvage their expert's opinion by relying on cases applying Rule 703 of the Federal Rules of Evidence, adopted in 1975. This rule was intended to broaden the acceptable bases of expert opinion, but it was not intended, as appellants seem to argue, to make summary judgment impossible whenever a party has produced an expert to support its posi-

tion. . . . To hold that Rule 703 prevents a court from granting summary judgment against a party who relies solely on an expert's opinion that has no more basis in or out of the record than Staelin's theoretical speculation would seriously undermine the policies of Rule 56.

569 F.2d at 672–73 (footnotes omitted). We shall have occasion to discuss this point again when we address the question whether the expert reports create a genuine issue of material fact in our forthcoming opinion addressing defendants' motions for summary judgment as to plaintiffs' conspiracy claims.

their individual factual patterns and none provide us with a conceptual framework for assessing reasonable reliance. Drawing on these cases, on Rule 703 itself, on the Advisory Committee Note, and on the history of the Rule, including the pre-Rules cases, we have concluded that the following factors should guide our determination as to the reasonableness of reliance in cases outside the "mainstream" of Rule 703 as we have explained it:

1. The extent to which the opinion is pervaded or dominated by reliance on materials judicially determined to be inadmissible, on grounds of either relevance or trustworthiness;

2. The extent to which the opinion is dominated or pervaded by reliance upon other untrustworthy materials;

3. The extent to which the expert's assumptions have been shown to be unsupported, speculative, or demonstrably incorrect;

4. The extent to which the materials on which the expert relied are within his immediate sphere of expertise, are of a kind customarily relied upon by experts in his field in forming opinions or inferences on that subject, and are not used only for litigation purposes;

5. The extent to which the expert acknowledges the questionable reliability of the underlying information, thus indicating that he has taken that factor into consideration in forming his opinion; [17]

6. The extent to which reliance on certain materials, even if otherwise reasonable, may be unreasonable in the peculiar circumstances of the case.

We add that if, for example, an inadmissible document were one of a myriad of sources consulted by an expert, and if it were clear that the expert was cognizant of and took into consideration the questionability of that lone source, the opinion would likely be admissible. If, on the other hand, the expert's opinion is so dominated or pervaded by his reliance on materials which have been excluded for reasons which bear on their reliability, or is rife with similarly unreliable unsupported conclusions, having no support in the record, that opinion must also be excluded. In short, it is a balancing process. We will thus examine the sources of plaintiffs' expert opinions with these factors in mind, and will exclude those portions which prove to be pervaded with reliance upon unreliable sources.

We turn to the issues presented under F.R.E. 702 and 704.

## B. *Rules 702 and 704*

The parties are also in sharp dispute over the proper interpretation of Rules 702 and 704. F.R.E. 702, which for the most part codifies existing common law, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The foundation of this basic rule concerning expert testimony is that testimony must be helpful to the jury. As defined by the Advisory Committee, the helpfulness inquiry is " 'whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute,' " *quoting* Ladd, *Expert Testimony*, 5 Vand.L.Rev. 414, 418 (1952). The rule thus expands slightly the practice of most jurisdictions of permitting expert testimony only when the subject matter was otherwise beyond lay comprehension. *See generally* S. Saltzburg & K. Redden, *Federal Rules of Evidence Manual* 413 (2d ed. 1977). Another expansion from the common law is the final "or otherwise" clause, which permits an expert not only to render an opinion, but, as described by the Advisory Committee, to

---

17. We would limit applicability of this criterion to close cases of admissibility. An expert who was a true "hired gun" could always surmount it.

"give a dissertation or exposition of scientific or other principles relevant to the case" as well. This would leave the trier of fact to apply the principles to the facts as they develop and obviate the need for a hypothetical question. Of course, the dissertation or exposition must still meet the "helpfulness" standard that is central to the rule.

In addition to helpfulness, F.R.E. 702 requires that an expert witness be qualified by scientific, technical, or other specialized knowledge. Without such specialized knowledge, his testimony would not be helpful to the jury. For example, if the expert's qualifications are suspect, he would be no better than the average juror at interpreting matters upon which his expertise is expected to bear. Similarly, if no specialized knowledge is needed, the jury will not be assisted by expert testimony which merely tracks the same analytical process which they as jurors are capable of carrying out.

Under the common law, no witness could testify to matters which would usurp the province of the jury by expressing an opinion on the ultimate issue in the case. Following a growing trend to permit such testimony when it is helpful, the "ultimate issue" rule was abolished for the federal courts in Rule 704:

> Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

The framers of the rule had in mind testimony on such questions as sanity, testamentary capacity, intoxication, speed, and value. *See* Advisory Committee Note to Rule 704. Because of the plain language of the Rule, it cannot be disputed that testimony concerning the ultimate issue in the case is permitted only if otherwise admissible. Ultimate issue testimony which does not assist the trier of fact is not rendered magically admissible by Rule 704; rather, if such testimony is helpful, it is no longer automatically excluded under the common law. Indeed, even helpful ultimate issue testimony is not automatically admissible. As explained by the Advisory Committee:

> The abolition of the ultimate issue rule does not lower the bars so as to admit all opinions. Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day. They also stand ready to exclude opinions phrased in terms of inadequately explored legal criteria.

Defendants in this litigation do not dispute that, in an appropriate case, an expert witness may opine on an ultimate issue. They argue, however, that in this instance, plaintiffs' experts have gone beyond the types of testimony contemplated by the Rule and have entered the province of "oath-helping" by merely interpreting the evidence which will be before the factfinder, explaining, in effect, what result should be reached. Plaintiffs counter that testimony on an ultimate issue is plainly admissible and that their experts' specialized knowledge will indeed help the factfinder to interpret the evidence before it. Thus, as we see these arguments, there is no real issue under Rule 704 in this case; instead, we are asked to determine, pursuant to Rule 702, whether (a) these experts' reports do provide "scientific, technical, or other specialized knowledge"; [18] and (b) whether that specialized knowledge will assist the jury, or whether it invades the jury's function and becomes "oath-helping."

Standards for determining whether particular expert testimony will assist the jury

---

**18.** At this time there is no challenge to the professional qualifications of the experts. The question is whether they have utilized that expertise in the preparation of their reports, or whether they have gone beyond the realm of that expertise and drawn impermissible legal conclusions or presented what are in actuality lay interpretations of the documents in the case.

have not, to our knowledge (and indeed could not have) been developed with any precision beyond what was described by the Advisory Committee, quoted *supra*. Rather, courts have necessarily approached the question on an *ad hoc* expert-by-expert basis. Nonetheless, the cases which have considered the question are instructive insofar as they define the contours of the types of information which are considered helpful to the trier of fact.

It has been held that it is helpful to a jury for an expert to interpret jargon or methodology peculiar to particular enterprises, and for the expert to form an opinion as to a given defendant's role in the operation based upon evidence in the record. *See United States v. Scavo*, 593 F.2d 837 (8th Cir. 1979) (gambling); *United States v. Milton*, 555 F.2d 1198 (5th Cir. 1977) (gambling); *United States v. Jackson*, 425 F.2d 574 (D.C.Cir.1970) (pickpockets). Similarly, expert testimony was permitted in *United States v. Jenson*, 608 F.2d 1349 (10th Cir. 1979) (securities fraud action), to interpret certain rules of the National Association of Security Dealers, including the effect of these rules on certain computations. Because the rules were the private rules of a self-regulating association, their interpretation was held not to be a legal conclusion within the province of the court, and was helpful to the jury.

On the other hand, expert testimony was excluded in *Marx & Co. v. Diners Club, Inc.*, 550 F.2d 505 (2d Cir.), *cert. denied*, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977). In that case, also involving securities fraud, an expert on securities law testified as to the legal construction of the contract at the heart of the action, and expressed his opinion as to the reasonableness of defendants' behavior.[19] In ruling that the testimony was erroneously received, the Second Circuit took the time to discuss generally the

types of expert opinion appropriate in a complex case. In *Marx* the expert would have been competent to explain to the jury, under the "or otherwise" clause of F.R.E. 702, the customary practices followed in registering an issue of stock with the SEC. He could not testify, however, as to the legal consequences he believed could be derived from an acquisition contract, for it is for the court, not a witness, to instruct the jury as to applicable legal principles. Furthermore, the expert was qualified only as an expert in securities regulation; contract law was held to be outside his area of expertise. Perhaps most damaging, the expert had testified that defendant had no legal excuse for nonperformance of the contract, basing his conclusion on his examination of documents and correspondence which were before the court. The Second Circuit held this testimony to be superfluous, and continued:

> As Professor McCormick notes, such testimony "amounts to no more than an expression of the [witness'] general belief as to how the case should be decided." *McCormick on Evidence*, § 12, at 26–27. The admission of such testimony would give the appearance that the court was shifting to witnesses the responsibility to decide the case. *McCormick on Evidence*, § 12, at 27. It is for the jury to evaluate the facts in the light of the applicable rules of law, and it is therefore erroneous for a witness to state his opinion on the law of the forum.

550 F.2d at 510. Finally, the court warned against allowing jury trials in intricate cases to become "battles of paid advocates posing as experts on the respective sides concerning matters of domestic law." *Id.* at 511.

In *United States v. Fosher*, 590 F.2d 381 (1st Cir. 1979), a criminal action, defendant sought to introduce expert testimony con-

---

**19.** Defendant Diners Club had acquired the assets of plaintiff's company in return for unregistered Diners stock and other consideration pursuant to an agreement which provided that, upon notification from plaintiffs of a desire therefor, Diners would file a registration statement for the stock and would use its "best

efforts" to cause the registration statement to become effective. Plaintiffs contended, *inter alia*, that defendants had failed to use their best efforts to make the registration effective as part of a manipulative scheme to prevent plaintiffs from offering their shares for sale, to plaintiffs' detriment.

cerning the unreliability of eye-witness testimony. The Court upheld the trial court's refusal to permit the testimony, pointing out that issues of credibility are traditionally jury matters, and that a jury, aided by the traditional cautionary instruction, is perfectly capable of assessing an eyewitness's ability to perceive and remember without scientific testimony on matters such as the rate of memory decay. In short, the subject matter was not sufficiently beyond the ken of lay jurors to justify introduction of material of questionable scientific validity with potentially prejudicial effect.

Similarly, the court in *United States v. Pacelli*, 521 F.2d 135 (2d Cir. 1975), *cert. denied*, 424 U.S. 911, 96 S.Ct. 1106, 47 L.Ed.2d 314 (1976), refused to permit a psychiatrist to testify that the major prosecution witness was psychopathic and incapable of telling the truth. The testimony would not have been helpful to the jury, which already knew about the witness's bizarre behavior and status as an accomplice. These facts were held to be enough to permit the jury to assess credibility, for even the psychiatrist admitted that twelve average people would recognize that the witness's testimony must be carefully reviewed. *Cf. United States v. Collins*, 395 F.Supp. 629 (M.D.Pa.), *aff'd mem.*, 523 F.2d 1051 (3d Cir. 1975), *cert. denied*, 423 U.S. 1060, 96 S.Ct. 797, 46 L.Ed.2d 651 (1976) (expert testimony on reliability of eyewitnesses excluded on relevancy grounds).

In *Webb v. Fuller Brush Co.*, 378 F.2d 500 (3d Cir. 1967), a pre-F.R.E. case, a physician was not allowed to testify to his opinion whether a jar of cream should have contained a warning, for once the facts regarding the cream's dangerous character were in evidence, the jury needed no expert guidance in reaching a further conclusion.

And, in a copyright infringement suit brought by the sons of Ethel and Julius Rosenberg over quotation of their parents' letters, expert testimony by literary authorities concerning the qualitative impact of the letters on the quoting publication, a question relevant to the fair use issue, was held to be unhelpful to the jury in its deliberations. The jury was held to be "fully competent to understand the subject matter of the work and to evaluate the qualitative importance of certain materials to the presentation of that subject," especially in this "famous and controversial" context. *Meeropol v. Nizer*, 417 F.Supp. 1201, 1211 (S.D.N.Y.1976), *aff'd in part and rev'd in part on other grounds*, 560 F.2d 1061 (2d Cir. 1977), *cert. denied*, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978).

The cases discussed under F.R.E. 703, *supra* at 1328–1330, which refused to accept expert opinion based upon faulty assumptions and unfounded conclusions, are also instructive in this context.

Although the case law is limited, and adds little beyond examples to the Advisory Committee Note and the Rule itself, it makes several things plain. First, expert opinion must be approached on an expert by expert, or even opinion-by-opinion, basis, and the court must, as with the data underlying an expert opinion discussed *supra*, carefully examine each opinion offered by the expert to assess its helpfulness to the jury. Second, while it is not immediately obvious whether the inquiry should proceed under F.R.E. 702, 703, or 403,[20] it is clear that the court may—indeed must—carefully scrutinize the underlying assumptions, inferences drawn, and conclusions reached by the experts before reaching a decision on admissibility of the expert's opinion. Opinions which contain inferences which cannot logically be drawn are no more helpful to the jury than are opinions based upon unreliable information. Third, and of critical importance here, opinions do not assist the jury when they are cumulative of evidence already before the jury, or when the expert has sifted through that evidence reaching a

---

**20.** It has also been suggested that the inquiry could proceed under F.R.E. 401, for opinions with faulty assumptions, inferences, or conclusions arguably have no "tendency to make the existence of any fact" in issue more probable than not, and are hence irrelevant. If that were true, however, F.R.E. 703's helpfulness requirement would be rendered largely superfluous.

conclusion which in essence attempts to tell the jury how it should decide the case. Rather, the expert must utilize specialized knowledge, not ordinarily possessed by the layman, to reach an opinion which truly aids the jury in understanding the evidence or in determining a fact in issue.[21] We think one of the best expressions of this principle is contained in Stern, *Toward a Rationale for the Use of Expert Testimony in Obscenity Litigation*, 20 Case Western L.Rev. 527, 546 (1969): "The expert should strive to instruct the court *in the ways of his work*, whether it be psychology, literature or whatever, and to explain the nature of the judgments made in that work" (emphasis added). We shall refer to this formulation from time to time.

If, as defendants contend, the expert opinions in this litigation stem merely from a rehash of the evidence already before the trier of fact without adding a component of expertise, *i. e.*, without instructing the trier of fact "in the ways of his [the expert's] work," those portions will be found inadmissible because they are the unhelpful "oath-helping" of a "conspiracyologist." If, on the other hand, the experts' economic sophistication enables them to explain the evidence to the jury in a permissible manner otherwise beyond the jury's sphere of knowledge, the opinion would be admissible. We note that expert testimony may not be used merely to interpret a factually complex record. The test for admissibility of an expert's opinion turns not on complexity but on the subject matter of the opinion, *i. e.*, on whether the expert's specialized knowledge enhances the jury's understanding.

The task of the court is to sift through the reports, parsing out those portions which will aid the jury. We reiterate that we are not considering the admissibility of these reports *qua* reports as documents to be admitted into or excluded from evidence. Rather, we are assessing the admissibility of the key opinions expressed in the reports, purged of their rhetoric and stylistic devices, as though they were being carefully framed at trial.[22] We turn first to the report prepared by DePodwin Associates, Inc.

### III. *The DePodwin Report*

#### A. *Introduction*

The DePodwin Report,[23] "Economic Study of the Japanese Television Industry," is by far the most careful, scholarly, and disinterested of the reports submitted by the plaintiffs' expert witnesses.[24] The meat

---

**21.** As discussed *supra*, relevance issues, including those of unfair prejudice and waste of time under F.R.E. 403, will be deferred for consideration until the opinion addressing the issue of conspiracy.

**22.** We do not intend to consider all the opinions expressed in the reports. Rather, we will restrict our inquiry to those opinions germane to the summary judgment motion and the 104(a) determination on the conspiracy claims.

**23.** Dr. Horace J. DePodwin is president of Horace J. DePodwin Associates, Inc., a team of industrial economists. He holds a Ph.D. in economics from Columbia University, and is Dean of the Graduate School of Business Administration at Rutgers University. He was also consultant to the U.S. in the General Agreement on Tariffs and Trade (G.A.T.T.) negotiations and chairman of the Business-Economics Section of the American Statistical Association. He has published widely and has served frequently as an expert witness in various antitrust and trade matters.

Also contributing to the DePodwin report were Dr. David Schwartzman and Marcio Teixeira. Dr. Schwartzman holds a Ph.D. in economics from the University of California at Berkeley. He has held numerous teaching and consulting positions in the United States and Canada, and has published widely. The record contains no biographical data on Mr. Teixeira.

**24.** By its very phraseology, this comment is comparative in nature. However, we refer herein only to the report, and not to the lengthy affidavit filed by Dr. DePodwin on September 23, 1980. This affidavit is in the nature of a point by point refutation of contentions raised by defendants during argument of the summary judgment motions, with, on some points, a total change of theory. We will comment upon the substance of the affidavit in our opinion on the sufficiency of plaintiffs' conspiracy claims. What is noteworthy here is its tenor and its style, for the affidavit does not present an economist's opinion; rather, it is a lawyer's brief. As such it not only demeans itself, but also calls into question the objectivity of the re-

of the three-volume report appears in Volume I. Volume II is a statistical appendix, and Volume III is a compilation of damage calculations for plaintiff National Union Electric Corporation.[25] As described in the introduction, the report "presents the preliminary results of a continuing economic study of the Japanese television industry undertaken at the request of plaintiffs' counsel" in this litigation. The study focuses on:

> the unusual sales increases achieved by the defendants in the United States market. It seeks to determine how the growth and development of Japanese television sales in the United States were related to the agreements and arrangements among Japanese producers, United States importers and mass merchandisers, distributors and others. In particular, the study seeks to determine whether certain restrictive trade practices engaged in by the defendants and others resulted from concerted activity, and whether they constituted an unreasonable restraint on the trade and commerce of the United States. Additionally, the study seeks to determine the economic significance and impact of pricing practices on the marketing of television receivers in the United States and in Japan by the Japanese television manufacturers and their affiliates, [and] whether the use of restrictive trade practices by them represented the exercise of concerted market power with the intention of affecting the United States industry.

DePodwin Report at I–1. Finally, the study assesses the injury to and damages incurred by plaintiff NUE.

The first thing that strikes one about the stated objectives of the DePodwin study is the concern with determining the existence of a conspiracy and of conspiratorial intent. Those are not the kinds of concerns one thinks of at first blush as being within an economist's purview. We merely note this point now, reserving fuller consideration for later, and turn to an equally disconcerting matter, the fact that the report begins with a number of assumptions which are themselves matters of dispute among the parties. For example, the report assumes the existence of agreements among the Japanese manufacturers, as well as the existence of certain restrictive trade practices.[26] These introductory comments serve as a warning to the reader to be wary of unsupported assumptions while proceeding through the report.

As described by DePodwin in his summary submitted in connection with the evidentiary hearings, see note 2, supra, the principal conclusion which he reached is that

> by means of a broad range of anticompetitive practices, Japanese manufacturers of television receivers, particularly the defendants, succeeded in gaining a large share of the United States market. To achieve this objective, they carved out a substantial portion of that market and proceeded to saturate it with sales promoted through a variety of anticompeti-

mainder of Dr. DePodwin's work, raising questions as to whether he is in fact acting as an economist or as an advocate. We note with reference to Dr. DePodwin's credibility that all inferences must be taken in favor of plaintiffs in our consideration of the summary judgment motions. That is not the case, however, with the determination to be made as to the sufficiency of plaintiffs' proof of conspiracy under F.R.E. 104(a).

25. We will not reach issues relating to damages at this stage of the litigation.

In addition to the three-volume report and the recent affidavit discussed in note 24, supra, Dr. DePodwin submitted an affidavit in August 1980 clarifying his position with regard to cer-

tain price differentials originally set out in Appendix B to Chapter VI of his report. The August 1980 affidavit was filed in response to an affidavit submitted in May by Kenji Yamagishi, a Matsushita employee, which had taken issue with DePodwin's assumptions. These matters are discussed at 1356–1363, infra.

26. Whether these assumptions amount to bias is a question to be considered by the trier of fact, after cross-examination, as it assesses the weight to be given an expert's opinion. One must acknowledge that some built-in bias is an inevitable by-product of the use of expert testimony in an adversarial process.

tive devices, all the while "respecting" each other's territory.

\* \* \* \* \* \*

Japanese television manufacturers, particularly the defendants, operated as a cartel, setting prices for both the Japanese domestic market and the United States. They acted in concert, exercising market power through trade associations, industry committees, and other groups. In doing so, they intensified the competition which United States manufacturers experienced, while attenuating, if not eliminating, competition among themselves.

That the cartel operated in domestic as well as export markets is emphasized. Control over prices in the domestic market, to which entry was effectively barred, provided the protective umbrella which enabled the Japanese firms to engage in predatory pricing abroad. If competition had prevailed in the domestic market, then predatory pricing in the United States would have been more difficult.

Had free and fair competition prevailed between United States and Japanese producers, production capacity in each country would have adjusted properly to the size of the combined markets, and been allocated properly between the United States and Japanese industries. The size and profitability of each nation's industry would have been determined by free and fair competition, rather than by the Japanese cartel. Finally, Emerson/NUE would not have suffered the damages specified.[27]

In order to determine whether these conclusions are permissible expert testimony, ·

we must proceed step by step through the report, examining the bases for the opinions rendered according to the principles discussed under F.R.E. 703, Part IIA, *supra*, as well as analyzing the assumptions, inferences, and conclusions as an aid to considering whether the opinion assists the jury as required under Rule 702. We reiterate that we are *not* considering the admissibility of the reports as written, but of those opinions and background material contained therein that are of importance to our summary judgment and *in limine* determinations.

### B. *Outline of the Economic Analysis*

Part I of the DePodwin Report outlines the economic analysis which underlies the conclusions reached. As such, it summarizes the evidence considered by the experts, sets forth some basic economic principles which inform the conclusions reached, and summarizes the ultimate conclusions. To the extent that this section summarizes either evidence or conclusions, we need not consider it separately here, but will address those opinions as they appear in detail in subsequent sections. To the extent, however, that it presents the analytical framework for the opinions to follow, it must be examined at this juncture.

Dr. DePodwin would plainly be permitted to testify concerning the methodology by which he reached his conclusions; we believe this to be undisputed by defendants. Such methodology would, of course, be relevant only to the extent that the data to which the methodology is applied is deemed reliable under Rule 703, as discussed *supra*.

As part of the outline of the economic analysis, the report discusses, as background, some basic economic principles.

---

**27.** Attached to this summary, Dr. DePodwin provided a chart entitled "Combined and Concerted Actions of Japanese Manufacturers, Particularly the Defendants, Gains Realized by Them and Adverse Impact on the United States Television Industry," which was also included in Part I of his report. In addition to the items listed in the title, the chart conveniently contains a column telling the reader what provision of the United States law is violated by each of the "combined and concerted actions" listed. Plaintiffs concede that Dr. DePodwin is

not proffered for the purpose of rendering a legal opinion, *see* Pretrial Order No. 281 at 150, implying that they agree that the chart would be inadmissible. The point is worthy of mention, however, because it is characteristic of the advocatory nature not just of the DePodwin report, but of all the expert reports under consideration. Legal conclusions are never appropriate for expert testimony, *see, e. g., Marx & Co. v. Diners Club, Inc., supra,* and to the extent that these reports attempt such conclusions, they will be disregarded.

Specifically, Dr. DePodwin outlines the practices of the classical cartel, citing economic literature, including the studies of Professor Ervin Hexner, and discusses the conditions necessary to make price discrimination possible and profitable. This material is also unchallenged except on relevancy grounds, and we find it plainly admissible as an expert "dissertation" permitted under the "or otherwise" clause of F.R.E. 702.

■ Thus, in sum, assuming relevancy, Part I is admissible insofar as it lays out underlying methodology and background information. Because it is clear that Dr. DePodwin would not attempt to testify to his ultimate opinions in as conclusory a fashion as his summary might imply, we need not consider the form of the conclusions presented here. Rather, we see this section as a preface to the weightier analysis to follow, and will consider the opinions in their subsequent context.

#### C. *Industry Background Materials*

Part II of the DePodwin report, entitled "Background on the Television Manufacturing Industry in the United States and Japan" and Part III, "Japanese Television Industry," set forth basic background materials in a straightforward discursive manner. Part II concentrates on the history of television technology and production, with emphasis on the fact that American firms were primarily responsible for technology development, and that Japanese firms subsequently licensed that basic technology under various patent agreements. Part III is heavily statistical, discussing industry concentration, production and export data, production capacity, investment, and facilities expansion for the industry as a whole and for individual defendant companies.

Defendants do not complain about the vast bulk of information contained in these two sections, except to question its relevance. Thus we will not tarry over the

potential fine points of analysis, deferring judgments as to individual items until trial. We find the information useful as background, although we are not certain that an economist is necessary or qualified to expound to the jury on technological development. However, as a prologue to or basis for the economic analysis to follow, the background, which appears drawn from legitimate sources, can give the jury a framework within which to fit other pieces of evidence.

A few individual items in Parts II and III should be mentioned as problematic. Part II includes a discussion of the mechanics of patent licensing by the Japanese, reputedly organized through the Electronic Industries Association of Japan (EIAJ), a trade association. According to the DePodwin narrative, the Japanese manufacturers jointly negotiated their patent licensing agreements with United States firms, thereby eliminating internal Japanese competition for imported technology. DePodwin Report at II–23 to II–26. This section is followed by a brief "Appendix to Part II" which explains that "[t]he radio and television industry has a notorious history of using patent licensing agreements to restrain trade." Because we consider these ideas to be of only tangential relevancy to the question of the unitary export conspiracy among the defendants charged in this litigation, or even of the alleged home market facet of the alleged conspiracy, because they are certainly insufficient to create a material issue of fact given the gravamen of plaintiffs' case, and because the defendants do not at this time seriously contest the underlying information, we will not address the Article VII issues related thereto.[28]

■ Part III, while primarily statistical and unobjectionable, contains two portions which must be excised. First, in connection with a discussion of capacity expansion and exports, the report opines:

---

**28.** We note, however, that the report relies heavily on such questionable sources as *Television Digest*, various unauthenticated internal documents of defendants, and minutes of the EIAJ of the type which we excluded from evidence in our Japanese Materials Evidentiary

Opinion. The Appendix portion relies upon some plainly legitimate sources, but concludes with five pages lifted almost verbatim from plaintiffs' preliminary pretrial memorandum. There are thus significant problems under F.R.E. 703.

Two things are clear when we examine Japanese statements on adding to production capacity during the 1965–1970 period. One is that the companies sought to avoid competition with one another when adding to production capacity. The other is that the additions to capacity were intended largely to support increases in exports to the United States.

DePodwin Report at III–33.

There is plainly nothing wrong in and of itself with adding to capacity to support exports; to that extent the opinion is irrelevant if intended to support an inference of export conspiracy. The bald statement that the companies sought to avoid competition when adding to production capacity is supported solely by a statement by a single Japanese executive—a statement of otherwise doubtful admissibility as to that executive's company and inadmissible as to the other defendants.[29] DePodwin's opinion, coming as it does out of thin air, is simply unsupported either in the report or in the record, and cannot be admitted. At best, if the executive's statement were to be deemed admissible, its interpretation would be a matter for the jury to consider along with the other pieces of the puzzle, rather than a matter for expert analysis. It is simply not reasonable for an expert to base such a sweeping conclusion on a single disputed essay; nor is it helpful to the jury, in

that there has been no application of expertise.

A second problem area in Part III discusses the alleged subsidization of Far East subsidiaries (in Korea, Hong Kong, and Taiwan) of Japanese manufacturers, in an attempt to imply that the Japanese companies' participation in the United States market was predatory. DePodwin Report at III–36 to III–43. This section is entirely supported by documents produced in this litigation, and there are serious questions of admissibility under both F.R.E. 702 and 703.[30] Defendants do not strenuously urge an Article VII objection to this information, preferring to stress a relevancy objection. Accordingly, we shall defer consideration of this point until our decision on the conspiracy motions.

The crucial part of the DePodwin report begins with Part IV, to which we now turn.

### D. The Japanese Television "Cartel" and Its Operation

#### 1. Introduction

Parts IV and V coherently lay out for the reader the essence of plaintiffs' antitrust conspiracy case. The reader is not left in suspense about the conclusion to be reached, for Part IV is entitled "Japanese Television Industry Cartel," and Part V, "Operation of

---

29. The statement in issue, by Konosuke Matsushita, Chairman of defendant Matsushita Electrical Industrial Co., Ltd., as recited by DePodwin at III–33, reads:

We must not have excessive competition for plants and facilities even if we do enter a period of prosperity. Of course we should expand equipment fully and steadily step by step. But, in the future, expansion that produces the effect of competition among rival companies must not be permitted. In a Japanese wrestling match, victory or defeat is important. But we do not compete for victory in business.

In recent years, mass media has often reported on the rivalry among companies and predicted the victory or defeat of a company over the others. I think this is outrageous. Even assuming that the quotation is accurate (the statement, as quoted by DePodwin, is found in an EIAJ publication entitled "Denshi Electronics" which was produced by Sharp), it is doubtful whether this statement would qualify as an admission against Matsushita. See

Japanese Materials Evidentiary Opinion at pp. 98 n.71 & 254. At all events, the statement is plainly hearsay as to all other defendants, and plaintiffs, despite challenge to the document at pretrial evidentiary hearings, have laid no foundation for its admission as an exception to the hearsay rule. The several speeches and newspaper articles upon which plaintiffs rely in part to show intent to collude will be discussed in greater detail in our final conspiracy opinion.

30. The documents upon which the analysis rests include many internal memoranda of both defendants and non-parties to this litigation, the admissibility of most of which is challenged by defendants on both authentication and hearsay grounds, thus calling into question admissibility of the opinions based thereon under F.R.E. 703. Furthermore, the section is merely narrative, with a striking paucity of economic analysis, leading us to note its potential inadmissibility under F.R.E. 702 as well.

the Japanese Television Cartel." The conclusions reached in Part IV are starkly summarized in the first paragraph of the chapter:

> Japanese manufacturers of television receivers achieved their phenomenal success in exports, particularly to the United States, through concerted collusive action. The manufacturers colluded through various associations and committees. It will be shown that they engaged in a concerted drive to attain and keep a large share of the United States market by means of agreed upon predatory prices designed to eliminate domestic manufacturers. Japanese manufacturers, particularly the defendants in the Japanese Electronic Products Antitrust Litigation, priced exports to the United States well below the price at which they sold comparable products in their home market, they agreed to allocate United States customers among themselves, they freely exchanged information on their corporate production, inventories, shipments, and prices, and they engaged in many other acts designed to reduce, if not eliminate competition among themselves.

DePodwin Report at IV–1.

Part IV describes in detail the various groups and associations through which defendants are alleged to have conspired; Part V discusses the mechanics of the conspiracy. It is undisputed that the Japanese defendants were members of the various trade associations and groups delineated in the report; it is what occurred at those meetings that is in dispute, as well as the inferences to be drawn therefrom. Dr. DePodwin's format, which separates a description of the groups from a description of their operation, strikes us as somewhat awkward, and his order of description, which differs from that of plaintiffs PPTM and FPS, is not entirely logical. However those are matters of no importance and we shall proceed according to the organizational structure of the report. We shall not catalogue all of the materials relied upon by DePodwin in preparing his report, but we shall cover the highlights, quoting liberally when appropriate.

### 2. Conspiratorial Groups

Dr. DePodwin begins with a brief discussion of the Electronic Industries Association of Japan (EIAJ), an umbrella trade association of which certain Japanese defendants and numerous other corporations are members.[31] The EIAJ has a large number of committees relating to the television industry, including one which DePodwin identifies as the Committee of TV Exports to the U. S. We are informed that the EIAJ provided facilities for the Television Export Council, described in conclusory terms, without source reference, as the "administrative body of the manufacturers export cartel," and that the offices were the same as those of the Market Stabilization Council, "the body which implemented the domestic television cartel agreement." Except for the EIAJ membership list, which was produced in discovery in this litigation, none of this information is supported by any citations at this point in the report, although much of it is fleshed out in subsequent sections, which will be addressed as we reach them.

The report next launches into a detailed discussion of the Market Stabilization Council and a number of other industry groups alleged to have facilitated market control, among them the Okura Group, the Palace Group, the Palace Preparatory Group, the Tenth Day Group, the MD Group, and the Hibiya (or Twentieth Day) Group. According to DePodwin, the purpose of the Market Stabilization Council was to control the domestic market for electrical appliances, whereas the other groups, representing various levels in the corporate hierarchy, implemented that goal in the television industry by agreeing upon volume of production, price levels, projected volume, shipment, and inventory levels.

■ There are a number of problems with this narration, and we have no difficulty holding this portion of DePodwin's

---

**31.** Many of the non-defendant members are alleged to be co-conspirators.

analysis to be inadmissible. First, with regard to the basis for the testimony under F.R.E. 703, except for the facts that the groups indeed existed and that executives of certain defendants were members and attended meetings thereof, matters which are conceded by defendants, all other matters are supported almost entirely by sources which were ruled inadmissible in our two previous evidentiary opinions. For matters related to the Market Stabilization Council, DePodwin relies entirely upon two sources: plaintiffs' answers to defendants' interrogatories and materials relating to an investigation into the Council's activities by the Japanese Fair Trade Commission (JFTC). Plaintiffs' answers to interrogatories, although sworn, are essentially statements of plaintiffs' contentions with respect to the Council, and, as such, are certainly not appropriate material to serve as a factual basis for an expert's opinion. We explained in detail in our Public Records Opinion that the JFTC investigation into the Market Stabilization Council's affairs was extremely preliminary, ending in a Recommendation Decision, or consent agreement, prior to the holding of any hearings, and that documents related to that investigation were not probative of the truth of the matters set out therein. Accordingly, we ruled the only document tendered, the Recommendation Decision, inadmissible. While it is unclear precisely what materials Dr. DePodwin considered from the JFTC record of this investigation, it is plain that his primary reliance was upon this Recommendation Decision, or consent agreement, which we have since found to be untrustworthy.

As to the other industry groups, the fact that representatives of the defendants participated in regular meetings is permissibly gleaned from defendants' answers to plaintiffs' interrogatories, and is, as we have noted, undisputed by defendants.[32] Information on which DePodwin bases his conclusions that the meetings were used to exercise market control, however, comes from more suspect sources. The most frequently referenced document, cited some sixteen times between pages IV–9 and IV–13, is the diary of S. Yajima, a Toshiba employee, which had been seized by the JFTC in its price-fixing investigation in the so-called "Six Company Case," and which is discussed in detail in our Japanese Materials Evidentiary Opinion. We ruled the diary inadmissible on a variety of grounds, mainly related to trustworthiness, in that same opinion.[33]

In addition, Dr. DePodwin consulted an "initial decision" or "draft of decision" rendered by the JFTC in the same case. That document was withdrawn from our consideration at the evidentiary hearings, presumably because the full Commission, in an action taken subsequent to the issuance of the initial decision by the trial examiner, terminated the proceedings for lack of evidence.[34] We have no doubt that, had the document been considered, we would have ruled it inadmissible for reasons similar to those which informed our exclusion of a similar initial decision in a resale price maintenance case brought against Matsushita. *See* Public Records Opinion, 505 F.Supp. 1125, at 1181.[35]

---

**32.** DePodwin also relies in part for this basic background information on certain testimony before the JFTC in connection with the so-called Six-Company Case, discussed in detail in our previous evidentiary opinions. In our Japanese Materials Evidentiary Opinion we ruled that only portions of this testimony were admissible, and at that against only six of the twenty-four defendants. With minor exception, all "export" references were excluded.

**33.** DePodwin also relies upon other diaries which were excluded in the Japanese Materials Evidentiary Opinion.

**34.** We discussed at some length in our Public Records Opinion the role of an initial decision

(or draft of decision) in a JFTC proceeding. In essence, following hearings, the hearing examiner prepares a document which is fully reviewed by the Commission before official action is taken. In the Six-Company Case, the Commission refused to adopt the hearing examiner's draft. *See* Japanese Materials Evidentiary Opinion, 505 F.Supp. 1190, at 1209, n.2.

**35.** In the resale price maintenance case, the initial decision was superseded by a consent agreement; in the Six-Company Case, the superseding document was a termination by the Commission. If anything, the Six-Company Case document presents a stronger argument for exclusion.

The final sources of DePodwin's information related to the structure of industry groups are lectures and interviews by Konosuke Matsushita, Matsushita's founder and Chairman, to the effect that industry executives "have summit talks" to encourage cooperative management, and a report in the periodical *Industrial Japan* to the effect that industry stabilization is of concern to the industry. The personal views of one industry executive and an unsigned, heretofore unauthenticated periodical article, all of questionable independent admissibility,[36] simply do not appear to us to be the type of information reasonably relied upon by economists to determine whether firms agreed on price and output.

But even without deciding whether Dr. DePodwin placed "reasonable reliance" on any individual item, the entire section is so utterly dominated by materials which we have found to be totally unreliable—principally the JFTC materials and especially the Yajima diary—that under the principles developed in Section II, *supra*, the opinions based on such materials must be excluded as not reasonably based under F.R.E. 703.

It is arguably incorrect to view the materials considered by the experts as materials upon which they "relied." Instead, what they have actually done is set forth in an orderly manner the "evidence" before them. In so doing, they have in essence created for themselves a hypothetical question of a traditional sort, *i. e.*, they have laid out in narrative fashion the bases for their opinions, as gleaned from various sources. But at common law, a hypothetical question had to be supported by evidence in the record. *See, e. g., McCormick on Evidence* § 14, at 33 (2d ed. 1972). What has happened here is that plaintiffs have attempted, via the mechanism of an expert's report, to insinuate reams of otherwise inadmissible evidence into the record by having the expert "rely" on it and provide a dissertation on

defendants' practices on that basis. This is a fallacy which crops up throughout all of the expert reports, and is one which we cannot countenance.

In his post-hearing affidavit, *see* note 24, *supra*, DePodwin seeks to justify his reliance upon the diaries, minutes of meetings, etc. by invoking the work of Professor Oskar Morgenstern:

> There is a vast body of important material currently used by economists which is non-numerical. It is either historical-descriptive in nature, or it consists of direct qualitative empirical observations by a given investigator who lives in a certain economic milieu or who participates in economic activities and business decisions. Some further information is derived from introspection, and this too has played a considerable role in the development of various branches of economic theory. All of these sources of information have, of course, various kinds of error for which allowance should be made, if only the source and extent of the error were known. This is of especial importance when this type of evidence is brought into contact with that which appears in numerical form. Such combinations are inevitable and are therefore highly characteristic of economics.

DePodwin affidavit at 1.5, quoting O. Morgenstern, *On the Accuracy of Economic Observations* 3 (2d ed. 1963). Dr. DePodwin continues:

> Numerous studies rely on the kind of economic evidence, such as diaries, memoranda, minutes of meetings, rationales for agreements, and other qualitative empirical information, found in the DePodwin Report and which Professor Morgenstern deems appropriate economic data.

To describe the diaries, minutes of meetings, etc. which we have excluded in the second opinion in this evidentiary trilogy as "direct qualitative empirical observations"

---

**36.** At most, Chairman Matsushita's statement would be admissible only against Matsushita among the twenty-four defendants. *See* note 29, *supra*. We take this opportunity to incorporate by reference our frequent comment in the Japanese Materials Evidentiary Opinion to the effect that plaintiffs have now been victimized by their own pretrial and trial strategy of failing to take depositions to lay the foundation for the documents which they have proffered in the FPS, the authentication and admissibility of many of which defendants have challenged.

is, in the wake of the *ratio decidendi* of that opinion, no less than farcical.[37] We reject DePodwin's justification and hold that his exposition and opinions regarding conspiratorial groups, recorded in his report at IV-1 to IV-21, are inadmissible.

■ As an alternative and co-equal basis for our holding of inadmissibility, we find these sections relating to conspiratorial meetings to be impermissible as expert testimony under F.R.E. 702.

What Dr. DePodwin has done is to step into the shoes of the factfinder and to set forth in narrative fashion what he believes the "evidence"—*i. e.*, the materials he consulted—shows. He has described the Market Stabilization Council and the various industry groups as they appear from plaintiffs' documents, accepting the interpretation of those documents that plaintiffs have espoused throughout this litigation in their briefs and arguments, and concluding that certain activities of a conspiratorial nature—primarily exchange of information— occurred at industry group meetings. These activities are said to have constituted exercise of market control in the Japanese domestic television market. There is in this exposition no evident application of any economic expertise whatsoever. Dr. De-

Podwin, in the process of reaching his conclusion, has not instructed us in any degree in "the ways of his work." Instead, he has done exactly what the jury is supposed to do—he has sifted through materials provided by plaintiffs, analyzed them factually, and reached certain conclusions regarding culpability of the defendants. This is precisely the oath-helping "conspiracyology" defendants object to so strenuously. It lends an unwarranted aura of scientific reliability to the arguments of plaintiffs' attorneys. We agree with defendants that such testimony neither utilizes special expertise nor assists the trier of fact, and that it is therefore inadmissible.

The groups discussed so far concerned themselves, in plaintiffs' submission, with control of the Japanese domestic television market. As will be explained at length in our forthcoming opinion addressed to the issue of conspiracy, plaintiffs contend that this "Japan-side" conspiracy to fix high prices in Japan was essential to the scheme to flood the United States market with electronic products priced at an artificially low level, in that it provided defendants with the necessary financial cushion. The balance of Chapter IV of the DePodwin report shifts its focus from the home mar-

---

**37.** Such a description also lacks fidelity to Morgenstern's own prescription that allowance be made for "error." To the extent that DePodwin's reference to Morgenstern means that he maintains his opinion notwithstanding acknowledgment of reliance upon materials of questionable reliability, *see* point 5 at p. 1330, *supra*, he has gone far beyond the pale.

The parties have engaged in an extensive post-summary judgment argument exchange of correspondence regarding the integrity of Dr. DePodwin's report. We shall not chronicle that exchange here, but we do note the latest and most trenchant defense of Dr. DePodwin, that contained in the letter of November 19, 1980, from Edwin P. Rome. In justifying De-Podwin's reliance upon materials claimed to be "historical-descriptive" in Morgenstern's terms, Mr. Rome writes:

> Defendants have mistakenly assumed that the "economist" and the "investigator" cited by Morgenstern must be one and the same. Yet the Japanese and the American executives who participated at meetings where business decisions were made are bona fide observers of economic evidence and the

notes, letters, and diaries generated at or as a result of such meetings are proper qualitative empirical observations or records of the conduct and agreements reached during them. If economists were restricted to the use of material generated during the course of their personal participation in economic activities or business decisions, or restricted to things directly observed in a certain milieu, the majority of economic treatises now existing would not have been written. Under this narrow premise, advanced by defendants, economists would be barred from writing studies in the field of economic history; works in the field of institutional economics would disappear; and one generation of scholars would be barred from analyzing and/or reviewing the economic facts of prior generations.

The obvious answer is that an economist would be barred only from serving as an expert witness when he grounds his opinion on such matters, where they are demonstrably untrustworthy, and not from otherwise practicing his profession.

ket to the alleged export conspiracy, and it is to that claim of plaintiffs that we now turn.

### 3. The Manufacturers' Agreements and the Japan Machinery Exporters Association (JMEA) Rules

For reasons that will appear, DePodwin's discussion of the Japan Machinery Export Association (JMEA) and its alleged mechanisms for controlling the export market suffers from many of the same faults as the description of home market groups.

Defendants do not dispute membership in the JMEA; as with the domestic industry groups, however, they dispute the motivation for and results flowing from their participation in JMEA activities. DePodwin summarizes his discussion of the JMEA as follows:

The JMEA served as a vehicle through which certain aspects of defendants' controls over exports were organized and implemented. For example, defendants utilized the JMEA as a forum for the discussion and coordination of the pricing of consumer electronic products exported to the United States. They entered into agreements and adhered to rules expressly designed to implement such agreements, the objectives of which were to facilitate the coordinated and concerted dumping campaign in consumer electronic products exported to the United States. The export program included the setting of price levels of television receivers and radios to be exported to the United States, limitations on the number of United States customers to whom each manufacturer or exporter may sell, cus-

tomer boycott provisions, joint standardization of consumer electronic products, establishment and allocation of quotas for export of consumer electronic products, and the setting of export goals for consumer electronic products.

DePodwin Report at IV–23.

■ The JMEA supposedly achieved control through two primary mechanisms: "Manufacturers' Agreements," referred to by plaintiffs as "cartel agreements," and rules of the association.[38] These are the only sources relied upon by Dr. DePodwin in this section of the report. The admissibility of the Manufacturers' Agreements and the JMEA rules is not contested, and we can assume that they are appropriate bases for Dr. DePodwin's opinion under F.R.E. 703. We nevertheless find the opinions based thereon—or interpretations thereof—impermissible expert testimony according to the standards developed under F.R.E. 702.

As with the discussion of industry groups outlined in the previous section, DePodwin analyzes the evidence to be presented to the jury and tells the reader—or the jury—what it means. The analysis is not economic, but factual. Phrases such as "[o]ne of the principal purposes of the Manufacturers' Agreements was ..." (IV–25) and "[t]he general purpose of the 'Manufacturers' Agreements' was ..." (IV–24) abound. Most of the section is made up of quotations from and paraphrases of the agreements and JMEA rules, with occasional conclusory terms appended to "explain" what these documents mean.

A few examples will suffice to illustrate the problems rampant in this portion of the

---

**38.** The agreements discussed were all entitled "Agreement on Manufacturers' Domestic Transactions Relating to Exportation of Television Sets." There were seventeen such agreements, covering consecutive time periods between 1963 and 1973. The JMEA rules that are the subject of DePodwin's analysis were in existence during the same ten-year period. Defendants concede the existence of these agreements and rules, but have long maintained that plaintiffs have no standing to attack them, contending that the agreements (also known as "reference price agreements" or "check-price

agreements"), which established *minimum* prices for export of television receivers into the United States, could not have injured U. S. television manufacturers. Furthermore, defendants contend that the agreements were entered into at the mandate of the Japanese Ministry of International Trade and Industry (MITI) as part of MITI's industry regulation to avoid upsetting trade relations with the United States, and that the agreements are thus protected under the doctrines of act of state, sovereign compulsion, and international comity.

report. A subsection entitled "Television Export Cartel Agreements," which cited only plaintiffs' PPTM, begins by defining the "general purpose" of the Manufacturers' Agreements," which DePodwin describes as "written price agreements," as being "to govern price levels and conditions of sales on transactions between Japanese manufacturers of television receivers and the exporters of such receivers to the United States market." After discussing the "fact" that the primary target of the agreement was the United States, a fact gleaned from a quote from article 4 of the agreement and conceded by defendants, the report continues:

> One of the principal purposes of the Manufacturers' Agreements was to create an active forum for discussions of and agreement upon the price levels of television receivers for export to the United States and to implement the agreed on relation between such price levels and those established during price-fixing activities relating to television receivers sold by them in Japan. The question of prices was the specific subject of Article 8, which provided that the Television Export Council, the cartel's policing body expressly created to implement the Manufacturers' Agreements, had the ability to discuss and determine the price levels for television receivers for exportation to the United States.

DePodwin Report at IV–25. DePodwin's opinion, framed in terms of these conclusory statements, is supposedly "proved" by the ensuing direct quotation from the agreement:

> *(Prices)*
>
> Article 8
>
> 1. The Council, if it is going to establish minimum selling prices to export businessmen of these goods which are specified in Attached Schedule 2, or amend same, shall serve prior notice upon the Minister of International Trade and Industry.
>
> 2. The parties to this agreement shall not sell to export businessmen those goods which are specified in Attached

> Schedule 2 at prices lower than the prices established in accordance with the above paragraph.
>
> 3. The parties to this Agreement shall strive to refrain from such dumping as may cause a market disturbance in the United States.

*Id.* (footnotes omitted).

Turning from the "cartel agreements" to the JMEA rules which allegedly governed enforcement of the agreements, DePodwin informs us:

> The provisions fixing the export price levels for television receivers to be exported to the United States are contained in Article 10 of the 1963 JMEA Agreements. Article 10 makes specific reference to the price levels established in the television "Manufacturers' Agreements" and employs them as the basis on which the export price is to be mechanically calculated. Article 10 sets the television export price levels at the prices set by the "Manufacturers' Agreements" plus commissions and expenses and specifies that notification be given to the Television Export Examination Committee of the JMEA of these prices:
>
> *"(Export Prices)*
>
> Article 10
>
> "The members of the Association, when they export to the applicable area those models of applicable goods for which the shipment prices have been established by the Agreement on Manufacturers' Domestic Transactions Relating to Exportation (hereinafter referred to as the 'Manufacturers' Agreement'), shall export at a price higher than the sum of said shipment price plus the appropriate expenses and commissions relating to the exportation; and furthermore, shall notify the Association of the export prices (FOB) for the goods."

DePodwin Report at IV–32 (footnote omitted).

A particularly striking example of DePodwin's conclusory style appears on page IV–33, where he unequivocally states:

The JMEA "Rules" on television receivers were designed to eliminate all competition among the defendants in the export of television receivers and to concentrate the injurious impact of defendants' joint, manipulated pricing levels against United States manufacturers. One of the principal objectives of the defendants' conspiracy, as applied to television exportation, was to get the business, to achieve "steady expansion of exportation" to the United States, to capture increasingly larger shares of the total sales in the United States utilizing what defendants termed "*a system of harmonious exportation.*" Examples of the techniques used unlawfully to achieve this result may be found in the cartel members' employment of these trade restraints:

1. the so-called "Five-Company Rule" for television receivers; [39]

2. the prohibition against changes in export customers during the period of the JMEA "Rules"; and

3. the restriction prohibiting two cartel members from selling to the same customers.

The report then goes on to discuss the three techniques listed above in a manner similar to the sections quoted *supra.* Further quotation would be redundant, for it is plain that the "analysis" undertaken in this section of the DePodwin report in no way resembles economic analysis. It cannot possibly be construed as instructing the trier of fact in "the ways of [DePodwin's] work." This is factual analysis: DePodwin has quoted the documents—documents we have assumed to be in evidence and which are of a type that is traditional fodder for jury

deliberation—and has overlaid those quotations with his own gloss on their meaning. There is nothing in this section which aids the trier of fact in drawing any conclusions that it could not independently draw, and there is much that is potentially highly misleading.[40] According to the principles outlined in Part II.B., *supra*, this section must be deemed to be the work of an oath-helper, and therefore inadmissible under F.R.E. 702.[41]

### 4. *Information Exchange and Voting*

Part V of the DePodwin report, which discusses the operations of the Japanese television "cartel," begins with a discussion of the information allegedly exchanged among members of the groups described in Chapter IV. The chapter describes "in detail the collection, tabulation, and dissemination of information on production, inventories, and domestic and export shipment." DePodwin Report at V–1. Once such information was exchanged, members were in a position to vote "regularly on the volumes of production and shipments, adjustments in production, and inventory levels." *Id.*

DePodwin's discussion of information exchange is comprised entirely of references to certain reporting forms, produced by the defendants in this litigation, which were submitted by the Japanese manufacturing defendants to the EIAJ on a regular basis, and which detailed monthly production, shipment, export, and inventory information, as well as references to EIAJ's monthly industry-wide summary forms. We have not considered the admissibility nor the trustworthiness of these documents, and for the purpose of this opinion we will assume

---

**39.** DePodwin again discusses the Five-Company Rule in Chapter V. *See* p. 1349, *infra.*

**40.** We will deal at length with this point and with the legal sufficiency of this material in our opinion addressing the conspiracy issues.

**41.** Alternatively, despite DePodwin's reliance upon trustworthy documentary sources, it can be argued that his opinions must nonetheless be excluded under F.R.E. 703 because his assumptions concerning those documents are demonstrably false, in that the conclusions do not follow from the documents. For example, the

conclusion suggesting a broad range of export price fixing activity which DePodwin based upon Article 8 of the Manufacturers' Agreements and which we quoted at 1344–1345 *supra*, constitutes a misleading version of the minimum price language on the face of the agreement. Moreover, as will be seen *infra*, his interpretation of the Five-Company Rule is contrary to the record developed before us. Thus, even his factual analysis—his practice of conspiracyology—is flawed. However, we need not reach this 703 analysis.

their independent admissibility and their reliability for Rule 703 purposes. With regard to voting by the defendant companies on shipment, production, and inventory levels, however, DePodwin relied upon three very different sets of documents. The first is the Yajima diary, which was discussed *supra* in conjunction with our ruling on the meetings of conspiratorial groups. The second is a group of documents which DePodwin refers to as "Toshiba notes on meetings" (V–19), and which he has included in an appendix. The documents which he has appended, however, do not fit that description; most of them are pages from the diary of M. Yamamoto, a Hitachi employee, which we held inadmissible in the Japanese Materials Evidentiary Opinion on the same grounds as the Yajima diary. Two additional documents appended under the rubric of "pages from Toshiba notebooks" are unauthenticated documents produced by Hitachi, one purporting to be minutes of a meeting of the Tenth Day Group, and the other a meeting notice and agenda for a meeting of the MD Group apparently circulated by Nippon Columbia Co., Ltd. The final document upon which Dr. DePodwin relies in this section is a similarly unauthenticated document produced by the Japan Victor Co. regarding balloting results of the MD Group in 1970. This is not the Japan Victor document excluded in our Japanese Materials Evidentiary Opinion, but a document we have not before considered. All of these latter documents suffer from the same flaws as the numerous documents excluded in the Japanese Materials Evidentiary Opinion.

For information on joint forecasting, DePodwin uses three sources. He quotes verbatim the "Shimizu memorandum," which we ruled inadmissible in our Japanese Materials Evidentiary Opinion. He quotes from a statement by Konosuke Matsushita, similar to that which we discussed *supra*. Finally, he refers to a document which we have not previously considered, one which he describes as "prepared by or at the be-

hest of the TV Export Council" entitled "The Status of TVs shipped to the United States (First Half of 1967)." [42] This document, produced by Matsushita, has never been authenticated, and it suffers from the same flaws as other documents which we have already ruled inadmissible.

■ This segment is dominated by reliance on untrustworthy materials, either already excluded or demonstrably excludable; hence, the opinions expressed therein are inadmissible under Rule 703 for lack of reasonable reliance. Moreover, the entire section covering information exchange, voting, and forecasting is inadmissible under F.R.E. 702. This section is the same type of narrative, factual analysis of documents otherwise potentially before the court, without the use of special expertise which could assist the trier of fact, as discussed in the previous section. DePodwin has not analyzed the information contained in the reporting forms and other documents; he has merely recited that information, telling the trier of fact what he believes it represents. This is not "helpful" within the meaning of Rule 702.

We wrap up our discussion of information exchange with a final illustration, one paragraph on page V–2, which reads:

As pointed out in Part I, Outline of the Economic Analysis, a cartel's efficacy is enhanced if its members are provided with detailed information to reduce uncertainty, promote collusion, and police the observance of cartel agreements. The Japanese television cartel collected, organized, and distributed an extraordinary amount of information to its members.

The first sentence of this paragraph refers to Part I of the report, which outlined the economic methodology in reaching a conclusion, and as such we believe it to be permissible expert testimony under Article VII. The second sentence, however, is not permissible expert testimony for the reasons

42. We note that this document is not in the document depository and should not therefore be considered under PTO 219. Nor was it tendered at the pretrial evidentiary hearings. DePodwin has included a copy, with translation, in an appendix.

above discussed: it is a factual conclusion totally within the province of the factfinder. If there were at trial sufficient evidence in the record to support a finding in accordance with the second sentence of the quoted paragraph, the expert could assume the truth of the evidence presented and base a conclusion thereon. However, in this situation, the expert has not *assumed*, based on evidence in the record, that the Japanese defendants performed certain acts; he has simply categorically stated so. This he may not do.

### 5. *Price-Fixing Activities in Japan*

In the next section of the report, "the fixing of prices for the domestic market by the cartel is described in detail. It shows the extent to which prices, and wholesale and retail margins were rigged for the benefit of cartel members." DePodwin Report at V–1. Plaintiffs have contended that an agreement to fix high prices in the Japanese domestic market is of importance to the alleged export conspiracy because it enabled the defendants to amass a "war chest" to fund their low-price entry into the American market.

 This section is inadmissible on both F.R.E. 703 and 702 grounds. First, with respect to Rule 703, the entire discussion is based upon documents related to the "Six Company Case" before the Japanese Fair Trade Commission, discussed *supra* and in our previous opinions. Essentially, what Dr. DePodwin has done is to second-guess the JFTC, for that body, after reviewing the same materials examined by DePodwin, terminated the proceeding against the six companies for lack of evidence. As we discussed at length in our Public Records Opinion, preliminary investigative reports that are superseded by contrary official actions, as in this situation, are inadmissible because they lack the necessary indicia of trustworthiness required to come into evidence under an exception to the hearsay rule. The same reasoning compels us to find that the investigators' reports are not reasonably relied upon by an expert witness under F.R.E. 703.

In addition to the investigators' reports, DePodwin relied in this section upon the diaries of defendants' officials which had been seized by the JFTC in conjunction with the Six Company Case, virtually all of which were ruled inadmissible on trustworthiness grounds in our Japanese Materials Evidentiary Opinion, and which we have discussed *supra*. Finally, Dr. DePodwin relied upon testimony before the JFTC and protocols submitted to the JFTC, again in conjunction with the Six Company Case. We ruled these materials to be admissible against some defendants, with the exception of certain "export references." However, whatever reliance DePodwin may have placed on these materials is totally overshadowed by his reliance on the documents we have said to be unreliable. This segment of the report is so permeated by reliance upon untrustworthy materials that it cannot be admitted under F.R.E. 703.[43]

Moreover, this section is written in precisely the same discursive factually informative style as those sections discussed previously. Once again, we are told "what happened" with reference only to documents otherwise before the court. Once again Dr. DePodwin has stepped into the shoes of the factfinder, rendering his opinion inadmissible under F.R.E. 702.

### 6. *Export Reference Prices*

Having already, in Chapter IV, discussed the Manufacturers' Agreements to which defendants were signatories, Dr. DePodwin in this section examines the prices allegedly established by those so-called "check-price" or "reference-price" agreements. He informs us, first, that reference prices were set by the TV Export Council through trading companies, but he offers no support for

---

**43.** We note that one small segment of this section, at pp. V–29 to 30, presents calculations showing that an agreement on minimum retail prices coupled with common retail and wholesale profit margins, plus common rebate poli-

cies, is equivalent to an agreement on the ex-factory price. This analysis, if relevant, would be admissible, but only if there were sufficient extrinsic evidence in the record to support the premise.

that statement. He next recites, in tabular form, reference prices established pursuant to the Manufacturers' Agreements for July and August 1964, basing those prices upon notifications to MITI.[44] He continues reciting reference prices as contained in his Table V–6 and V–7,[45] and compares those prices with domestic prices, making adjustments for wholesale and retail margins, and concluding that the domestic prices were considerably higher.

DePodwin relies for domestic prices upon the draft of decision in the Six Company Case, which we have discussed *supra*. While we explained that that document would not be independently admissible, and that it could not support an expert's inference of conspiratorial activity, we cannot say that the price levels contained therein are unreliable. Some of the price data received by the JFTC came from testimony and protocols, which we have found to be admissible and upon which an expert could reasonably rely. We do not know where the rest of it came from. Accordingly, we think this calculation might be reliably based and admissible. In order for us to rule definitively, however, the basis for the domestic price levels would have to be more explicitly stated. We thus defer ruling upon the admissibility of the calculations based upon these prices.

DePodwin goes on to point out that his estimates are supported by the Yajima diary. That paragraph is inadmissible under F.R.E. 703, for reasons which need not be reiterated.

### 7. Rebates and Kickbacks

After discussing the allegedly fixed export prices, Dr. DePodwin continues to narrate plaintiffs' theory of the case by explaining that defendants did not actually sell their products in the United States at that fixed price. Instead, they allegedly engaged in a scheme of discriminatory rebates and kickbacks. The evil of this system, in DePodwin's submission, was that it "enabled defendants to win the patronage of special customers, and to take sales from American manufacturers." DePodwin Report at V–39.

This section of the report describes the mechanics of the rebate system, discussing the need for fictitious customs declarations, overbilling and underbilling procedures, and the various euphemisms designed to "cover up" the rebate practices. He details which customers supposedly received rebates, and suggests that the "cartel members" were aware of one another's rebating systems and that all parties knew the practice to be illegal.

▮▮▮ We will again pass over the Rule 703 issue presented by the rebate discussion, noting only that the source most frequently cited is that compendium of lawyers rhetoric, Plaintiffs' PPTM. Dr. DePodwin claims, at V–40, that there is "abundant evidence to support" his assertions, and that he has referred to only a small part of the available evidence. We will assume for F.R.E. 703 purposes that Dr. DePodwin reasonably relied upon the materials which he examined. However, this discussion repeats the vices of previous sections by merely reciting the evidence which the factfinder would have before it, explaining, as one subheading at V–40 describes it, "How

---

44. Defendants do not dispute that they reported to MITI pursuant to the Manufacturers' Agreements. Indeed, their sovereign compulsion and act of state defenses, *see* n.38, *supra*, rest in part upon the reporting requirement.

45. The figures gathered in Tables V–6 and V–7 were drawn from two types of sources. Some of the prices were drawn directly from schedules attached to the Manufacturers' Agreements, which we have posited to be reliable. The rest, however, were obtained from internal Sony memoranda which were not addressed in our pretrial evidentiary hearings. We note that plaintiffs have laid no foundation for admission of these documents, and they are plainly of a piece with the many unauthenticated, hearsay documents excluded in our Japanese Materials Evidentiary Opinion. Nevertheless, because DePodwin's calculations are based also on the Agreements, and because the check price levels are generally not disputed, we will not attempt to determine whether his opinion as to the check price levels is dominated or pervaded by his reliance on questionable documents for F.R.E. 703 purposes.

the System Worked." This is factual analysis, which usurps and derogates the function of the factfinder, and is accordingly inadmissible under F.R.E. 702.

#### 8. Five-Company Rule

■ The "Five-Company Rule" refers to a provision of the previously discussed JMEA rules, in effect from 1967 to 1973, which restricted each Japanese exporter to five U.S. customers. The rule was enforced by a registration and reporting requirement. Once again, DePodwin merely describes the rule and its use. The existence of and adherence to such a rule is not a matter which requires the application of specialized expertise, but is instead a matter uniquely within the competence of the fact-finder. Factual recitation such as that provided by Dr. DePodwin is not helpful to the trier of fact, hence excludable under F.R.E. 702.[46]

We note that once independent evidence supports a finding that such a rule was adhered to, an expert could appropriately opine as to such a rule's potential effects on competition. This type of economic analysis is what DePodwin contemplated in his Outline of Economic Analysis in Chapter 1, discussed *supra*.[47] It is not, however, what he has done.

#### 9. Summary

Although we have dissected each discrete section of chapters IV and V of Dr. DePodwin's report, we still believe it would also be useful to examine the overall thrust of the opinions expressed in those chapters, as well as the manner in which they are expressed. What DePodwin has in essence done is to examine the myriad documents supplied to him by plaintiffs' counsel, to quote liberally from those documents, and to conclude, "Aha! Cartel! Conspiracy! Illegal concerted action!" Defendants maintain that a conclusion of conspiracy is never appropriate for an economist to draw, pointing out that they have, despite diligent effort, found no case which permitted an expert to testify in such manner. Drawing a distinction between conduct of defendants and industry structure, defendants offer the following quotation, which we find highly useful:

> The role of the economist as an expert depends upon the emphasis of the various antitrust statutes, with the scope of that role widening as the focus shifts away from conduct and towards structure or performance. An emphasis upon conduct will focus the attention of the trier of fact ... upon whether particular acts were committed by the defendant. (*Collusion, for example, is not particularly the subject of economic expertise.*) In contrast, an emphasis upon the structure of an industry or firm or upon the performance of an industry—or of a firm within an industry—will focus the attention of the trier of fact upon economic issues that are the special subject of economic expertise.

O'Hara, "The Economic Expert in the Antitrust Arena," 12 *Antitrust L. & Econ. Rev.* 17, 19–20 (1980) (footnotes omitted) (emphasis added).

We need not decide whether an expert may ever testify that, in his opinion, based upon his economic analysis of certain behavior of defendants, a conspiracy exists, for, as we have discussed in some detail, Dr. DePodwin's analysis adds no increment of

---

**46.** We have already posited the reliability of the Manufacturers' Agreements and the JMEA rules, upon which DePodwin relies in this section. *See* p. 1343, *supra*. We assume that he also relied upon reporting and registration forms, although he did not explicitly so state; because it is uncertain what materials DePodwin consulted, and because this section is inadmissible under F.R.E. 702, we will not address the F.R.E. 703 question. We note, however, that the Five-Company rule did not operate to restrict competition in the manner DePodwin

suggests, for American subsidiaries of the Japanese manufacturers could be included as one of the five customers. The subsidiaries could then sell to anyone. Moreover, to the extent that the rule limited the number of Japanese manufacturers who could sell to an American importer, that could only keep prices up, benefiting plaintiffs.

**47.** An expert may not, of course, so testify in derogation of the facts. *See* note 46, *supra*.

economic expertise which would aid the jury, and his analysis is further flawed by reliance upon a considerable body of untrustworthy materials. In short, there is no "economic value added."

In an apparent effort to shore up his waning credibility in the wake of the summary judgment argument, Dr. DePodwin submitted the affidavit described in note 24, *supra.* Noting the paucity of documentary evidence of conspiratorial conduct, he asserts that "[w]here such evidence exists it is widely quoted in economic textbooks." [48] Dr. DePodwin invokes two examples to illustrate this point. First he notes that in his discussion of agreement among sellers, Professor Richard Caves stated:

> In the United States, the antitrust laws discussed in Chapter 6 make cartel agreements illegal in most industries. However, the law enforcers continue to turn up a number of less extensive agreements involving price fixing among competitors and the division of markets, the latter especially in connection with bids for United States government contracts. The most spectacular price-fixing conspiracy to come to light in recent years involved the companies making heavy electrical equipment. . . ."

Caves, *American Industry: Structure, Conduct, Performance* 56 (4th ed. 1977). Second, he quotes Professor Fritz Machlup, who reported the connection between the notorious "Gary dinners" and Adam Smith's famous statement on sellers' agreements:

> The gentlemen's agreement holds its special place in the history of collusion chiefly for two reasons. One is the famous statement made by Adam Smith in 1776 and quoted with great regularity in all discussions of this kind. He said: "People of the same trade seldom meet together even for merriment and diversion, but the conversation ends in a conspiracy against the public, or on some contrivance

to raise prices." The other reason is the fame of one of the best known American examples of such gentlemen's conversations, the so-called Gary Dinners, where the leaders of the steel industry met from time to time, during the years 1907–1911, to discuss—for "merriment and diversion"—by way of after dinner speeches, the market situation and the most appropriate prices for their products. Since price-fixing agreements were unlawful in the United States, those gentlemen believed themselves to be within the law when they avoided formal agreements. But if the main speaker submitted that the market situation warranted, in his humble opinion, a price of so and so many dollars, and if the next speakers expressed their belief that the main speaker, who incidentally was usually the biggest steel boss, had shown perfect understanding of the situation and that they saw eye to eye with him, the dinner party was likely to be a lasting success (giving indigestion only to the non-invited public)."

F. Machlup, *The Political Economy of Monopoly. Business, Labor and Government Policies* 87–88 (1952) (footnote omitted).

Dr. DePodwin seems, however, to ignore, or at least to blur, the distinction between the role of the economist as historian and his role as social scientist, particularly the most rigorous application of that role, where he acts as an expert witness, duty bound to apply economic analysis to demonstrated facts. We have encountered economists of the caliber of Dr. DePodwin in their academic milieu, and, knowing their fetish for rigorous analysis, cannot conceive of them (or of Dr. DePodwin in his academic role) seriously positing economic conclusions based upon the kind of evidence upon which Dr. DePodwin relied in his report. Although he has now disclaimed reliance on the diaries of Yajima and others,[49] that

---

**48.** He continues,

Thus, while discussing collusion, cartels, and conspiracy, economists frequently rely on two landmark cases of collusion among business executives: The notorious "Gary dinners" and the heavy electrical equipment conspiracy.

**49.** In his post-argument affidavit, DePodwin averred:

disclaimer cannot eradicate the pervasive and indelible imprint of those documents upon his report. In short, Dr. DePodwin's adaptation of the universe of economic literature, in which generally but loosely stated historical descriptions have an appropriate role, to the kind of analysis required of expert opinion in this case can create only a kind of ersatz economic science which Rule 703 cannot cognize.

Dr. DePodwin also defends his use of the term "cartel" and his conclusion of concerted action by defendants. His utilization of the studies of Professor Ervin Hexner on cartel behavior is the subtlest, and in some ways the most significant, aspect of his report.[50] Throughout the report, DePodwin refers to the export arrangements into which the Japanese manufacturing defendants and others entered under the aegis of MITI, see n.38, supra, as a cartel. He buttresses this usage in his affidavit by a number of references in which commentators and governmental and international agencies have referred to the activities of the Japanese manufacturers, defendants and others, who were signatories to the Manufacturers' Agreements, as a cartel.[51] What DePodwin then does is to interpose the historical notion of a cartel between the evidence and the ultimate conclusion of a violation of section 1 of the Sherman Act. The unstated premise of this argument, unsupported in law, is that anything which can be called a cartel is *ipso facto* violative of the Sherman Act. Building a great scaffolding upon that unstated premise, he also says that we have been studying cartels for years; this is a classical international cartel which fits the historical pattern, ergo there must be an antitrust violation.

> In the preparation of the DePodwin Report the experts did not rely simply on the minutes of meetings, diaries, and other information and documents to which defense counsel object· in order to reach conclusions about conspiracy and the occurrence of joint actions which restrained trade and attenuated competition among Japanese manufacturers and exporters of television receivers. As noted above, the report contains a wealth of

This approach is more than subtle. It is clever, but it is also legerdemain. We cannot permit this or any case to be determined by a tyranny of labels. Rather, we must look at actual facts, *i. e.*, at the actual arrangement and its effects. That is what we have done *supra* in determining the admissibility of opinions expressed in Dr. DePodwin's report, and what we shall do in terms of the motions for summary judgment and the preliminary determination (under F.R.E. 104(a)) of the sufficiency of conspiracy proof. In short, no talismanic significance attaches to the use of the term "cartel."

On the related question of the use of legal conclusions such as "concerted action" and "conspiratorial," DePodwin responds that he used such terms because he found

> numerous documents which showed that the setting of such things as Check Prices, Bottom Prices, was done not individually, but jointly by companies whose executives met for these purposes. Examples of some of these documents are referenced in Parts IV and V of the DePodwin Report.

But as we have explained *supra*, these are for the most part documents which have been excluded because they are untrustworthy. Moreover, with respect to the "agreements" as to the Japanese home market, DePodwin has either ignored or taken a one-sided view of what transpired at meetings of the various industry groups, parroting the rhetoric of plaintiffs' lawyers.

Apparently aware of the vulnerability of this approach, Dr. DePodwin again invokes the writings of Professor Machlup:

> Sensitive readers may accuse us of attempting to use loaded words, since "collusion" is sometimes used with an under-

> economic facts and analyses which were used to reach these conclusions.
> *See also* pp. 1341–1342, *supra*.

**50.** We touched on this aspect of the report briefly in our discussion of the outline of DePodwin's analysis, *supra* at 1336–1337.

**51.** Those references are themselves inadmissible, but we will assume here that they are within the ambit of Rule 703.

tone of condemnation and with an allusion to deceit, fraud, or trickery. Let us make it absolutely clear that no ethical connotation is here intended and that *the word as used in economic analysis is meant to be neutral as to ethical judgments and unprejudicial as to legal consequences.*

F. Machlup, *The Economics of Sellers' Competition* 433 (1952) (emphasis added by DePodwin) (footnote omitted).

Adapting this Machlupian passage to his own stewardship, Dr. DePodwin writes:

> The analyses and judgments on which such conclusions were based were economic not legal, as evidenced by the report and the documents upon which it is based. Moreover, it is not out of order for economists to characterize business actions as "illegal" or as "violations of law" since key issues in antitrust law are matters of economic judgment.... Next, the standard texts in industrial organization, that area of economics which covers restrictive trade practices and other departures from competition, abound in references to antitrust laws. See, for example, F.M. Scherer, *Industrial Market Structure and Economic Performance* (Chicago, Illinois: Rand-McNally, 1980, second edition). Therefore, the economic experts did not see it inappropriate to render economic judgments on the defendants' joint actions and the United States antitrust laws.

It was once observed, whimsically of course, that saying something three times makes it so. But to say three times or nine times, in the present context, that Dr. DePodwin has not made a legal judgment (or, more precisely, to say that he has made a "neutral judgment unprejudicial as to legal consequences") is to belie reality. As we have explained, these judgments made by DePodwin, largely on the basis of expressly excluded evidence, are those not of an economist, but of a conspiracyologist, and are not cognizable in evidence in this court.

---

**52.** Defendants do not challenge the Cohen report except as utilized by DePodwin. See note 4, *supra*.

---

### E. The Price of Japanese Television Receivers in the United States and Japan

#### 1. Price Comparisons.

Part VI of the DePodwin Report consists of three alternate sets of calculations which purport to compare the defendants' prices in the Japanese domestic market with their prices in the U.S. market. Appendix B to Part VI consists of a construction offered to show that four of the defendants sold their products in the U.S. at prices which were below their costs. We discuss the Appendix B cost construction *infra*.

The first price analysis in Part VI sets forth a comparison of average prices on (Japanese) domestic sales with average prices on export sales of television receivers, by screen size categories, for the Japanese manufacturing defendants, Matsushita (MEI), Melco, Sony, Hitachi, Sanyo, Sharp, and Toshiba. The calculations of average prices were made by the firm of Morris R. Cohen & Co., another of plaintiffs' expert witnesses.[52] Average domestic prices in each case are derived by dividing the monetary value of sales to each company's first-line domestic distribution company, less returns, by the total number of units sold, less returns. Average export prices are derived by dividing revenues from sales by each company to its export subsidiary, agent, or customer by the total number of units exported, less returns if any. Although Dr. DePodwin performs separate analyses of color and of black-and-white television receivers, his analysis does not otherwise distinguish among different models in the same screen-size categories. According to DePodwin, this analysis reveals that the domestic price exceeds the export price in all cases, by amounts which range from a few percent to more than 100% of the export price.

The second price analysis, based on the technical comparison of domestic and export television models prepared by plaintiff

Zenith Radio Corporation, is a comparision of the prices of domestic models and of export models which Zenith's engineers found technically comparable. *See* Opinion and Order (1916 Antidumping Act), 494 F.Supp. 1190, 1203–04 (E.D.Pa.1980), *appeal pending*, No. 80–2080 (3d Cir.) (explanation of technical model comparisions). The basic sources of price data for sets sold in Japan were defendants' answers to plaintiffs' Interrogatories No. 45 and 46(c) and Supplemental Interrogatory No. 11, and defendants' commodity tax returns as filed with the Japanese Ministry of Finance. The prices of sets exported to the United States were derived primarily from documents produced in discovery by U.S. purchasers of Japanese-made television receivers. Dr. DePodwin performed this second analysis twice: once using domestic prices taken from defendants' answers to interrogatories, and again using domestic prices derived from the Japanese commodity tax returns. He states that the analysis was made with respect to products manufactured by six defendants, but only discusses the results reached for three of them—Sanyo, Toshiba, and MEI. According to DePodwin, the second analysis revealed large disparities between domestic and export prices of these three defendants. As in the first analysis, domestic prices exceeded export prices, in DePodwin's submission, by amounts ranging upward to more than 100% of the export price.

The third analysis is based on the first, but includes adjustments to the prices which are specified in the text of the Antidumping Act of 1916, upon which one count of plaintiffs' complaint was premised. While Dr. DePodwin, in his explanation of the third comparison, discusses the model-by-model comparisons prepared by Walter Lukas, another of plaintiffs' experts, for plaintiff NUE, the third comparison as submitted in his report is not based on those comparisons. Instead, it is based on the figures for average prices by screen size calculated by Morris R. Cohen & Co. which had also been the basis for the first price analysis. According to Dr. DePodwin, making these adjustments "accentuates and increases substantially the dumping margins, already evident in the price differences shown in the preceeding portions of this report." DePodwin Report at VI–47.

The defendants' attack on the admissibility of the first and third of these price comparisons is based on the claimed unreliability of the average prices, by screen-size categories, which were calculated by Morris R. Cohen & Co. and used by DePodwin in both those analyses. The Cohen calculations and DePodwin analyses do not even purport to take into account any characteristics of the defendants' television receivers other than screen size and monochrome or color status, thus ignoring both technical differences among models of receivers sold domestically or exported and other differences such as cabinet size and style. Instead, the average price calculations lump together all monochrome and all color receivers of a particular screen size, even though one model might contain the finest state-of-the-art electronics in an expensive wooden cabinet while another might contain less expensive electronic parts housed in the cheapest of plastic. Most of the defendants have consistently contended that, at pertinent times, their product mix in the United States was predominantly composed of "economy" models, while their product mix in Japan was more heavily weighted toward more expensive models.[53]

---

**53.** This contention is also supported by the affidavit of Mr. Yamagishi. *See* p. 1359 *infra*. The only defendant that has not made this contention is Sony, which asserts that it sold at "the top of the line" in the United States.

It is also worth noting that the average prices relied upon in DePodwin's first comparison represent, in many or most cases, sales by the manufacturing defendants to their sales subsidiaries. Thus the prices used to compute the averages are, in many cases, intracorporate transfer prices between parent and subsidiary or between subsidiary and subsidiary. The Matsushita defendants urge, in their brief concerning DePodwin's cost construction, *see infra*, that the average export prices used in that construction are deficient because they are based upon intracorporate transfer prices between two MEI subsidiaries. The average prices discussed in that brief are the same as

Dr. DePodwin has made no effort to rebut this contention, nor to make the appropriate allowances for it if it is true.

■ We think that defendants' objection to DePodwin's use of average prices by screen size is well taken, and accordingly we find his first and third sets of price comparisons inadmissible under both F.R.E. 703 and 702. Under Rule 703, we do not believe an expert economist can reasonably rely upon average prices calculated in such gross terms.[54] Nor, we add, can average prices which are calculated in such gross terms, taking no account of highly significant variations among models, be helpful to the trier of fact. Consequently the first and third set of price comparisons are not admissible.

The defendants' attacks on the second set of price comparisons, which *are* based on model-by-model comparisons constructed by Zenith's techical experts, are premised on the notion that Dr. DePodwin is "comparing apples and oranges" in two respects. First, defendants note that we have ruled that television receivers manufactured for use in Japan, as a group, and those manufactured for use in the United States, as a group, are not comparable for purposes of the Antidumping Act of 1916 since they are not of "like grade and quality" and are not commercially interchangeable. Opinion and Order (1916 Antidumping Act), *supra.* More importantly, the defendants contend that Dr. DePodwin's second analysis is based upon a comparison of list prices as opposed to actual prices, charged at different levels of distribution, without regard to rebates or other adjustments, rendering the prices incomparable. They also challenge DePodwin's use of commodity tax returns in his alternative calculation.

As to the first objection, we do not think that Dr. DePodwin's use of price comparisons of models which are not of "like grade

and quality" renders his analysis inadmissible. The comparisons which he uses are based on extensive technical studies undertaken by Zenith personnel in order to pair models of television receivers sold in the U.S. and Japanese markets which, in Zenith's submission, are technically comparable. Although we have ruled that the technical differences between television receivers manufactured for use in Japan, as a class, preclude the plaintiffs from comparing the prices of such receivers to support a claim under the Antidumping Act of 1916, different considerations apply to the comparison of television models for purposes of plaintiffs' remaining claims under the Sherman Act.

■ The issue of comparability under the 1916 Antidumping Act was whether the television models are sufficiently similar to justify subjecting the defendants to treble-damage liability simply because they allegedly charged different prices in the two markets, assuming that the other requirements of the Act are satisfied. The issue of comparability under the Sherman Act as presented here, on the other hand, is whether the television models are sufficiently similar that proof of allegedly parallel price differentials between the U.S. and Japanese markets is admissible evidence to support an inference of conspiracy from consciously parallel interdependent conduct. Since the Antidumping Act claims as they related to television receivers have been dismissed, the analysis of price comparisons contained in the DePodwin Report is now offered only to support an inference of conspiracy under the Sherman Act. For this purpose, we think it reasonable for Dr. DePodwin to rely upon the Zenith technical model comparisons, even though the models are not of "like grade and quality." The essential test is whether the models are sufficiently similar to make the comparison of their prices logically probative of parallel pricing by the

those utilized by DePodwin in his first price comparison. While there may well be some merit to Matsushita's contention, we need not and hence do not reach it, either here or in our discussion of the cost construction.

**54.** In terms of the factors set forth at p. 1330, *supra,* there is a problem of trustworthiness and of invalidity of assumptions. Our inadmissibility determination is reinforced when it is noted that actual price data was available to plaintiffs.

defendants, which is in turn an intermediate step in the inference of conspiracy which plaintiffs seek to have the trier of fact draw from circumstantial evidence. We do not agree with the defendants that the price comparison is logically probative of parallel pricing only if the articles compared are of like grade and quality. Thus, defendants' objection that the models compared are not of like grade and quality does not prevent the price comparisons from being admissible under Rule 703.

The defendants' objection to De-Podwin's use of price comparisons which employed prices for the domestic Japanese market that were derived from defendants' answers to interrogatories 45 and 46(c) can be analytically broken down into two subobjections. First, defendants argue that their interrogatory answers provided only list (as opposed to actual) prices and explicitly gave the plaintiffs notice that there were rebate structures involved which were not included in the 45 and 46(c) interrogatory answers. The use of list prices, without allowing for rebates, tends to overstate the domestic Japanese prices and, in defendants' submission, renders Dr. DePodwin's analysis of the price differentials inadmissible under Rule 703. We agree with the defendants on this point. It is plain from the record that rebates were common at all levels of distribution in the Japanese market. As a result, price comparisons which are based solely on list prices do not provide a trustworthy picture of the economic realities of the Japanese market. Accordingly, such price comparisons are not a reasonable basis for an economic expert's opinion under Rule 703.

The second prong of defendants' objection relates to prices charged at different levels of distribution. They claim that the domestic prices which Dr. DePodwin derived from their answers to interrogatories are suggested retail prices and are identified as such in the interrogatory answers. Dr. DePodwin, they contend, has made no adjustments to the prices to reflect retail-

ers' margin, wholesalers' margin, rebates, or the 15% Japanese commodity tax. The export prices with which Dr. DePodwin compares these unadjusted domestic suggested retail prices, defendants submit, are actual transactional prices paid by large U.S. importers of their products. Defendants' counsel contended at our evidentiary hearing that if the proper adjustments were applied to the domestic prices which Dr. DePodwin used, the differentials which he found would essentially disappear. PTO 281 at 163–64 (July 16, 1980).

The record is insufficient for us to rule at this juncture on this aspect of defendants' objection, for the record as to price levels utilized is undeveloped. Defense counsel represented at the evidentiary hearing that those price comparisons were based on suggested retail prices, see PTO 281 at 163, but no supporting affidavit or other evidence was submitted. The plaintiffs have never responded on this point, either at the hearing or in a written submission. The fundamental inadequacy of the record with respect to the calculation of price differentials based upon the interrogatory answers arises from the fact that the differentials themselves were calculated by Zenith personnel using the Zenith computer system; Dr. DePodwin only undertook a statistical analysis of Zenith's results. There is nothing in the record to indicate the methodology used in preparing the computerized price comparisons. Our independent examination of the Toshiba and Matsushita interrogatory answers neither supports nor undermines the representations of defense counsel; both sets of answers provide list prices at several levels of distribution, only one of which is suggested retail price. It is impossible to tell merely from examination of the answers which of the several alternative list prices at different levels provided therein were used by the plaintiffs in constructing the price comparisons which were provided to Dr. DePodwin. Thus, we are unable to rule at this time on this alternative defendants' objection.[55]

---

55. We note that, in view of the fact that it is the plaintiffs' burden to establish the admissi-

bility of the testimony they proffer once an objection is made, it is highly dubious whether

The defendants also object to DePodwin's alternative calculation based upon domestic prices derived from the defendants' Japanese commodity tax returns. They suggest that, once again, the domestic and export prices which DePodwin compares are prices at different levels of distribution, hence incomparable.[56]

According to the opinion of the Japanese law firm of Braun, Moriya, Hoashi and Kubota, one of plaintiffs' experts that is at present unchallenged (see note 4 supra), the assessment standard upon which the Japanese commodity tax is levied can be calculated in two primary ways: one proceeding forward from the ex-factory price, and the second calculating backward from the retail price. The first alternative, based on the ex-factory price, results in an assessment base equal to the "sales price ... at which the manufacturer offers such commodities at such ex-factory point freely for sale to purchasers in the ordinary amount and form of a wholesale transaction after deducting the commodity tax thereon," Braun, Moriya Report at 2, citing Article II, ¶1, item 2 of the Commodity Tax Law of Japan. The second alternative, based on the retail price, is calculated by multiplying the retail price by a fixed percentage, set forth in an appendix to the law. That percentage is apparently intended to represent the amount that would re-

sult if the retail price were reduced by "the amount equivalent to the usual profit and expense of the seller of such commodity (excluding the manufacturer thereof) in respect of the sale thereof, together with the amount equivalent to the transportation cost usually paid by the manufacturer," Braun, Moriya Report at 3, and by the commodity tax amount itself.

■ The Braun, Moriya Report further states at ¶5 that the "assessment standard of the commodity tax for television receivers has been mainly based on the retail price thereof ..." What this means is that the simpler calculation, based on an industry-wide formula, is generally used for television receivers. The assessment standard that results is thus a hypothetical price. The commodity tax formula does not purport to be a reliable guide to the actual prices charged in the Japanese market, but is instead intended as an industry-wide construct which avoids the computation of actual prices for countless transactions.[57] Such artificial prices are simply not comparable to the actual transactional prices in the U.S. market with which DePodwin attempts to compare them. The calculation is accordingly inadmissible under F.R.E. 703.

2. *Appendix B Cost Construction*

■ Appendix B to Part VI of the DePodwin Report is a mathematical construc-

---

the analysis based on 45 and 46(c) interrogatory answers will be admissible unless the record is supplemented. The preclusivity of the FPS would not necessarily bar supplementation of the record on an evidentiary point. Such supplementation would depend upon whether or not the additional matter were fairly within the framework of what is required by PTO 154 to be set forth in the FPS or expert report and whether, if it should have been set forth, good cause has been shown for failure to do so. If DePodwin's testimony is in fact based on a comparison of prices at different levels of distribution, it is not admissible evidence. The comparison of retail prices with wholesale prices cannot be of any economic or legal significance in the circumstances of this case, and thus plaintiff's economic expert could not reasonably have relied upon such a comparison. Thus, Dr. DePodwin's analysis of price differentials based upon the 45 and 46(c) interrogatory answers may well be inadmissible under Rule 703.

**56.** The most thorough coverages of this objection are found in Melco's September 22, 1980 response brief at 114–17 and certain defendants' October 24, 1980 response brief at 30–32.

**57.** The fact that the Treasury Department at one time utilized this formula in calculating 1921 Act antidumping duties does not help plaintiffs, for as we have already noted, the formula has been effectively repudiated by responsible officials. See Public Records Opinion, 505 F.Supp. 1125, at 1157–1158. We explained at that time that Commerce Department General Counsel Homer E. Moyer, Jr. had stated that the formula had been adopted because it was "quick and simple," but "less accurate than original data that document actual foreign market prices." Moyer additionally pointed out that it would be unlikely that a showing could be made that the prices derived from the formula are identical to actual prices in Japan.

tion which is offered to show that between 1967 and 1970 four companies—MEI, Melco, Hitachi, and Sanyo—sold television receivers in the United States at prices below their costs, while earning substantial profits on their sales in Japan. The construction is explicitly based on three assumptions which are contradicted by the sworn affidavit of Kenji Yamagishi, an MEI executive, and which are also inherently implausible. A fourth assumption implicit in the analysis is also contradicted by Yamagishi's affidavit. The analysis uses average prices by screen size categories which, as we have already

**58.** The Matsushita defendants also note, supported by Yamagishi's averment, that two of the five Matsushita factories discussed by De-Podwin—Moriguchi and Utsunomiya—did not produce television receivers for export to the United States during the relevant period. In his August 1980 affidavit, Dr. DePodwin conceded that his inclusion of the Utsunomiya plant was based on an apparent misreading of MEI's interrogatory answers. In his post-argument affidavit, DePodwin conceded that the Moriguchi production records show that it produced television receivers only for the domestic market. MEI's counsel points out that DePodwin's Appendix B construction found that the Moriguchi and Utsunomiya plant incurred massive losses on exports to the U.S., while in fact the plants produced no exports at all, and characterizes the construction as a "fantasy." Dr. DePodwin's concessions vitiate his analysis as respects the Moriguchi and Utsunomiya plants, but do not in themselves undermine his analysis as respects other Matsushita plants and the plants of other defendants. The concessions are relevant, however, to DePodwin's attack on Yamagishi's credibility. *See* n. 62, *infra*.

**59.** DePodwin explains his methodology as follows:

Based on the above assumptions, the methodology for deriving the operating profits on United States exports and domestic sales is illustrated through an example for 12 inch black & white television sold in 1969 by Matsushita's Moriguchi TV Business Division.[6]

[6] The unit values shown are for total company sales of 12 inch black & white television receivers. However, based on assumption (1), these unit values are applicable to the 12 inch black & white television receivers of the Moriguchi TV Business Division.

The following items of data are necessary for the computation:

ruled, could not reasonably be relied upon by an economics expert. For these reasons, discussed in detail below, the cost construction is inadmissible under Rule 703.[58]

The Appendix B analysis is not based on direct evidence of the defendants' costs. Rather, it is a mathematical construction based only on the internal profit and loss statements of the defendants' factories and on company-wide average prices, or "unit values," of television receivers by screen size, calculated separately for monochrome and color sets, again by Morris J. Cohen & Co.[59] Plaintiffs have submitted this con-

| | | |
|---|---|---|
| a. | Operating unit profit on sales: | 8.8% |
| b. | Unit value, domestic sales: | $76.78 |
| c. | Unit value, exports to the United States: | 43.65 |
| d. | Unit value, exports to the United States and domestic sales: | 59.95 |

*Computational Steps:*

1. Based on assumption 2(a), the operating profit on exports to the United States plus domestic sales for 12 inch black & white television receivers is 8.8%, i. e., the return on sales of the entire operating unit. Since the unit value (average sales per unit) of these television receivers is $59.95, their average operating profit per unit is:

$8.8\%$ of $59.95 = $5.28

2. Their average operating cost per unit is average sales per unit less average operating profit per unit, or

$59.95 - $5.28 = $54.67

3. Based on the assumption 2(b), the average operating cost per unit is the same for exports to the United States as for domestic sales. Thus,

Average operating cost per unit of exports to the United States = $54.67

Average operating cost per unit of domestic sales = $54.67

4. The average operating profit per unit of domestic sales is the average sales per unit (unit value) of domestic sales less the average operating cost per unit of domestic sales, or

$76.78 - $54.67 = $22.11

Similarly, the average operating profit per unit of exports to the United States is the average sales per unit (unit value) of exports to the United States less the average operating cost per unit of exports to the United States, or

$43.65 - $54.67 = -$11.02, or a loss

5. The operating profit on domestic sales is the average operating profit per unit of domestic sales expressed as a percent of average sales per unit (unit value) of domestic sales, or

$22.11 as a percent of $76.78 = 28.8%

struction in lieu of an analysis of the actual cost data of defendants, much of which was tendered to them during discovery, and even more of which plainly would have been discoverable under the Federal Rules of Civil Procedure had they sought it. The extent of the cost data which was actually tendered to plaintiffs' counsel was summarized by Matsushita's counsel during argument:

MR. MILLSTEIN: [I]n May and June and October of 1976 apparently I'm told that the plaintiff's representatives went to Japan and MEI representatives tendered to the plaintiff for inspection a host of cost-related documents. Just prior to this argument I asked my colleagues to attempt to ascertain what was tendered to the plaintiffs, what did MEI offer to the plaintiffs to look at and what did they look at? And here is the list with which I have been provided.

THE COURT: Are you reading a list of what was tendered or what they looked at?

MR. MILLSTEIN: Tendered and looked at. That's what my colleagues tell me happened in 1976. Expense ledgers, production records, tooling charge calculation sheets, cash journals, accrued expense ledgers, annual financial statements, asset and liability ledgers, sales slips, financial statements for the export color TV department, head office accounts books, accounts payable notes, deposit account books, balance sheets, profit and loss statements, sales and general administrative expense sheets, general allocation and direct sales expense sheets, journal books, specifications of tooling charge calculations, work time and estimated cost calculations for models TR–901BR, TR143AK, TR622UK, TR929UW, general vouchers, materials purchase slips and four more pages which I will not read into the record of those types of papers turned over for the plaintiffs to look at.

Now, I am told that the plaintiffs took about 25 percent of what they looked at and never touched the balance of 75 percent.

PTO 167 at 633–34 (April 25, 1979). Plaintiffs did not counter Mr. Millstein's representations, sub silentio conceding them.

Although the principal basis for our exclusion of the Appendix B cost construction is its reliance on average prices and erroneous assumptions, it is also significant that the plaintiffs and their expert eschewed the particularized, actual cost data which was available to them, in favor of a mathematical construction in gross terms of what is obviously at best a rough estimate of defendants' costs. The availability of actual cost data is pertinent to our analysis, for we do not think that Dr. DePodwin acted reasonably under Rule 703, in relying on the data and the methodology of Appendix B, when actual cost data was available. As we have stated, however, the principal reasons for the exclusion of Appendix B is its use of average prices by screen-size categories and its reliance on assumptions which, according to the uncontroverted affidavit of a person with knowledge, are simply wrong.[60] We have discussed the infirmity of DePodwin's use of average prices calcu-

---

Similarly, the operating loss on exports to the United States is the average operating loss per unit of export to the United States expressed as a percent of average sales per unit (unit value) of exports to the United States, or

$-\$11.02$ as a percent of $\$43.73 = -25.3\%$ Owing to the low unit values for exports to the United States *vis a vis* domestic unit values, the overall operating profit on sales of 8.8 percent for 12 inch black and white television receivers translates to a loss of 25.3 percent on exports to the United States, and a profit of 28.8 percent on domestic sales.

DePodwin Report at VI–72 and 73.

**60.** The Matsushita defendants also contend that the DePodwin cost construction is inadmissible or irrelevant because it relies on intra-corporate transfer prices between two Matsushita subsidiaries, which in their contention are of no legal or economic significance. *See* n. 53, *supra.* They further contend that the only costs which are relevant to a claim of predatory pricing are marginal or average variable costs, which DePodwin does not even purport to consider. We do not reach these objections.

lated by gross screen size categories *supra* and need not add to that discussion here, incorporating it instead by reference. We turn instead to an analysis of DePodwin's assumptions.

Dr. DePodwin identifies three assumptions upon which the construction is based:

The operating profits on exports to the United States and domestic sales are derived for television receivers of several screen sizes, both color as well as black and white, for each company, by operating unit. The derivation is based on the following assumptions:

1. For each company, the unit values (by screen size, monochrome, and color) of exports to the United States, domestic sales, and exports to the United States plus domestic sales were the same for all television manufacturing plants of the same company.

2. For each operating unit:

a) The operating profits/losses on all major products covered by the profits/losses reported were in close correspondence.

b) The average (operating) cost of exports to the United States of each screen size, monochrome, and color was the same as the average (operating) cost of domestic sales of the same screen size, monochrome, and color.

DePodwin Report at VI–70 & 71 (footnote omitted). In addition to these explicit assumptions, the defendants have correctly identified a fourth assumption which is made implicitly in the course of the analysis: that the factories considered in the analysis did not produce significant numbers of television receivers destined for sale in countries other than the United States and Japan. We discuss the most egregious of these assumptions first.

a. *The Cost Equivalency Assumption*

The most extravagant assumption in Dr. DePodwin's construction is the one which he identifies in the portion of his report which we have just quoted as 2(b): that within each operating unit, for each monochrome and color screen size, the average operating cost of exports to the United States was the same as the average operating cost of products sold in Japan. We agree with the Matsushita defendants that:

This "cost equivalency" assumption is the very linchpin of the analysis, since it is used by DePodwin as a surrogate for actually measuring defendants' operating costs for television exports to the United States. Moreover, since the Cohen Report calculates lower unit values (average selling prices) for defendants' U.S. exports vis-a-vis domestic sales, DePodwin's "cost equivalency" assumption essentially preordains the conclusion that defendants' exports will be found to generate lower profits (or, more likely, losses).

In other words, assumption 2(b) is where Dr. DePodwin puts the rabbit into the hat.

According to the affidavit of Kenji Yamagishi, an MEI executive, this assumption is "completely inaccurate." Yamagishi avers:

During the 1967–70 period, MEI's average operating costs were never the same for sales of television models in domestic and export markets. Rather, in each year discussed by DePodwin, there were substantially different cost factors associated with MEI's production and sale of television sets for these markets which render DePodwin's assumption of a domestic-export "cost equivalency" totally invalid.

Moreover, the mix of television sets sold by MEI in the United States during the 1967–70 period consisted primarily of lower cost economy models, while the mix of television models sold by MEI in Japan during this period was more heavily weighted towards higher cost models. Consequently, average operating costs were consistently lower for exports to the United States than they were for domestic sales.

Thus Yamagishi's affidavit squarely contradicts Dr. DePodwin's cost equivalency assumption.

Dr. DePodwin attempts to support his cost equivalency assumption by an analysis of MEI's production costs, as reported to the United States Treasury Department in

connection with the proceeding under the Antidumping Act of 1921. *See generally* Public Records Opinion, 505 F.Supp. 1125, at 1151–1155 (description of antidumping proceedings). According to Dr. DePodwin "the production costs of almost two-thirds of the export models are within 15 percent of the production costs of their equivalent domestic models." DePodwin Report at VI–71. His own figures show, however, that the difference between domestic and export production costs exceeds 10% for 56.7% of the models considered, exceeds 15% for 36.7% of the models considered, and exceeds 20% for 25.0% of the models considered. It is plain that in some cases the domestic production costs are greater than export production costs, while in many other cases the opposite relationship exists. These results hardly support his thesis that export and domestic production costs are identical.[61]

DePodwin also announces that the *average* production cost difference was only 0.02%. We find this figure unpersuasive. First, it is obviously the result of averaging a large number of comparisons in which the domestic costs exceeded the export costs with a similarly large number of comparisons in which the export costs exceeded the domestic costs. It therefore does little to establish that the production costs were nearly identical; the result of averaging a large positive figure with an equal negative figure is always zero. Second, DePodwin does not explain how he calculated this "average"—e. g., whether he gave each comparison equal weight, whether he gave each comparison weight according to the number of units produced of each model, whether he gave each comparison weight according to the monetary value of sales of each model, or whether he gave the comparisons varying weights according to some other system.

In any event, even if the data supported Dr. DePodwin's claims about *production*

costs, the equivalency of domestic and export production costs would not support his assumption about the equivalency of average *operating* costs. Production costs represent only part of overall operating costs. In his affidavit, Yamagishi avers:

> The "production costs" reported by MEI in the Treasury Department submissions cited by DePodwin [citations omitted] only include manufacturing costs, such as direct material costs, direct labor costs and manufacturing overhead. By contrast, the factory profit and loss statements used by DePodwin to calculate MEI's operating costs included *both* production costs and other operating costs, such as direct selling expenses in Japan, allocation expenses and the Japanese Commodity Tax.

This averment is entirely consistent with the contention of the defendants throughout this litigation, and throughout the 1921 Act antidumping proceeding, that the manufacturing defendants bear substantial expenses for selling, distribution, advertising, promotion, and warranty costs of their products in the domestic Japanese market, as well as the Japanese commodity tax, which they do not bear with respect to models manufactured for export. Because of the difference between operating and production costs, DePodwin's figures for production cost will not support his assumption of the equivalency of average operating costs for domestic and export products.

The failure of the cost equivalency assumption is itself sufficient to vitiate the entire cost construction and render it inadmissible under Rule 703. Since DePodwin also makes three other assumptions which are contradicted by the record, however, we turn to a brief discussion of these.

b. *The Unit Value Equivalency Assumption*

The assumption which Dr. DePodwin identifies as number 1, quoted at 104, *supra*,

---

**61.** In his August 1980 reply affidavit, DePodwin undertook another, somewhat more extensive analysis of production cost data submitted by MEI to the U.S. Treasury Department. In that analysis, he found that the difference between domestic and export production costs

exceeded 10% in only 38.5% of the comparisons considered. We do not find the difference between this analysis of production costs and the one in his original report to be significant in any way.

is that within each screen size, and monochrome or color category, the unit values or average prices of the television receivers made by a particular company were the same in each factory operated by that company. This assumption is made with respect to the average prices of receivers manufactured for export, of those manufactured for domestic sales, and to the combined average of export and domestic sales. Yamagishi's affidavit flatly contradicts this assumption, averring:

> This is completely inaccurate. In 1972, MEI produced to plaintiff National Union Electric Corporation the production records (MJ4645–4725) for each of the factories studied by the DePodwin Report for the 1967–70 period. These records clearly show that during this period, MEI's factories devoted a different proportion of their production to different priced products in the same screen size and color categories. As a result, the average selling prices (or what DePodwin terms "unit values") were not the same for each of the relevant factories during the 1967–70 period.

In his August 1980 reply affidavit, DePodwin defends this assumption in three ways. First, he asserts that his assumption was not actually that the unit values are *identical*, but only that the unit values are "sufficiently similar" that it is "not unreasonable" to use them in the computation. Of course, DePodwin's own statement of his assumption, quoted *supra* at 1359, belies this assertion. Furthermore, his methodology makes it clear that his assumption is in fact one of identity. *See* n. 59, *supra* (DePodwin's footnote 6). If DePodwin had made a showing that the differences among unit values were so insignificant that they could reasonably be disregarded, that might suffice to justify his assumption of their iden-

tity. However, he has made no such showing; nor do the conclusory statements in his report even suffice to put the point in issue.

Second, DePodwin attacks Yamagishi's credibility and claims that there is no evidence to support Yamagishi's averments. His attack on Yamagishi's credibility is based primarily on a factual claim which DePodwin has since withdrawn. It is obvious that Yamagishi's affidavit is itself evidence, and need not be supported by other evidence. Moreover, we find Yamagishi's affidavit highly credible, both because of his high position in MEI, which supports his claim of personal knowledge of the matters covered in his affidavit, and because of the obvious inherent implausibility of DePodwin's assumptions.[62] It is DePodwin's assumption, and not Yamagishi's averment, that fails for total lack of support in the record.

Finally, DePodwin notes that if he had not made the unit value equivalency assumption, he would have been unable to conduct his analysis on a factory-by-factory basis, but would have been reduced to treating each company as a whole. This contention fails for two reasons. First, the analysis might have been made on the basis of adequate cost data had such been inspected or sought. Second, the fact that his assumption number 1 enabled DePodwin to present his construction with a veneer of precision has no bearing on whether or not the assumption is defensible.

#### c. *The Operating Profit Equivalency Assumption*

The assumption which Dr. DePodwin identifies as 2(a) (p. 1359, *supra*) is that within each operating unit, the operating profits or losses on all major products were "in close correspondence." Although he

---

**62.** DePodwin's attack on Yamagishi's credibility in his August 1980 affidavit is based primarily on DePodwin's claim that the Moriguchi plant produced television receivers for export to the United States. As we have mentioned, Yamagishi averred that the Moriguchi plant manufactured only domestic products. Since DePodwin conceded in his September 22, 1980, affidavit that according to production data

Moriguchi produced only for domestic consumption, he has in effect withdrawn the basis for his attack on Yamagishi's credibility. *See* n. 58, *supra*. While it is of course true that matters of credibility must at the summary judgment stage be resolved in favor of plaintiffs, that is not the case when the court is assessing admissibility pursuant to F.R.E. 104(a).

does not state the assumption as one of identity among the profits or losses for the various products, using the phrase "in close correspondence," it is clear from his explanation of his methodology that his actual assumption is that the profits or losses for the various products were identical. *See* n. 59, *supra* (Computational Step 1). Thus Dr. DePodwin assumes that if a particular factory reports an overall profit rate of 8.8%, it is earning an 8.8% profit on each of the products which it manufactures. Again, this assumption is flatly contradicted by Yamagishi:

> During the 1967–70 period, MEI's factories realized different rates of profitability on each of their different television models. There was thus a wide variation between the overall rates of profitability reported for the TV Departments discussed by DePodwin and the individual profitability rates realized for the various television models produced by those factories during the 1967–70 period.

In his August 1980 reply affidavit, DePodwin attempts to justify this assumption by examining the ratio of price to production cost for 89 MEI television models exported to the U.S. and 18 domestic models. His calculations show that the ratio for export models ranges from some unspecified figure below 1.25 to a maximum of 1.54. His calculations for domestic models show a variation from 1.80 to 2.50. Although DePodwin presents only a summary of the distribution of these figures, it appears that with respect to both domestic and export models, the ratios are distributed quite evenly between the extremes we have mentioned. DePodwin claims that these figures demonstrate that the profit or loss rates on various products were "in close correspondence," but this is plainly not so. Apart from the wide variation in DePod-

win's ratios themselves, the distinction between production and operating cost vitiates this analysis as well. If, for example, overhead and other non-production costs for export models amount to 25% of production costs, DePodwin's ratios would correspond to a rate of profit which would vary from a loss, in an amount which cannot be discerned from his figures, to a profit of 23%.[63] Thus the analysis in DePodwin's reply affidavit is insufficient to support his profit/loss equivalency assumption.

#### d. *The Assumption That No Products were Manufactured for Export to Third Countries*

An assumption which is implicit in Dr. DePodwin's methodology is that all the television receivers manufactured in the factories which he considers were either sold in Japan or exported to the United States. Yamagishi avers that MEI factories "produced significant numbers of television sets for sale to export markets other than the United States."

According to Dr. DePodwin's August 1980 reply affidavit, Matsushita's sales to third countries amounted to 3.8 percent of its television sales in 1968, 4.2 percent in 1969, and 9.9 percent in 1970. In that affidavit, he recalculates the cost construction to take those third-country sales into account, and avers that the new calculations do not alter his ultimate conclusion that the defendants sold their products at a loss in the United States. However, his own comparison in that affidavit of the two sets of calculations shows that the exclusion of third-country sales resulted in an overstatement of the alleged constructed loss on exports to the U.S. by amounts of up to 10%. Accordingly, it is plain that the exclusion of third-country sales distorted his

---

**63.** According to DePodwin's figures, the ratio of price to production costs for export models varies from less than 1.25 to a maximum of 1.54. If we assume that non-production costs amount to 25% of production costs, any price below 125% of production costs would represent a loss. The maximum ratio reported by DePodwin, 1.54, would represent a profit of 29% of production costs (154% minus 125%), which is equivalent to 23% of overall costs (29% as a percentage of 125%). While there is no support in the record for our assumption that non-production costs are 25% of production costs, or for any other specific figure, we make the assumption here only for purposes of illustration, *i. e.* to show how DePodwin's analysis is vitiated by his failure to take non-production costs into account.

original calculations to an appreciable extent.

### e. *Admissibility With Respect to MEI, Sanyo, Hitachi, and Melco*

We conclude that the Appendix B cost construction is inadmissible under F.R.E. 703 because of the use of average prices by screen size, because of the erroneous assumptions upon which Dr. DePodwin relied, primarily the assumption of cost equivalency, and because of the availability of more reliable data. The discussion above has focused on MEI because the issues were briefed and argued by MEI's counsel, because only MEI has represented that it actually tendered voluminous cost data to the plaintiffs, because the Yamagishi affidavit refers only to MEI, and, balancing out these matters, because DePodwin made no effort whatever to support any of his assumptions except with respect to MEI.

We think, however, that the Appendix B cost construction is inadmissible with respect to Sanyo, Hitachi, and Melco as well. Although we do not know whether these companies tendered cost data to the plaintiffs, it is plain that such data would have been discoverable under the federal discovery rules. The construction relies on average prices by screen size in regard to these companies as well as MEI. Furthermore, we have characterized Dr. DePodwin's assumptions as inherently implausible, and all of the defendants have represented that their costs for television receivers manufactured for the domestic market include substantial non-production costs which they do not bear with respect to the television receivers manufactured for export to the United States. In the absence of any support for DePodwin's crucial assumption of cost equivalency, we find that it was unreasonable for him to rely on that assumption in his analysis of any of the four companies which he considered. Nor have DePodwin or the plaintiffs provided adequate support for the other assumptions made with respect to Sanyo, Hitachi, and Melco.[64]

Thus, with respect to all four of the defendants whom DePodwin considers in Appendix B, we find that the cost construction is pervaded by reliance on untrustworthy sources of information: false or unsupported assumptions, and average prices calculated in gross terms. This pervasive reliance on suspect sources renders the Appendix B cost construction inadmissible in its entirety under Rule 703.

### F. *The Japanese Market Background*

Chapter VII of the DePodwin report describes the Japanese domestic market, reaching the conclusion expressed in the chapter's title: "The Nature of the Market for Television Receivers in Japan Has Been Conducive to Cartel Agreements." DePodwin discusses the high degree of concentration in the Japanese consumer electronics market, informing us that a high degree of concentration "is conducive to collusion." He goes on to state that "[c]ollusion among domestic manufacturers was aided by barriers to competition from imports." DePodwin Report at VII–1.

After discussing concentration of the market, DePodwin describes other barriers to imports into the Japanese market, concentrating on tariff rates, import quotas, and other governmentally imposed restrictions, such as import deposits, labeling laws, and safety standards. He closes with a short section describing barriers to direct foreign investment in Japan.

▬ We held *supra* that narrative information in the nature of industry background is helpful and admissible under Article VII. Market background is of a similar nature, and is admissible for the same reasons.[65]

---

**64.** According to DePodwin's figures, Hitachi and Melco did not manufacture television receivers of the same screen size at different plants. Thus DePodwin's assumption number 1—that average prices by screen size were the same at each plant of the same company—is unobjectionable with respect to those two companies.

**65.** Defendants object to this background as irrelevant, contending that trade barriers in Japan have nothing whatever to do with an ex-

■ One section, however, from pp. VII–7 to VII–12, cannot truly be called background material. That section, which deals specifically with the home electric appliance industry, and which refers specifically to certain of the defendants in this litigation, is based solely on a publication by Komiya et al., which DePodwin quotes verbatim and which he plainly adopts unquestioningly. We discuss a similar section of the Yamamura report based on the same publication *infra* at p. 1368, concluding it is inadmissible. The same result follows here for the same reason, and we incorporate that discussion here by reference.

### G. Summary of Conclusions

We have not addressed those portions of DePodwin's report which go to the issues of damage and injury, for they are not germane to our decision on the summary judgment motions. Of the remainder of the report, we have found that, with certain exceptions, those matters which are primarily background, *i. e.*, methodology and economic principles in Part I, industry background in Parts II and III, and market structure background in Part VII, are admissible under Article VII. Those portions of the report that discuss the "cartel" alleged to exist in this litigation, primarily Parts IV, V, and VI, are not admissible.[66]

### IV. The Yamamura Report

### A. Introduction

If the DePodwin report is the most professionally disinterested of plaintiffs' expert reports, Professor Kozo Yamamura's report, "The Pervasive Use of Collusive and Company Group (*Keiretsu*) Activities in Achieving the Rapid Increase in Japanese Exports of Television Receivers to the Unit-

ed States," is the most partisan.[67] Professor Yamamura, an economist specializing in the Japanese economy, described his task as follows:

The central purpose of this Report is to demonstrate that the rapid increase in exports of Japanese electronic products for home entertainment (especially television sets and radios) to the United States from the mid-1950s to the early 1970s was achieved with the substantive and crucial aid of effective collusive activities in which the major Japanese producers of television sets and other electronic products engaged in both domestic and American markets.

Yamamura Report at 1. In contrast to Dr. DePodwin, who sought to examine "whether" collusive behavior among the Japanese was responsible for their success in the United States market, Prof. Yamamura set out to prove "that" collusion was prevalent. We do not say that this is necessarily an impermissible objective, but it does cause us to carefully consider defendants' contention that an expert who begins with the assumption that something is the case is likely to be able to "prove" that the assumption is indeed true.[68]

### B. The Japanese Market Background

After a brief introduction, the Yamamura report begins with a discussion of the Japanese post-war economy, with emphasis on the importance attached to rapid growth. Part I of the report, entitled "Environment for Rapid Growth of the Economy and Exports," describes two aspects of what Prof. Yamamura describes as close cooperation between industry and government: monetary policy and relaxation and weak enforcement of Japanese antitrust policy. As

port conspiracy. That issue will be addressed in our forthcoming opinion on the conspiracy questions.

**66.** Certain calculations of price differentials in Part V were reserved. *See* p. 1348, *supra.*

**67.** Professor Yamamura holds a Ph.D. in economics from Northwestern University. He is a Professor of Economics and Asian Studies at the University of Washington, as well as Ad-

junct Professor of International Business in the School of Business Administration and Chairman of the Japanese Studies Program in the School of International Studies, both at the University of Washington. His publication list is extensive, covering virtually all aspects of Japanese economic history and development.

**68.** Prof. Yamamura notes that he has long held the views expressed in his report.

described by Prof. Yamamura in his summary submitted at the court's request, *see* note 2, *supra*:

> The five critical ingredients of the monetary policy are outlined (on pp. 7–9) and the report states that "the eagerness of the officials of the Ministry of Finance and the Bank of Japan to use their legal and extra-legal powers of persuasion, backed by their power to allocate loans, the money market was effectively "administered" for the purpose of achieving rapid economic growth" (p. 9). The policy consistently and strongly favored the largest banks and the largest firms, and, in particular, made it difficult for small- and medium-sized firms to obtain loans.
>
> The relaxation and weak enforcement of the domestic antitrust policy also created an environment in which large firms could flourish and cooperate in cartels. Antimonopoly legislation was viewed by industry leaders and pro-growth policy-makers as inhibiting economic growth and an increase in exports and a number of important changes were instituted in the 1950s. . . . Not only did the number of exempted cartels increase, but "unauthorized illegal cartels also proliferated, the costs of which included restricted competition at home and the imposition of severe injury to foreign firms in markets abroad." (p. 15). . . . In the words of the report, "Prevailing MITI attitudes and ineffective FTC enforcement have combined to permit widespread violation of Japanese antitrust law." (p. 21). . . . "Cartel capitalism" has had numerous deleterious effects on the Japanese population, including maintaining artificially high domestic prices. Pages 25–32 of the report decument [sic] the increased public criticism and consumer reaction to cartels.

Professor Yamamura follows his general discussion of the Japanese economic environment with a detailed section describing company or industry groups called *keiretsu*, a significant characteristic of Japanese economic life.[69] According to the report, *keiretsu* "collectively dominate the industrial, financial and marketing activities of the [postwar Japanese] economy." As explained by Professor Yamamura at p. 33,

> The central purposes of this section are to: (1) identify the *keiretsu*; (2) present observations and evidence concerning their presidents' clubs, mutual shareholdings, and several other crucial factors which establish their existence and indicate the degrees of their "group solidarity"; (3) discuss the roles of the trading companies as members of company groups; (4) ask why such *keiretsu* exist in Japan; and (5) examine the roles of the *keiretsu* in the effectiveness of domestic cartels and their effect on the conduct of member firms in international markets.

Professor Yamamura explained in his summary that there are two principal international consequences of *keiretsu*: "(1) they facilitate predatory behavior of firms, and (2) they prevent foreign entry into Japanese markets."

Having described *keiretsu* and their economic effects in detail, Professor Yamamura was able, by way of summary, to conclude the section with a definition:

> A *keiretsu* is a group of companies in various industries which is formed to gain and increase the member companies' collective market power in both domestic and international markets. A *keiretsu* increases the market power of its members because the member companies, as a group, can create a dominant inner circle of the largest companies which effectively limit or minimize the rigor of domestic and international market forces. This inner circle is created because the member companies enjoy a more ready and reliable access to capital, market information, privileged and often exclusive trading relationships, and other advantages than do non-members. To realize these gains, the cohesiveness of the groups is essential and it is solidified by means of the presi-

---

**69.** Professor Yamamura concentrates in this section upon company group, or horizontal, *keiretsu.* He touches briefly in a subsequent section upon vertical, or distribution, *keiretsus*; these vertical arrangements are the subject of Professor Haley's report, addressed *infra*.

dent's clubs, interlocking directorships, cross-shareholdings, and other means.

To the extent that such groups constitute a large segment of the Japanese economy as a whole, and to the extent that the group activities are conducive to increasing the efficiency of the economy by means of shared information, technological expertise and the joint financing of large and riskier ventures, the growth of the Japanese economies are aided by these inner circles—albeit at the cost of having anti-competitive inner circles of large enterprises. For foreign enterprises, however, the *keiretsu* constitute a substantive barrier to trade and an effective source of market power in the Japanese market which increases the efficacy of domestic cartels organized to maximize domestic profits which can be and are used to subsidize the efforts of Japanese cartel members to increase market shares in foreign nations by means of dumping and price fixing.

Yamamura Report at 71–72.

▌ Defendants contest the relevancy of the information provided in these two sections on several grounds,[70] but we do not reach those objections in this opinion. Their Article VII objections are considerably less strenuously pressed. Their 702 argument essentially attacks the relevancy of this discussion: defendants seem to be saying that testimony which is irrelevant is not helpful to the jury. While that may be true, it is more appropriately considered in the relevancy context. We shall restrict our inquiry of helpfulness under F.R.E. 702 to the question whether the expert's specialized knowledge is of assistance to the jury *if* relevant. We hold that these sec-

tions of Professor Yamamura's report, which constitute the kind of helpful background we have referred to *supra*, do present significant matters within the purview of an economist otherwise beyond the ken of the jury and pass muster under the "or otherwise" clause of F.R.E. 702.

▌ With respect to F.R.E. 703, defendants challenge occasional individual sentences as being conclusory, without underlying basis. This argument is not vigorously pressed, however, and the contentions have not been explicitly outlined. Nor have the sources upon which Yamamura relies been attacked. We think it is clear from a reading of these sections that the information presented is sufficiently based upon reliable economic sources. We see no problem under F.R.E. 703.[71] Accordingly, Professor Yamamura's "Japanese Market Background" segment will be considered on the summary judgment motion and in connection with the F.R.E. 104(a) conspiracy determination and, subject to an appropriate limiting instruction, may be submitted to the trier of fact at trial.

### C. Collusive Activities

▌ The remainder of the Yamamura report, beginning at page 73, is totally inadmissible for the same reasons discussed with respect to Dr. DePodwin's report. Professor Yamamura, like Dr. DePodwin, read the documents that have been offered in this case and undertook to weave a story from them, narrating their contents and offering his interpretation. He thus runs afoul of both Rules 703 and 702 by relying on the same untrustworthy documents as did Dr. DePodwin, and by providing no "economic

---

70. They argue, *inter alia*, that a climate or environment conducive to concerted action is in no way probative of actual concerted action among these defendants. They argue further that an opinion that the Japanese have a "propensity to conspire" is inadmissible character evidence under 404(a), in that it can only logically be offered to suggest that these defendants acted in conformity with that trait. Finally, they argue that, even if some minimal probative value were to be discovered, it is vastly overshadowed by the unfair prejudice such tes-

timony could engender, and hence is inadmissible under F.R.E. 403 as well.

71. We should point out that Professor Yamamura's report is fraught with conclusory and inflammatory rhetoric. As we discussed *supra*, we shall have no difficulty ignoring such rhetoric in our consideration of the summary judgment motions. Nor do we foresee any danger at trial, for the requisite form of questioning and availability of the motion to strike will preclude any expert witness from testifying in an inappropriate manner.

value added" which would assist the trier of fact in understanding the evidence.

Professor Yamamura signals in the introduction to Part III that these problems will undoubtedly arise:

The central aim of this section is to provide, against the background already presented, the abundant and compelling evidence demonstrating the effectiveness of the collusive activities (vertical and horizontal price fixing, predatory dumping, and other illegal conduct) in which the defendant television producers engaged for over two decades, beginning in the mid–1950s, in both the Japanese domestic market and the United States market.

More specifically, the evidence to be presented below will show: (1) that the collusive activities in which the defendant television producers engaged in the domestic Japanese market were elaborately and closely coordinated and monitored by numerous consultative bodies which met regularly, and by various sub-groups and committees organized within the trade association of the industry for the purpose of fixing prices, profits and rebate rates, market shares, joint output, etc.; and (2) that the collusive activities in which the defendant television producers engaged in the United States market were also elaborately and effectively coordinated, monitored, and implemented—including predatory price fixing and other anti-competitive means intended to increase the Japanese producers' market share in the United States—at the cost of grave and permanent injury to the United States producers of television sets.

Yamamura Report at 73.

Directing his attention first to the domestic market, Professor Yamamura begins with a description of the "collusive activities" of the familiar domestic "conspiratorial groups"—the EIAJ, the Market Stabilization Council, and the various sub rosa groups—followed by page after page (approximately forty of them) of what Yamamura terms "supporting evidence." This "supporting evidence" is nothing but direct quotations from documents submitted in conjunction with this litigation.[72] All of the documents quoted by Professor Yamamura were part of the record in the Six Company Case before the JFTC, and all were considered by us in the pretrial evidentiary hearings. Specifically, he quotes protocols, or statements, by various employees of the six companies,[73] testimony by two of those same employees, and the diaries of Yajima, Yamamoto, and Tokizane. The diaries were excluded from evidence in our Japanese Materials Evidentiary Opinion. The testimony, however, we ruled to be admissible, with the exception of certain export references not at issue here, against the six companies involved; the protocols, with the exception of that of Mr. Koishi of Fuji, a non-party, we found also to be admissible as admissions against the individual employer.

We need not determine whether Professor Yamamura's use of the admissible protocols and testimony is so tainted by his equal reliance upon the unreliable diaries as to amount to a lack of reasonable reliance under F.R.E. 703, however, for Professor Yamamura has run afoul of F.R.E. 702 by engaging in the same oath-helping conspiracyologist exercise as did Dr. DePodwin. In fact, Yamamura's presentation is even less helpful than DePodwin's, for he has done nothing but quote the documents directly,

---

**72.** Professor Yamamura's format is somewhat curious. He begins with a four-page conclusory section about collusive meetings, which he follows with a "summary of selected evidence." This "summary" merely lists the paragraph numbers of the "evidence" which follows which supports the statements in the brief narrative. He follows this summary with his "evidence" in a section which merely quotes directly from documents. There is no narrative interspersed, and no attempt at explanation of the documents. The quotations are merely strung one after the other in no immediately apparent order.

**73.** Protocols included are those of Adachi (Hitachi), Yamamoto (Hitachi), Kawahara (Toshiba), Kamuro (Toshiba), Kamakura (Toshiba), Saeki (Hayakawa, now Sharp), Narita (Toshiba), Okuma (Melco), Ito (Melco), Koishi (Fuji), and Yajima (Toshiba).

after prefacing those quotations with a summary of their contents. But under our system of jurisprudence, we leave to lay jurors the task of sifting through the evidence presented, assessing its probative worth, and, aided by the arguments of counsel, the instructions provided by the court, and their own common sense, deciding for themselves the inferences and conclusions to be drawn. We do not delegate that task to expert witnesses. This is fact-finding, not the application of expertise, and is totally inappropriate expert testimony.

Concluding his discussion of the Japanese domestic market, Professor Yamamura notes, as described in his summary:

> Of special importance in terms of the collusive activities of the defendant television producers in their domestic markets is the control they exercised over distribution, through employing collusive vertical restraints (Section A–3, pp. 118–125). Instrumental in this respect was the (1) "tight grip which each major Japanese manufacturer had on their respective distribution outlets" (the details of which are explained on pp. 118–124), which "constituted a very effective barrier to the entry of foreign sellers, Japanese discount stores, and Japanese as well as foreign producers into the Japanese market for television sets and other electric home entertainment products" (p. 124), (2) weak domestic antitrust enforcement (p. 125), and (3) cooperation between MITI and industry (pp. 125–126).

With regard to the first of these points, manufacturers' control over the distribution channels, Professor Yamamura rather astonishingly quotes verbatim for five and one-half single spaced pages from a publication which he neglects to identify, except by noting that it was written by "Komiya et al." We assume this is the same publication as that cited in a subsequent section at p. 126 and listed in the bibliography for the report. If so, it is a Japanese language article in a Japanese journal, apparently about the electric home appliance industry, with an unknown translator. The quotation discusses the vertical, or distribution, *keiretsu* in the home electric appliance industry, with specific factual reference to some of the defendants in this litigation.

This segment presents an admissibility problem different from the others we have addressed in this opinion. We can assume, although we may be incorrect, that the journal in question is an economics journal, and that Komiya et al. are economists. We can even assume that the article is of the highest scholarly caliber, and that it would be unquestionably reasonable for an expert witness to rely upon it in forming an opinion. But Professor Yamamura has not merely relied upon it in forming an opinion: he has imported it wholesale, incorporating it into his "dissertation" on the Japanese market structure. He has, in actuality, switched expert witnesses. Instead of Professor Yamamura expounding under the "or otherwise" clause of F.R.E. 702, we now have Komiya et al. providing their views. But those persons have not been qualified as expert witnesses in this proceeding. Nor has there been any attempt to qualify the Komiya publication under Rule 803(18), which permits materials "established as . . . reliable authority" and relied upon by an expert witness to be read into evidence as an exception to the hearsay rule. Indeed it would be extremely difficult to so qualify this article, for it presents such detail with respect to individual defendants as to demand a particularly firm foundation. Moreover, the publication is intrinsically tentative on factual matters and does not appear to espouse an opinion. It is replete with phrases such as "it is said that," "there are some manufacturers who," "it is estimated that," and "from a clue provided . . . ." For these reasons, the quoted section is inadmissible.[74]

The other points referred to above—barriers to foreign sellers, weak domestic anti-

---

74. As noted *supra*, the same reasoning excludes a corresponding section of the DePodwin report.

trust enforcement, and cooperation between MITI and industry—are passed over briefly by Professor Yamamura in a page and a half. Essentially, what he has done is to recall earlier sections of the report dealing with market structure, relating them to the television industry. We discussed this technique with reference to the DePodwin report, ruling that such testimony could be admissible only if the underlying factual basis were present in the record. *See* pp. 1346–1347, *supra.* As with the DePodwin report, because we have ruled Prof. Yamamura's discussion of conspiratorial activities inadmissible, there is nothing to inform his application of background materials to his analysis of collusive activities, hence this segment is inadmissible to support Yamamura's conclusions with respect thereto.

Turning from the domestic market to the export market, the report, again as described in the summary,

> explains the collusive activities engaged in by the defendant companies to increase exports of television receivers to the United States market. As is stated in the report, "The elaborate, effective, and nearly two-decade long collusive activities of the defendants in the Japanese domestic market provided them with (1) large profits ... which were used to finance the expansion of their productive capacities and to absorb the cost of dumping their products in the U. S. market; and (2) an established, on-going, and effective collusive apparatus which was well-tested in the dumping of radios in the United States and was also readily used in the dumping of television receivers in the U. S. market." (p. 126)

Once again the Yamamura report echoes the DePodwin report as it sifts through familiar documents, drawing therefrom conclusions regarding the JMEA rules and manufacturers' agreements, customer registration, the Five-Company Rule, reference prices, kickbacks, and rebates. Yamamura relies for his information primarily upon the Manufacturers' Agreements and JMEA rules, which we have assumed *supra* to be

reliable bases for expert testimony in terms of F.R.E. 703. He also, however, quotes heavily from such dubious documents as: the Komiya publication discussed above; a publication cited as Kazuki Daimon, *Kuroi Bukka* (Black Prices), a translation of which, titled "The Fangs of Monopoly," he has attached as Appendix B; *Yomiuri Shimbun,* Japan's major daily newspaper; the Initial Decision in the Six Company Case; and the Yajima diaries.

We need not balance Professor Yamamura's reliance on materials of questionable reliability against his use of materials assumed to be reliable, however, for we can easily dispose of this section of the Yamamura Report on F.R.E. 702 grounds. Yamamura has done nothing more than what Dr. DePodwin did. He has provided factual conclusions of conspiratorial activities based upon narration taken directly from documents proffered in this litigation. He has not performed any economic analysis; instead he has engaged in the practice of "conspiracyology." This section of his report is accordingly inadmissible.

Part IV of Prof. Yamamura's report is a brief conclusion which highlights the principal findings. To the extent that the section summarizes materials, such as those dealing with the structure of the market, which we have found admissible under Article VII, the summary is of course admissible as well. To the extent, however, that conclusions are repeated from those portions of the report which we have deemed inadmissible—*i. e.,* the findings of conspiratorial behavior among these defendants—the summary is likewise plainly inadmissible.

To summarize, we have found pages six through seventy-two of Professor Yamamura's report, purged of its conclusory and inflammatory rhetoric, to be admissible, but the balance must be excluded from evidence for the reasons stated.

## V. *The Nehmer Report*

The Nehmer Report,[75] "Economic Analysis of Evidence Relating to Japanese Elec-

---

**75.** Stanley Nehmer holds an M.A. from Columbia University. He is president of Economic Consulting Services, Inc. and Director of Economic Consulting Services, Wolf & Company.

tronic Products Antitrust Litigation," submitted by Economic Consulting Services, Inc., shares the problems of the DePodwin and Yamamura reports. As will be seen, the opinions it expresses are inadmissible essentially to the same extent as those reports.

The report proclaims itself an economic analysis, but it is much more akin to a highly-skilled research report prepared for some policy-making body, such as an executive branch agency or congressional committee. As such, it is essentially a collation of the factual materials we have discussed before, with a smattering of economic jargon sprinkled on top, but without the specialized knowledge of the Japanese economy and history provided by Professor Yamamura or the thoroughness of Dr. DePodwin. The report is noteworthy for the paucity of its citations. Nehmer has appended a lengthy bibliography, which includes vast numbers of documents we have held to be inadmissible in our previous evidentiary opinions, but he only occasionally informs the reader which of those many sources he is relying upon for particular information. In actuality Nehmer is plaintiffs' counsel's theoretician. He has supplied the jargon and the theory which has informed plaintiffs' case. As such he has served his purpose, but his opinions do not pass Article VII muster.

As with the other reports discussed, we are reminded from the outset that Mr. Nehmer began with a particular goal in mind:

The basic purpose of the report is to present an economic analysis demonstrat-

ing that the Defendants in said litigation ("Defendants") conspired and otherwise engaged in anti-competitive activities contrary to U.S. law in restraint of U.S. trade. The report also addresses the calculation of damages sustained by Zenith as a result of these unlawful acts.

. . . . .

The body of this report is organized in furtherance of four, principal objectives. These objectives can be briefly described, as follows:

(1) demonstrate that the Defendants have conspired to restrain U.S. trade in consumer electronic products and reduce competition in the U.S. market;

(2) demonstrate that the strategy pursued by the Defendants toward this end was anti-competitive in its intent and effects;

(3) demonstrate that the result of Defendants' strategy was the elimination of most U.S. manufacturing of consumer electronic products, and the consequent loss of thousands of U.S. employment opportunities; and

(4) calculate damages sustained by Zenith.

Nehmer Report at I–1 to 2.

■ Following a brief introduction, the report begins with a chapter entitled "Key Elements of Defendants' Anti-Competitive Strategy: Basic Theoretical Concepts." This chapter is somewhat analogous to DePodwin's "Outline of Economic Analysis," *see* pp. 1336–1337 *supra*, in that it describes a number of basic economic concepts

He has held a variety of economics-related positions, primarily in government, including Deputy Assistant Secretary for Resources and Trade Assistance, U. S. Department of Commerce, 1965–1973; Deputy Director and then Director, Office of International Resources, U.S. Department of State, 1961–1965; Senior Economist, International Bank for Reconstruction and Development (World Bank), 1957–1961; Economist, Department of State, 1945–1957; Office of Strategic Services (assigned by U.S. Army), 1942–1945; Fellow, City College of New York, 1941–1942; U.S. Representative, Commodities Committee, United Nations Conference on Trade and Development, Geneva

(1965); Adjunct Professor, American Business History, American University (1948–1963); Chairman and U.S. Representative, OECD Textiles Committee (1971–1973); Member, Oil Import Appeals Board (1965-1973); Chairman, Committee for the Implementation of Textile Agreements (1972–1973); Alternative Member, Oil Policy Committee (1970-1973); Director, Export Trade Mission to Japan and Hong Kong (1971); and, Director, Export Trade Mission to Eastern Europe (1973).

Mr. Nehmer's publications are primarily historical. In addition, he has frequently testified before the International Trade Commission with regard to various industries.

which it then relates in summary fashion to the "evidence" in this case as it is subsequently developed in the report. This chapter is accordingly admissible to the same degree as the correlative DePodwin chapter—that is, to the extent that it explains methodology, economic principles, or analytical framework, it is admissible; to the extent, however, that it applies such principles to the case at bar in conclusory fashion, it is not. Rather, the opinions expressed must be considered in their subsequent factual context.

Chapter III, "Structure of the Japanese Consumer Electronics Industry: A System of Total Control" is analogous in part to sections of the DePodwin and Yamamura reports which we found to be admissible. Nehmer's version, however, we must exclude.

The chapter describes the consumer electronic products industry in Japan "as a system subject to virtually total control by the major manufacturers acting in concert with respect to production, distribution, exports and pricing." Nehmer Report at III-1. The chapter begins with a brief description of the Japanese distribution system of affiliated dealers, and moves quickly into a lengthy discussion of the activities of the Market Stabilization Council. Nehmer briefly describes various of the other industry groups, returns to discourse again on the distribution system, mentions trade barriers,[76] and ends with descriptions of each of the Japanese defendants in this litigation.

Nehmer relies for his description of the industry upon three primary sources: the consent agreement in the Market Stabilization Council case before the JFTC, discussed *supra* at 1340; the Komiya publication discussed *supra* at 1368–1369, and a report by Techno International Inc. Nehmer not only relies on the Market Stabilization Council document, he quotes it verbatim for 5½ pages. But as we have discussed, both *supra* and in our Public Records Opinion, that document is not admissible because it is not reliable as proof of the matters set out therein. The Komiya article we discussed extensively in our consideration of the Yamamura report. Although Nehmer does not quote Komiya verbatim, as did Professor Yamamura and Dr. DePodwin, it is plain from his citation style, *see* pp. II–1 to 2; III–17 to 20, that he has merely narrated for a new audience the essence of the Komiya article. Thus the situation is the same as in the Yamamura report: Nehmer has not based an opinion upon a number of sources, but has merely adopted wholesale what someone else has said about the activities of these defendants. The Techno International article is used in precisely the same manner. The only other documents cited in the course of Nehmer's description of the market are: (1) defendants' answers to plaintiffs' interrogatories relating to group membership, which is undisputed; (2) the draft decision in the Six Company Case, cited to support a single paragraph describing the six companies' price agreements but which, as we have already explained, is inadmissible; and (3) a statement by Konosuke Matsushita, discussed *supra*. Reliance on these documents further undermines plaintiffs' position.

■ For reasons discussed with respect to the DePodwin and Yamamura reports, the opinions expressed in Chapter III of the Nehmer report must be excluded. Nehmer has adopted the sources discussed above, virtually all of which were either ruled inadmissible on trustworthiness grounds, or are otherwise untrustworthy (or not qualified under F.R.E. 803(18) as discussed at 129, *supra*). Opinions based thereupon are accordingly not reasonably based in terms of F.R.E. 703.[77] Moreover, Nehmer has

---

**76.** Thus those portions of the chapter addressing the market structure—the distribution system, trade barriers, etc.—are similar to DePodwin's Chapter VII and Yamamura's Chapters 1 and 2.

**77.** The closing section of Chapter III, which gives basic background about the individual defendants, is drawn entirely from two sources: *Fortune* magazine, and Judge Higginbotham's opinion on jurisdiction and venue, 402 F.Supp. 262 (E.D.Pa.1975). The *Fortune* article is plainly inadmissible hearsay. Judge Higginbotham's findings we ruled inadmissible in our

taken these documents and merely described them for his audience, often quoting at length. He has engaged in the same oath-helping factual analysis as have the other experts, hence his narration is inadmissible under F.R.E. 702.

■ Chapter IV of Nehmer's report, entitled "Japan as a Market 'Closed' to Foreign Competition in the Area of Consumer Electronics," describes the barriers which, in Nehmer's submission, effectively closed the Japanese market to imports. This chapter is similar to Chapter VII of the DePodwin report, discussed *supra* at 1363, and the major portion of it is admissible under Article VII for the same reasons.

The first fourteen pages of the chapter describe the financial and non-financial barriers which allegedly discourage the importation of foreign products into Japan, as well as barriers to direct foreign investment in Japan. While the section is for the most part citationless, we do not see that as a bar to its admissibility as expert testimony, for the bases of the testimony can plainly be elicited at trial under F.R.E. 705. This discussion appears to us to be the type of information which an economist could draw upon his own background and experience to provide, particularly one with as extensive experience in the U.S. Commerce Depart-

ment as Mr. Nehmer. We have no reason to suspect that Nehmer has primarily relied upon anything other than reliable sources. Moreover, the testimony is helpful in providing background for the trier of fact. Thus, purged of their occasional references to such things as "Defendants' scheme," the first fourteen pages of Chapter IV are appropriate expert testimony.[78]

■ Beginning on page IV-14, however, Mr. Nehmer takes a different tack, rendering the remainder of the Chapter inadmissible. The section describes unsuccessful efforts by individual U.S. manufacturers to enter the Japanese market, focusing on Zenith, Motorola, and Sears, all parties to this litigation. Nehmer relies solely on documents tendered in this case, primarily letters of various company executives.[79] We need not determine the independent admissibility of these documents, nor their reliability for purposes of F.R.E. 703, for the narrative is plainly inadmissible under F.R.E. 702. Nehmer has presented no economic analysis whatsoever, and this is not the type of economics-oriented background information which we found helpful with respect to trade barriers. Instead it is a factual narration with doses of pure speculation tossed in at random,[80] drawn from

Public Records opinion, however we do not reach the F.R.E. 703 issue with regard to reliance upon those findings.

**78.** We intimate no view here on the relevance of the matters contained in this section to the alleged export conspiracy.

**79.** *Inter alia*, Nehmer cites a letter from I. Kobayashi of C. Itoh & Co., Ltd. of Japan to Y. Tamiya of C. Itoh & Co. (America) Inc., a trading company through which Zenith attempted to sell its products in Japan, purportedly explaining why such marketing efforts must fail; a letter from D. Andre of Nichimen, Inc., another trading company, to J. Miguel, Zenith's Vice President for export, again explaining marketing difficulties; a letter from Charles A. Tausche, a Sears representative, to John Borst, Jr. of Zenith, explaining Sears' exclusion from the Japanese market; a letter from W. Frick of Zenith International to S. Inaba of C. Itoh & Co. (America) terminating Zenith's effort to enter the market; Japanese press reports of Motorola's proposed entry into

the market; and a market analysis prepared for Zenith by C. Itoh & Co.

**80.** An example of such speculation appears at p. IV-19. In the context of a discussion of Sears' exclusion from the Japanese consumer electronic products market, Nehmer quoted at length from a letter from a representative of the law department at Sears to house counsel for Zenith, written apparently to explain Sears' non-participation in the Japanese market, which included a comment to the effect that exporting such products to Japan was "rather like bringing coals to Newcastle." Nehmer continued:

The references to coals and Newcastle are hardly appropriate in this context, since if Sears were permitted to sell consumer electronic products in the Japanese market it would make little sense to import these from the United States, given the fact that Sears' principal suppliers were Japanese manufacturers located in Japan. Indeed, it would appear that the true reason for Sears' exclusion from the Japanese market is much more

and quoting liberally documents potentially before the court. Nehmer has merely strung together documents which the jury is perfectly capable of understanding, to describe attempts by American firms to enter the Japanese market. This is the same oath-helping we have held inadmissible before.

■ Nehmer turns in Chapter V to "Major Features of the Defendants' Anti-Competitive Export Strategy." That chapter outlines the economic structure of defendants' alleged successful penetration of the U.S. CEP market. It is followed by three chapters which detail plaintiffs' conception of the "cartel" with reference to specific product lines: Chapter VI addresses radio receivers; Chapter VII, television receivers, and Chapter VIII, tape recorders, phonographs, and other consumer electronic products. Because of its centrality to Nehmer's exposition, we describe the anatomy of Chapter V in detail before drawing our conclusions.

Chapter V is the most analytic of Nehmer's chapters, explaining in economic terms how and why particular corporate behavior patterns yield particular anti-competitive results. He begins by discussing the alleged system of discriminatory pricing:

> Japanese consumer electronics manufacturers could not export television sets to the United States at the same price at which they were sold in Japan because the cartel maintained artificially high prices in Japan. Japanese products would simply not be marketable in the United States at the high monopoly prices charged in Japan.
>
> But, given a willingness to violate U.S. law, there was no need to charge the same prices in the United States as in Japan. Japan and the United States represented two perfectly segmented markets as far as the Japanese cartel members were concerned: there was a possi-

bility that U.S. buyers could re-export products from the United States to Japan, competition in the Japanese market was restricted, and foreign competition simply was not permitted to exist in Japan.

> The ability to charge different prices in the cartelized Japanese market and in the competitive U.S. market also implied that the cartel members could charge a *lower* price in the United States market than would have been possible otherwise, with little consideration for aggregate supply and demand and for the disciplines of cost and capital formation which normally govern a competitive environment.

Nehmer Report at V–1. He then analyzes the effect on the vulnerable U.S. market of the low prices of the Japanese manufacturers, and ends the section with the following summary of his important points:

> 1. Due to the existence of the domestic cartel, cartel members have a capability for discriminatory pricing. This consists of charging artificially high, monopoly prices in Japan and exporting products to the United States at much lower prices.
>
> 2. The prices charged by cartel members in the U.S. market can be set at whatever level is needed to penetrate this market.
>
> 3. The ability to establish a discriminatory pricing scheme stems from the existence of the cartel operating within a Japanese market protected from foreign competition.

Nehmer Report at V–3 & 4.

Turning next to collusion in the export market, Nehmer merely reiterates that:

> [c]ollusion in the export market was an integral part of the operation of the cartel, and analytically it is impossible to divorce a discussion of the Defendants' anti-competitive activities in the U.S. market from their anti-competitive activities in the Japanese market. Such collu-

---

pointed. Sanyo and Toshiba simply would not want their low-priced television receivers produced for delivery to Sears in the U.S. to be sold in the higher-priced Japanese market

and thus destroy the price-fixing arrangements of the domestic cartel operating in Japan.

sion both allowed cartel members to target their sales efforts against U.S. firms rather than each other and provided them with a forum for agreeing upon ways to coordinate and conceal their activities. Nehmer Report at V–4. He then discusses the Manufacturers', or check-price, Agreements and JMEA rules which we have already described, including a description of the customer registration and allocation procedures, and analyzes their economic basis and effect. The core of plaintiffs' theory as to the check prices is explained thus:

First, "check" prices provided the cartel members with an essential defense against dumping charges. Such check prices could be, and were, presented as transaction prices even when large volumes of products in practice were continually sold at prices that were far below the established check price level, often surreptitiously through the vehicle of secret rebates.

Second, check prices of course served as common reference prices. Such reference prices both provided a convenient point of departure for cartel members in making their pricing decisions and established good lines of communication among the cartel members. Sales at prices above or below these reference prices were made, of course, whenever this was expedient.

Finally, it is important to note that to the extent that the check prices did indeed represent the lowest possible price that could be charged without disrupting the U.S. market and/or without dumping, the frequent and deliberate sales made by the Defendants at prices which were substantially below the established check prices provide clear evidence of anti-competitive intent, as well as a large volume of precise examples of illegally concealed dumping margins by individual cartel members.

Nehmer Report at V–6.

Nehmer next spends a few pages describing the Japanese manufacturers' phased entry into the U.S. market, by which they concentrated their sales in a given product category, beginning with those at the bottom end of the price spectrum. He explains that such a strategy increased the impact on the U.S. market by having a more pronounced impact in the targeted category than they would have had a similar sales volume been dispersed throughout the market.

Turning to alternatives to discriminatory pricing, Nehmer informs us that, although the "cartel members apparently preferred to use dumping to penetrate the U.S. market whenever this strategy was possible, . . . this preference did not prevent cartel members from using other methods either to maintain or to increase their share of the U.S. market." These other strategies included development of offshore facilities to take advantage of lower foreign labor costs and a program of anti-competitive acquisitions. The chapter closes with a brief description of the "Historical Evolution of the Japanese Consumer Electronics Cartel." Nehmer then summarizes the "evidence indicating that the Defendants both formed an effective cartel and used a systematic anticompetitive strategy to penetrate the U.S. market":

1. Clear indications of collusion in the Japanese domestic market including: price-fixing agreements, controls on production levels, refusal to allow imports from the U.S., and attempts to prevent entry of new firms into the market.

2. Price discrimination, or the charging of lower prices for exports to the United States than for shipments to the domestic Japanese market, for a *wide range of products over a large number of years*.

3. Massive over-investment, as the cartel members developed production capacity for most consumer electronic products far in excess of that needed to supply the domestic market alone.

4. The establishment of check prices that served both as reference prices and to conceal the dumping activities of the cartel members. These check prices were violated when this served the purposes of the cartel members, often by means of secret rebates paid to U.S. customers.

5. Written restrictions that limited the ability of cartel members to acquire or change customers without the approval of other cartel members, and which limited the ability of two or more cartel members to sell to the same U.S. customer.

6. The acquisition of U.S. firms by cartel members for the apparent purpose of (1) eliminating independent competitors and (2) increasing the market share and consequent market power of the cartel members.

Nehmer Report at V–13.

We have quoted at some length from the Nehmer report in part to illustrate his methodology and style. The entire chapter is without citation,[81] and it is therefore unclear precisely what information Nehmer is using. At best, he is in essence doing what Dr. DePodwin did in his Outline of Economic Analysis, *supra, i. e.,* summarizing the "evidence" discovered in his review of the case (presented in Chapters VI–VIII) and using that information as a basis for analysis. At all events, what Mr. Nehmer has done in Chapter V is to act as plaintiffs' theoretician—or summation orator—drawing conclusions from all the evidence and wrapping it up in a neat package. There is no economist's "value added" and the wrap-up does not bespeak the "ways" of Mr. Nehmer's work. This is the work of a conspiracyologist, not helpful to the trier of fact and inadmissible under Rule 702.

We make a number of additional observations germane to Rule 703 analysis. Nehmer has explained many facets of market pricing behavior that could appropriately be the subject of expert testimony. Unfortunately, however, the assumptions from which he extrapolates—that is, the alleged behavior patterns of the defendants which he analyzes—are not supported by the record. We would be inclined to rule that such testimony would be permissible, as an analogy to the hypothetical question, if it were plain there was sufficient evidence in the record to support the assumptions upon which the analysis proceeds.[81a] Indeed, at trial, Mr. Nehmer could join Dr. DePodwin and Professor Yamamura in analyzing economically the evidence presented. However, as the report is presented, the permissible analytical material is so embedded in a context replete with such startling assumptions as defendants' "willingness to violate U.S. law" that it is inseparable from the impermissible conclusions. Moreover, the conclusions that flow from the analysis are so thoroughly intertwined with the conclusory assumptions about defendants' activities that we are totally unable to separate them. The best that can be said for the segment of the report is that it is difficult to discern the basis for Nehmer's opinion in order to determine the reasonableness of his reliance thereupon.

In sum, we find that Chapter V of the Nehmer Report does not comport with the standards outlined under F.R.E. 703 as well as 702. The opinions expressed in Chapter V are therefore inadmissible.

Chapters VI, VII, and VIII describe in detail plaintiffs' (or Nehmer's) conception of the Japanese electronic products cartel. Chapter VI "traces in detail the course of the penetration of the U.S. market for radios by the Japanese consumer electronics industry." Chapter VII does the same for television receivers, and Chapter VIII for tape recorders, phonographs, and other consumer electronic products.

In the radio chapter Nehmer places heavy reliance upon the 1957 consent agreement

---

**81.** It could possibly be argued that an expert's naked, unsupported opinion defeats a summary judgment motion, and that the basis for that opinion need not be revealed until trial under F.R.E. 705, which states:

> The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be re-

quired to disclose the underlying facts or data on cross-examination.

In this case, however, the court has "require[d] otherwise," for Pretrial Order 154 requires that the bases for expert opinions be included in the parties' preclusive FPS's.

**81a.** We note again that plaintiffs were duty bound to have placed it in the record by this time, given the precepts of F.R.Civ.P. 56 and PTO 154.

in the Market Stabilization Council case before the JFTC, the rationales supporting the JMEA rules, the JMEA rules themselves, *Japan Economic Year Book*, JMEA and EIAJ newsletters, *Television Digest*, and the transcript of the record of a case before the Customs Court, *U. S. v. Continental Forwarding Co.*, Customs Appeal 5415 (1970). The television chapter relies upon the same 1957 Market Stabilization Council documents, the 1966 Six-Company Case draft decision, the previously-discussed Komiya article, the Manufacturers' Agreements and JMEA rules, various answers to interrogatories, the U.S. Tariff Commission injury determination in the 1921 Act antidumping proceeding, and a number of miscellaneous internal memoranda. The tape recorder, phonograph, and other products chapter relies almost exclusively upon the JMEA rules and their rationales.

Despite the fact that Chapters VI and VIII present virtually plaintiffs' entire case with respect to non-television products, we content ourselves with this outline, rather than discussing these chapters in any depth, for they are in essential part and flavor indistinguishable from the DePodwin and Yamamura reports. We would prolong this already lengthy opinion unduly if we were to repeat the analysis employed in connection with these reports even though it is equally applicable here. Even positing that some of these materials (*e. g.*, interrogatory answers, the Manufacturers' Agreements and the JMEA Rules) are trustworthy and admissible, the balance of materials on which Nehmer relies tip heavily to the side of untrustworthiness. Many, if not most, of the materials were excluded or are excludable; others are inadmissible or of no significance for reasons discussed from time to time herein. We incorporate by reference what we have said above in connection with the DePodwin and Yamamura reports.

However, even were we to wave a magic wand, declare all of these sources trustworthy, and rule that expert testimony based thereupon meets the requirements of F.R.E. 703, we would still be met by the insur-

mountable barrier of F.R.E. 702. Nehmer has done in these three chapters exactly what DePodwin and Yamamura did in their reports. He has taken documents otherwise potentially before the court and has analyzed them factually, building the edifice upon which the economic analysis of Chapter V, discussed *supra*, could proceed. He has not in these chapters aided the trier of fact in understanding anything other than factual matters already within its province. He has engaged in precisely the oath-helping that defendants' condemn, telling the trier of fact what defendants have done. His factual analysis is inadmissible under F.R.E. 702.

The balance of the Nehmer Report—Chapters IX and X—addresses injury and damage issues, which we need not reach at this summary judgment stage.

Accordingly, we find the opinions described above expressed in the Nehmer Report inadmissible, with the exception of the portions of Chapter II which deal with methodology and the first fourteen pages of Chapter IV.

## VI. *The Saxonhouse Report*

"The Impact of Japanese Financial and Employment Practices on Japanese Production, Marketing and Price Behavior," by Gary R. Saxonhouse,[82] is best summarized by Professor Saxonhouse himself:

This paper shows that Japanese firms, in general, and Japanese electrical equipment manufacturing including radio and television manufacturers, in particular, had higher fixed costs than did their American counterparts. These exceptionally high fixed costs were the result of the special labor market and financing practices common to Japanese firms. These high Japanese fixed costs had three consequences which are pertinent to the present litigation.

First, given their high fixed costs, Japanese radio and television manufacturers had a strong desire to avoid the risks of financially injurious, vigorous price com-

---

**82.** Dr. Saxonhouse is a Professor of Economics at the University of Michigan.

petition. This, in turn created a very strong desire to collude among Japanese manufacturers.

Second, the very high fixed costs meant, in a Japanese institutional context, that Japanese radio and television manufacturers would dump more output abroad with larger differences between home market price and domestic price than would otherwise be the case.

Third, it is shown that collusive price increasing behavior by Japanese manufacturers in their home market enabled and sustained lower prices in Japan's export markets. There is an intimate connection between pricing behavior in Japan's home market and pricing behavior overseas. Higher prices at home subsidized lower prices overseas.

Saxonhouse Report at 1–2.

 Defendants' primary objections to the Saxonhouse report are relevancy-based. They argue, first, that it is simply not a permissible inference to say that high fixed costs imply a wish to avoid risk, which in turn implies a motivation to collude. Second, they argue that, even if the assumptions about Japanese corporations in general were warranted, there is no basis for an inference that these particular defendants had any motivation to collude. And finally, they argue that propensity to collude is impermissible character evidence under F.R.E. 404(a). These are all potentially valid objections which we shall consider in conjunction with the conspiracy opinion. But the report is fundamentally flawed under Article VII as well.

The first portion of Professor Saxonhouse's report reviews statistics comparing (1) the debt-equity ratios of Japanese and American companies, as well as those of Zenith, NUE and various defendants; (2) the rates of corporate bankruptcy in Japan and the United States; (3) the rates of worker separation in the Japanese and American electrical equipment industries; and (4) expenditures for research and devel-opment by Japanese and American companies. Based upon these comparisons, he concludes that Japanese companies have higher fixed costs than American companies.

The figures which Saxonhouse uses are not seriously challenged as unreliable. However, we note that they do represent unweighted arithmetic averages, rather than providing information about individual companies. The single table, Appendix Table 4, that does break down the debt equity ratio averages on a company-by-company basis shows that, while for most years the Japanese manufacturing companies had higher debt-equity ratios than the plaintiff companies, that was not consistently the case.[83]

Having concluded that Japanese companies have higher fixed costs than do American companies, Saxonhouse states that "[t]his, in itself, makes predictable the necessity for collusive activity to minimize the risks entailed as a result of high fixed obligations." Saxonhouse Report at 5. This highly dubious inference is followed by the breathtaking statement that "[t]he following analysis will proceed *on the premise documented elsewhere that a calculated collusive decision had been made by Japanese radio and television manufacturers to take a continually increasing share of the American market*," citing the DePodwin and Yamamura reports. Saxonhouse Report at 5–6 (emphasis added). What Saxonhouse has done is to assume the very proposition which he then proceeds to "prove," and to base that assumption upon opinions which we have since found to be inadmissible, based in part upon their reliance upon untrustworthy information.

The ensuing pages of this brief report (14 pages of text, plus additional tables) are highly speculative, despite being adorned by impressive-appearing graphs charting the relationship between total costs and output and profit-loss curves. The following statement is illustrative:

---

**83.** Analyzed in the table are MEI, Sanyo, Sharp, Sony, Hitachi, Toshiba, Melco, Zenith, and NUE.

Studies of industries in the United States suggest that heavy fixed charges increase the desire and motivation of firms to collude. With fixed charges almost universally higher in Japan, the desire and motivation to collude in the home market and to carry that collusion to export markets must also have been stronger.

Saxonhouse report at 7–8 (footnote omitted).[84]

Not only is the report speculative, but it repeatedly restates the fact that a collusive decision by the defendants has been explicitly assumed. Neither Rule 703, which excludes opinions based upon unreliable assumptions, nor Rule 702, which excludes opinion testimony not helpful to the trier of fact, condones the admission of such circular expert testimony. The opinions expressed in the Saxonhouse report are inadmissible.

## VII. *The Haley Report*

Defendants' primary objection to "Vertical Restraints by Japanese Television Manufacturers: Anticompetitive Effects" by John O. Haley[85] is that it is irrelevant or, if minimally probative, nonetheless excludable under F.R.E. 403. However, they also interpose objections based upon F.R.E. 702 and 703.

As defined in his recently submitted summary, the conclusions reached by Professor Haley are:

1. From 1966 through the mid 1970s the defendant Japanese television manufacturers had the capacity effectively to enforce a price-fixing agreement (or cartel) related to sale of television receivers in Japan as a result of the following factors:

(1) There were governmentally-imposed barriers to entry by foreign television manufacturers under the Foreign Investment Law and the Foreign Exchange and Foreign Trade Control Law.

(2) The Japanese television industry, and in particular such major firms as Matsushita Electric Industrial Co. Ltd., Hitachi Co. Ltd., Sony and Tokyo Shibaura Electric Co. Ltd., had established by 1966 a network of manufacturer-controlled wholesale and retail outlets that permitted manufacturer supervision and control over resale prices.

2. The defendant Japanese television manufacturers, particularly major manufacturers such as Sony and Matsushita Electric Industrial Co. Ltd., used their control over distribution to fix and maintain resale prices.

█ Defendants do not attack Professor Haley's discussion of Japanese barriers to foreign competition beyond arguing that it, like similar discussions in the other reports, is irrelevant. Thus, for Article VII purposes the discussion summarized by subparagraph (1) above, when stripped of its occasional resort to conclusory terminology, is admissible. Similarly, the Japanese defendants do not dispute that they had a large number of affiliated dealers. They argue, however, that the conclusion at the end of subparagraph (2), that the practice of using affiliated dealers "permitted manufacturer supervision and control over resale prices" and the related conclusion of paragraph 1 that this control amounted to a "capacity effectively to enforce a price-fixing agreement" are economic conclusions and hence beyond Haley's expertise as a law professor specializing in Japanese antitrust law.

---

84. Defendants attack the two U.S.-industry studies cited by Saxonhouse, suggesting that studies of U.S. industry imply nothing about Japanese industry, and pointing out that one of those studies is based upon a classroom game rather than actual corporate behavior. When an economist uses scholarly economic literature, however, rather than the types of materials found untrustworthy in this case, we are loath to unnecessarily impugn the bases for his opinion.

85. Professor Haley holds an LL.B. from Yale University and an LL.M. from the University of Washington. He is Associate Professor of Law at the University of Washington, Executive Secretary of the Japanese American Society for Legal Studies, and Managing Editor of *Law in Japan: An Annual*, the principal English-language periodical on Japanese law. He studied in Japan as a Fulbright-Hays Scholar and earlier as a Princeton-in-Asia Teaching Fellow, and held legal clerkships with Japanese law firms from 1971,–74. He has published extensively on various facets of Japanese law.

While that suggestion is superficially attractive, we decline to rule on that basis. The line between antitrust law and antitrust economics is of necessity indistinct, and it is not clear to us that these statements are beyond Haley's sphere of expertise, especially since he will be subject to cross-examination. Accordingly, those portions of Haley's report which express the opinion that because of their distribution systems defendants had the capacity to fix resale prices are not excludable under Article VII for the same reasons that Professor Yamamura's discussion regarding motivation to collude is unobjectionable.[86] As an expert on Japanese law, Professor Haley is also capable of explaining that these distribution networks have been subject to increasing concern by the Japanese Fair Trade Commission.

Notwithstanding the foregoing, Haley's leap to the conclusion that Japanese television manufacturers actually used the capacity which he has posited in support of an actual price-fixing conspiracy (paragraph 2 above) is not admissible.[87] Haley's support for this conclusion apparently stems entirely from JFTC documents in three cases. None of these documents pass trustworthiness muster. He refers to the Initial Decision in the Six-Company Case, discussed *supra*, as showing that a price-fixing agreement among the Japanese manufacturing defendants "required manufacturer-imposed resale price maintenance as a means of effecting the horizontal agreement." Haley Report at 7. As we have already noted, the document was withdrawn by plaintiffs and is in any event untrustworthy. To show resale price maintenance he refers to the Draft of Decision and Consent Decision in the resale price maintenance case against Matsushita, but both of these were excluded in the Public Records Opinion. Haley also cites a Recom-

mendation Decision in a similar case against Sony. While the Sony document was not deemed important enough by plaintiffs to be proffered at the pretrial evidentiary hearings, it would clearly be inadmissible for the same reasons as the Recommendation Decision in the Market Stabilization Council case—because it is a preliminary, advocatory document in the nature of a complaint, which is not probative of the matters asserted. *See* Public Records Opinion, 505 F.Supp. 1125, at 1176–1184. As we explained *supra,* an opinion based pervasively upon such materials cannot be admissible under F.R.E. 703.

Moreover, the conclusion does not follow from those documents. The Six Company Case, which was terminated by the Commission for lack of evidence, alleged a horizontal agreement to fix prices. The resale price maintenance case against Matsushita which ended in a consent agreement, while concededly addressing a vertical arrangement, implicates only Matsushita. We observed with respect to F.R.E. 702, at 1134, *supra,* that opinions including inferences which cannot logically be drawn are inadmissible because they are not helpful to the trier of fact. To suggest, as Haley does, that because (under his assumption) the six companies were all involved in a horizontal conspiracy; because Matsushita and Sony were involved in vertical arrangements; and because such vertical arrangements are necessary to effectuate the horizontal agreement (*see* note 87 *supra*) all six companies were therefore guilty of vertical price-fixing is not a drawable inference. We cannot permit such faulty inferences to be presented to the trier of fact, hence the opinion is inadmissible on this alternate ground.

VIII. *Conclusion*

We have found the major, critical opinions presented in plaintiffs' expert re-

---

86. We express no view at this time with regard to the relevance of such a conclusion.

87. One peculiarity of Haley's report deserves particular mention. In his summary of conclusions, quoted *supra*, he states that defendants "used their control over distribution to fix and maintain resale prices." In the actual report, Haley also suggested that distribution control

was a "necessary feature of the 1964 cartel since the horizontal and vertical price-fixing cover could not be effective without such control." Haley Report at 9. If by this he means to suggest that vertical control is a necessary predicate to horizontal price-fixing, he is contradicted by a vast body of antitrust law and practice over the past century.

ports—those dealing with defendants' alleged conspiratorial activities—to be inadmissible under Article VII of the Federal Rules of Evidence. When we address the issue of conspiracy in our forthcoming summary judgment opinion, we will be left primarily with those portions of the expert reports that can be fairly described as "background" materials. We have also reserved our ruling with respect to certain of the price comparisons presented in Part V of the DePodwin report. We emphasize that we have not said that an economist may never express an opinion on conspiratorial activities of a defendant based upon certain market behaviors. Rather, we have said that the experts in this case have created their assumptions—the market behavior in question—in ways that invade the province of the fact-finder and, moreover, that their assumptions are based almost exclusively upon faulty underlying data. Under those circumstances, the experts' opinions are inadmissible.[88]

Because our rulings are all subsumed within the foregoing opinion, a separate Pretrial Order is unnecessary.

---

88. Minutes before the intended filing of this opinion, we received a letter from plaintiffs' counsel, Edwin P. Rome, Esq., dated December 8, 1980, addressing issues related to the cost constructions presented in Appendix B to Part VI of the DePodwin Report, which we ruled upon at pp. 1356–1363, *supra*. We delayed filing our opinion for a day in order to consider this additional correspondence. Upon review, we find that the letter adds no new information which would affect the analysis presented *supra*.